## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

———————————————————————

Soren Stevenson,

Case No. _____

Plaintiff,

v.

**COMPLAINT**
**Jury Trial Demanded**
**Under FRCP 38(b)**

John Doe 1, acting in his individual
capacity as a Minneapolis Police Officer;
John Does 2-6, acting in their individual
capacities as Minneapolis Police Officers;
John Does 7 and 8, acting in their individual
and official capacities as supervisory Minneapolis
Police Officers; Medaria Arradondo, acting in his
individual and official capacities as the Minneapolis
Chief of Police; and the City of Minneapolis,

Defendants.

———————————————————————

For his Complaint, Soren Stevenson ("Soren"), states and alleges as follows:

1.      This is an action for money damages for injuries sustained by Soren as a result

of the unreasonable use of deadly force on May 31, 2020, in addition to other violations of

his constitutional rights, by Defendants John Does 1-6, Minneapolis Police Officers.  The

conduct of these Defendants violated Soren's clearly established federal civil rights, all while

acting under the color of state law.

2.      Soren also asserts claims against John Does 7-8 (the supervisory defendants)

and Medaria Arradondo (the Chief of the Minneapolis Police Department) with regard to

their roles as trainers, supervisors and policymakers.

3.      Soren further asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

4.      These causes of action arise purely out of 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments to the United States Constitution.  State-law claims and, by consequence, limitations and defenses under state law are not applicable to this civil-rights lawsuit.

5.      Soren is, and was at all times material herein, a citizen of the Unites States and a resident of the State of Minnesota.  He is a recent Master's graduate of the University of Minnesota's Humphrey School of Public Affairs.

6.      Defendants John Does 1-6, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as officers of the Minneapolis Police Department.  They are sued in their individual capacities.

7.      Defendants John Does 7 and 8, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as supervisory officers of the Minneapolis Police Department.  They are sued in their individual and official capacities.

8.      Defendant Medaria Arradondo ("Chief Arradondo") was at all times material herein the Chief of the Minneapolis Police Department and a policymaker for the MPD.  He is sued in his individual and official capacities.

9.      Defendant City of Minneapolis is a municipality duly incorporated under the laws of the State of Minnesota.

10.      Soren brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of the Court over this matter.

11.      The events giving rise to this action occurred in the City of Minneapolis.  Venue is thus proper under 28 U.S.C. § 1391(b)(2).

## THE BACKDROP – THE MURDER OF GEORGE FLOYD BY MINNEAPOLIS POLICE OFFICERS

12.      On May 25, 2020, George Floyd was killed by former Minneapolis Police Officer Derek Chauvin while three fellow officers stood by and refused to intervene.

13.      Video of the murder sparked worldwide outrage and many protests ensued as a call to finally change systemic racism in our nation's police departments.  Mr. Floyd was one of many tragic casualties of the Minneapolis Police Department's long history of racial bias and unchecked, unconstitutional use of force practices.

14.      Some of the protests nationwide, including in Minnesota and Minneapolis in particular, caused severe destruction.  But, most of this occurred during nighttime hours.

15.      During the daytime in Minneapolis, the vast majority of activity was peaceful and aimed at effecting change.

16.      But as was typical for the Minneapolis Police Department's heavy-handed tactics, the protests – peaceful or not – were met with force by the MPD, including the

improper use of tear gas, 40 millimeter blunt-impact projectiles, and other supposedly "less lethal" munitions.

17.     On May 26, 2020, Minneapolis Councilmember Andrew Johnson denounced the police use of chemicals and projectiles, stating:  "What I saw from some of the scenes last night looked to be disproportionate and escalating force…It's extremely concerning, and we need answers and accountability for that."

18.     Another Minneapolis Councilmember, Steve Fletcher, described on May 28, 2020, that the police had flipped the script on peaceful protesters:  "The community gathered Tuesday night to mourn and express their outrage, peacefully.  Tactical decisions by MPD shifted the dynamic of the crowd…to confrontation."

19.     Days prior to Soren's injury, Minneapolis Councilmember Jeremiah Ellison described the same phenomenon.  Councilmember Ellison said:  "The police always respond this way to crowds, and things get out of hand…And I don't know how the strategy doesn't change.  And I'll tell you right now I've made calls requesting that the strategy change and it still has not."

20.     On May 27, 2020, Minneapolis Mayor Jacob Frey told residents that he understood their anger and he encouraged peaceful protests:  "What we need now in terms of protesting is peaceful protesting. . . No one out there will fight harder for their right (to protest). . . But those rights stop at a line when public safety is at risk and we need to be making sure that we're looking out for the safety of our residents."

21.     On May 28, 2020, the City of Minneapolis held a press conference and issued this statement:  "The City encourages everyone to exercise caution and stay safe while

participating in demonstrations, including wearing masks and physical distancing as much as possible to prevent the spread of COVID-19. The City has made hundreds of masks available to protesters this week."

22.     Minnesota Governor Tim Walz, too, recognized the value of protesting. As part of his Emergency Executive Order 20-67 issued on May 30, 2020, Governor Walz stated: "Thousands of Minnesotans have expressed their frustration in a peaceful and constructive manner."

23.     On May 30, 2020, Chief Arradondo stated: "We want to make sure that people continue to protest and gather PEACEFULLY. We don't want them to be in harms way by others."

24.     Also on May 30, 2020, Minneapolis City Council President Lisa Bender called the right to protest "sacred."

25.     Following this advice and encouragement from the Governor, the Mayor, the Chief of Police, and City Councilmembers, Soren joined the chorus of those peacefully protesting, gathering on May 31, 2020, with a group of other protesters near Interstate 35W and University Avenue, well before the 8:00 p.m. curfew.

26.     The City responded by shooting Soren in the face and permanently injuring him.

27.     The City of Minneapolis's severe and pervasive history of police misconduct and unchecked excessive force prevailed again.

28.     The City of Minneapolis has long ignored the problem. So the outcome befalling Soren was predictable and not surprising as City leadership seemed to implicate.

29.     Soren took part in classic First Amendment-protected activity.  To paraphrase Councilperson Ellison, the MPD did what it always does.  Soren therefore became one of the many victims of the MPD's pattern and practice of excessive force without fear of repercussion.

30.     The events culminating in Soren's shooting were broadcast on live television as depicted in the photographs below.

31.     The entire group was peaceful and many had their hands up.  Soren (circled) was wearing a mask.



32.     No warnings were given before Defendant Doe 1 fired.





33.     Soren was struck in the left eye with a 40 millimeter blunt-impact projectile, ultimately resulting in the loss of that eye.

34.     Soren can be seen holding his face and attempting to move away in the immediate aftermath of being shot.



35.     Soren was shot before the 8:00 p.m. curfew.

36.     Soren had not committed any crime and was never charged with any crime.

37.     Soren had not displayed any aggression.

38.     Soren was unarmed.

39.     Soren posed no threat to the officers or others.

40.     The scene was not chaotic.

41.     The scene did not contain rioters or looters.

42.     No warnings were given to Soren regarding a potential use of force.

43.     No directions were given to Soren.

44.     No commands were given to Soren.

45.     In order to shoot Soren with a blunt-impact projectile from a 40-millimeter launcher, Defendant Doe 1 had to execute a series of volitional acts.

46.     Defendant Doe 1 volitionally held the launcher in firing position, requiring his non-firing hand to hold the foregrip of the launcher and placing his firing hand on the pistol grip of the launcher.

47.     Defendant Doe 1 volitionally moved the safety lever on the launcher from the "safe" position to the "fire" position.

48.     When the safety lever of the launcher is in the "safe" position, a finger cannot be placed on the trigger.

49.     When the safety lever of the launcher is in the "safe" position, the trigger is unable to be moved rearward.

50.     It is only when the safety lever is in the "fire" position that a finger can be placed on the trigger, making the launcher ready to fire.

51.     Defendant Doe 1 volitionally inserted his finger inside the trigger guard.

52.     Defendant Doe 1 volitionally aimed the weapon at his intended target – Soren.

53.     Defendant Doe 1 volitionally placed his finger on the trigger.

54.     Defendant Doe 1 volitionally exerted sufficient trigger-pull pressure to fire the launcher loaded with 40 millimeter "less lethal" rounds at Soren.

55.     Defendant Doe 1 volitionally fired at Soren.

56.     The impact caused devastating injuries resulting in the loss of Soren's left eye, multiple facial fractures, a severe concussion, and other significant physical and mental injuries.

57.     Making matters worse, no MPD officer, sworn to "protect and serve," rendered aid to Soren after he was shot.

58.     Instead, several bystanders (who happened to be nursing students) provided immediate first aid before rushing Soren to M Health Fairview by vehicle.

## THE UNAUTHORIZED USE OF DEADLY FORCE

59.     MPD Policy 5-317 addresses the 40mm launcher that Defendant Doe 1 used to shoot the projectile into Soren's eye.

60.     Under Policy 5-317(I), the "MPD recognizes that combative, non-compliant, armed and or otherwise violent subjects cause handling and control problems that requires special training and equipment.  The MPD has adopted the less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations."  *See also,* Policy 5-317(V)(C), noting the launcher "can be used when the incapacitation of a violent or potentially violent subject is desired."

61.     Policy 5-317(II) defines a 40mm less-lethal round as a "[d]irect fire round used in situations where maximum deliverable energy is desired for the incapacitation of an aggressive, non-complaint subject."

62.     Under Policy 5-317(III)(D), MPD officers are forbidden from deploying the 40mm launchers for crowd-management purposes.

63.     Policy 5-317(III)(B)(1) notes that "[t]he use of the 40mm less-lethal round should be considered a level slightly higher than the use of an impact weapon and less than deadly force when deployed to areas of the subject's body that are considered unlikely to cause death or serious physical injury."

64.     Policy 5-317(IV)(B)(1) outlines the acceptable "target areas" as follows:

- Large muscle groups in the lower extremities (buttocks, thigh, knees);

- Alternative target areas (ribcage area to waist and larger muscle areas of shoulder).

65.     Policy 5-317(IV)(B)(1) notes the following **as areas to avoid**:

- Head;

- Neck;

- Spinal cord;

- Groin; and

- Kidneys.

66.     Policy 5-317(IV)(B)(2) states that "[o]fficers shall be aware that delivery of the 40mm impact projectiles to certain parts of the human body can cause **grievous injury** that can lead to **permanent physical or mental incapacity or possible death**" (emphasis added).

67.     Policy 5-317(IV)(B)(2) states that the "[a]reas susceptible to death or possible severe injury are the **head, neck, throat, and chest**" and that these areas should be avoided **"[u]nless deadly force is justified**" (emphasis added).

68.     Policy 5-317(V) requires medical assistance to be rendered in accordance with Policy 5-306.  Further, if possible, officers are to take photographs of any injuries to the subject.

69.     Policy 3-517(V)(G)(1)-(2) requires officers who deploy 40mm rounds to report the force in accordance with Policy 5-306, which mandates that they complete a report entitled "FORCE" and immediately notify dispatch, which in turn notifies a supervisor.

70.     Supervisors are notified because they are required to respond to the scene **any time** a 40mm round is used.  A supervisor must review the incident and complete a use-of-force review.  Further, the responding supervisor(s) are to ensure that the spent rounds are collected and property inventoried, if possible. *See* Policy 5-317(V)(G)(3)-(4).

71.     Defendant Doe 1's actions in shooting Soren contravened MPD training regarding the use of the 40mm launcher.

72.     Defendant Doe 1's actions in shooting Soren contravened MPD policies regarding the use of the 40mm launcher.

73.     None of the permissible uses of the 40mm launcher in Policy 5-317 applied to Soren.

74.     Defendant Doe 1 utilized deadly force when no force was authorized, and this was clearly established law as of May 31, 2020 in the United States America.

### CRAVEN COWARDS: THE POST-INCIDENT CONDUCT OF DEFENDANTS DOES 1-6

75.      The events surrounding the shooting of Soren became particularly suspicious when all of the MPD officers at the scene, including Defendants Does 1-6, failed to render aid to a seriously injured person.

76.     These actions and inactions were more than immoral; they were inhuman.

77.     The involved officers, who did not care about Soren's constitutional rights, showed they had no concern about him as a human being who was acutely injured – a person they had sworn "to protect with courage and serve with compassion." While they abandoned their duty to the Constitution, they also abandoned their humanity in order to shield their identities and avoid the consequences of even providing aid for what could have been a fatal wound.

78.     Similarly, and not surprisingly, none of MPD's policies were followed by Defendants Does 1-6 in the moments *after* the shooting of Soren.

79.     This was no isolated occurrence.  MPD has allowed its officers to get away with policy and constitutional violations without fear of repercussion for decades (at least).

80.     The failure to report, or to accurately report, the use of deadly force by MPD officers occurred repeatedly in the days following George Floyd's death by the Minneapolis Police Department.

81.     Indeed, the same pattern occurred with regard to the blinding of Ethan Marks, a peaceful, law-abiding citizen exercising his First Amendment rights during daytime hours on May 28, 2020, a mere three days before Soren was blinded, when an unknown MPD officer fired without warning a "less lethal" tear-gas canister directly into Marks's eye, destroying it, and then failed to render him any aid or properly document the incident.

82.     This was completely antithetical not only to the stated goals of transparency and accountability embodied in the MPD Policy and Procedure Manual, but also to Chief Arradondo's public pronouncements in the wake of George Floyd's murder.  Those pronouncements were mere lip service given MPD's long and unremedied history of flouting

the Constitution.

83.     The central tenet of MPD's Policies and Procedures is to enable the MPD, the involved citizens, and the public to learn:

- What acts each MPD officer took
- What use of force was employed
- What weaponry was used and in what fashion
- If any MPD officer injured any individuals
- If and what aid was rendered by any MPD officer

84.     Yet, there has been *no* such transparency with regard to Soren's incident, in an effort to *prevent* accountability.

85.     Additionally, upon information and belief, Defendants Does 1-6 either failed to follow MPD policies with regard to report writing and supervisor notification *or* falsified reports, utilizing systematic buzz words and phrases in an attempt to conceal the unauthorized use of deadly force on Soren.

86.     For example, Defendant Doe 1's unauthorized use of deadly force caused injury to Soren and therefore, under Policy 5-306, Defendant Doe 1 was **required** to document the use of force in a CAPRS Report entitled "FORCE" *and* notify a supervisor.

87.     Additionally, Defendant Doe 1 was to remain on the scene during said required notification of the supervisor.

88.     The "FORCE" CAPRS report was to be "completed as soon as practical, **but no later than the end of that shift."**

89.     Further, Policy 5-306 required supplements describing the use-of-force incident, in detail, to be completed.

90.     Similarly, Policy 4-602(A) mandated that "[a] short public narrative statement describing the offense or incident" shall be prepared.  Yet even this simple synopsis of events was not completed with regard to the shooting of either Soren or Ethan Marks.

91.     If the applicable MPD policies outlined above had been followed, the following information would be readily available:

- A description of the scene and events leading up Defendant Doe 1 pulling the trigger
- The identity of shooter
- The identities of witness officers
- The identities of lay witnesses at the scene
- The treatment and aid rendered by MPD officers (if any)
- A description of the injuries Soren suffered
- Identification of the launcher used and projectile deployed by the shooter

92.     But rank-and-file MPD officers have felt free to flagrantly violate subjects' constitutional rights under department-wide reporting methods to cover up their misconduct.

93.     Despite policies stating otherwise (*see* MPD Policy 5-105 – requiring officers to "immediately report any violation of rules, regulations or laws that come to their attention, including force-related misconduct"), candor with regard to fellow officers' obvious constitutional violations is nonexistent at the MPD.

94.     Instead, rank-and-file MPD officers (and beyond) have helped said unconstitutional actors to hide behind the Blue Wall of Silence, even where the officer becomes a convicted murderer.

95.     MPD officers have been instructed by their Union (the Minneapolis Police Federation) not to aid in investigations into other officers, and they follow said instruction.[1]

96.     The supervisory Defendants and policymakers at the City of Minneapolis and the Minneapolis Police Department had actual knowledge of the constitutionally infirm reporting and lack of adherence to MPD policies among officers or were deliberately indifferent to the need for proper reporting by turning a blind eye.

97.     Not only are MPD officers routinely not disciplined when they fail to truthfully report the unauthorized use of deadly force or fail to cooperate with investigations into fellow officers, the Minneapolis Police Federation is actively encouraging them to do so.

98.     Other than lip service, there has been no response by the City and Chief Arradondo to curb this practice of behavior by MPD officers and the Minneapolis Police Federation.

99.     Consequently, Federation members know that they can act in the above-described ways with complete impunity.

100.    The actions of the uncooperative and policy-violating MPD officers, and the failures of the City and Chief Arradondo to discipline the officers for such conduct, fly in the face of MPD's Code of Conduct, embolden officers to act without regard for the rights of citizens, and were a moving force behind the deprivation of Soren's federal civil rights.

101.    Some combination of the failure to report, the failure to report truthfully, the Blue Wall of Silence, and the failure to cooperate in investigations has occurred here.

---

[1] https://www.startribune.com/noor-trial-unfolding-amid-debate-over-blue-wall-of-silence/508574012/

102.    Defendants Does 2-6 actively encouraged Defendant Doe 1's use of excessive force by colluding with Defendant Doe 1 and one another to eschew report writing and supervisor notification, or to fail to report truthfully.

103.    Defendants Does 1-6 used the absence of report writing and supervisor notification or the absence of truthful report writing to frustrate Soren's assertion of his civil rights.

104.    Defendants Does 1-6 used the absence of report writing and supervisor notification or the absence of truthful report writing to skirt responsibility and accountability for their actions and inactions on May 31, 2020.

105.     Defendants Does 7-8, the City and Chief Arradondo have acquiesced in said collusion by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

106.    Defendants Does 7-8, the City and Chief Arradondo have acquiesced in further frustration of Soren's civil rights by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

107.    Defendants Does 7-8, the City and Chief Arradondo have acquiesced in the unauthorized use of deadly force by Defendant Doe 1 going unpunished by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

108.     Defendants Does 7-8, the City and Chief Arradondo have acquiesced in numerous additional policy violations by Defendants Does 1-6 going unpunished with regard to the events surrounding the shooting of Soren.

109.    The supervisory Defendants were causally and directly involved in the violation of Soren's constitutional rights.

110.    As a result of the department-wide reporting and cover-up methods, Soren has been unable to identify the shooter – Defendant Doe 1 – by name.

111.    Further, it is clear from the news video that multiple officers in the area of Soren's shooting were equipped with body-worn cameras (BWCs).

112.    MPD policies required that the officers at the scene have their BWCs in recording mode because the following applied to the subject incident: in-person contact by officers, use of force by officers, use of deadly force by officer and the situation amounted to a critical incident as defined by MPD policy. *See* Policy 4-223.

113.    In the event that the BWCs were not in recording mode prior to the shooting of Soren, they were required to be "activated as soon as it [was] safe to do so" under Policy 4-223(5)(6)(a)(vii).

114.    The digital audio-video evidence that the BWCs were to have collected from the scene was to be uploaded at the conclusion of the officers' shifts with the proper classification that linked it to the proper incident under Policy 4-223(8)(a)-(d).

115.    Failsafes in the MPD BWC policy also would ensure that some information regarding the event was reported in case all of the officers at the scene of Defendant Doe 1's shooting of Soren had failed to put their BWCs in recording mode. *See* Policy 4-223(6)(d).

116.    However, rank-and-file MPD officers have felt free to violate MPD's policies with regard to BWC usage, which dovetails with the department-wide cover-up methods described above.

117.    The supervisory Defendants and policymakers at the MPD and the City of Minneapolis had actual knowledge of policy violations among officers with regard to the BWCs or were deliberately indifferent to the need for proper use or reporting of the failure to activate the BWCs by turning a blind eye.

118.    To date, despite many efforts, Soren has been unable to obtain any BWC footage of the incident from the MPD or the City – either none exists or the City or MPD is withholding it.

119.    Soren, by and through his counsel, has made repeated attempts to identify the officer or officers who fired at him.

120.    Soren's counsel has sent letters describing these events in detail, with images, and asked for assistance in locating all recordings and any reports relevant to the incident and the aftermath to Chief Arradondo, the City Attorney's Office and the Minnesota Bureau of Criminal Apprehension.

121.    Similarly, Soren's counsel has made calls and sent emails to County and City officials inquiring what, if any, progress has been made in identifying the offending officers.

122.    Additionally, a public data request was submitted by Soren's counsel, as they were instructed to do by the City.

123.    Despite these entreaties, neither the shooter nor the other involved officers have been identified.

124.    The Blue Wall of Silence remains alive and well, operating as it has historically, within the MPD and the City.

- 19 -

125.   The lack of consequences imposed upon MPD officers who protect their own or who, in violation of their sworn duties as peace officers, fail to cooperate with investigations into such matters ensures that the Blue Wall of Silence remains intact.  Chief Arradondo has repeatedly failed to hold such officers accountable.

126.   Numerous MPD officers and the City continue to hamper Soren's ability to investigate and vindicate his civil rights.

127.   MPD Policy 5-101.01 provides that:

The integrity of police service is based on truthfulness.  Officers shall not willfully or knowingly make an untruthful statement, verbally or written, or knowingly omit pertinent information pertaining to his/her official duty as a Minneapolis Police Officer.

MPD employees shall not willfully or knowingly make an untruthful statement or knowingly omit pertinent information in the presence of any supervisor, intended for the information of any supervisor or before any court or hearing. Officers shall not make any false statements to justify a criminal or traffic charge or seek to unlawfully influence the outcome of any investigation.

These requirements apply to any report, whether verbal or written, concerning official MPD business including, but not limited to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business.

MPD employees are obligated under this policy to respond fully and truthfully to questions about any action taken that relates to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business

128.   The MPD's continued failure to discipline officers, through policymakers Defendants Does 7-8 and Chief Arradondo, causes MPD officers to act with impunity and without due regard for the Constitution and laws of the United States.  The consequences of this are becoming all the more apparent and pervasive.

## SOREN'S INJURIES

129.    Soren sustained devastating and permanently disfiguring physical injuries as a result of being shot.

130.    After being rushed to the hospital by bystanders, a CT scan was taken at 7:24 p.m. on May 31, 2020, which revealed that Soren had sustained multiple facial fractures including comminuted fractures of the nasal bones and nasal septum, comminuted fractures of the bilateral lamina papyracea/medial orbital wall, comminuted fractures of frontal sinuses/orbital roofs, and displaced fractures of the anterior and posterior walls of the left maxillary sinus and floor of the left orbit.

131.    Soren also had sustained a concussion.

132.    The CT scan showed a small right superior medial subperiosteal hematoma without significant mass effect, extensive intraocular gas, and layering debris in the left maxillary sinus, suspicious for intrasinus hemorrhage.

133.    The CT scan also revealed a global rupture with hyperdense material within the left vitreous compatible with hemorrhage, as well as extensive left-sided preseptal premaxillary edema/hematoma.

134.    In other words, Soren had suffered extensive injuries to his face and sinuses and catastrophic injuries to his left eye.

135.    Soren underwent emergent globe repair surgery on May 31, 2020, but ultimately the damage to his left eye was too extensive to save it.

136.    On June 10, 2020, Soren underwent further surgery for enucleation (removal) of his left eye and the implantation of a prosthetic eye in its place.

137.    As part of that procedure, tissue in his eye socket was sewn together in order to create a pocket for the prosthetic eye.  The pocket had not held together, however, and Soren will be required to undergo further surgery in which skin from his cheek will be grafted into his eye socket in order to create a stronger pocket.

138.    Since the enucleation surgery, Soren also has had ongoing difficulties around his left eye, including bloody drainage from the area and allergic reactions around his eye patch.

139.    In addition, Soren suffered from headaches and had cognitive difficulties, including stuttering and having trouble finding the right words, as a result of being shot.  He also suffered from light sensitivity, impaired balance, and difficulties from the loss of stereovision.

140.    Further surgery will likely be needed to repair Soren's facial and sinus fractures.

141.    Soren also has suffered significant emotional injuries as a result of the force deployed against him.

142.    He has experienced nightmares since the incident, as well as states of unreasonable fear.

143.    He sought counseling with Heather Marie Holt, MSW LICSW ("Holt"), at Brave Choices Counseling, who diagnosed Soren with Post-Traumatic Stress Disorder.

144.    The PTSD diagnosis is unquestionably related to being shot in the face and gravely injured.  Holt wrote:  "[PTSD] due to the life-altering injury he has suffered, the loss of an eye.  He exhibits avoidance symptoms as well as anxiety related symptoms."

145.     Holt suggested that Soren's difficulty expressing emotions since the injury is likely due to "dealing with psychological shock and continuing to experience some of his threat responses."

146.     She recorded other injury-related symptoms including continued bleeding from the left eye, hopelessness, difficulty sleeping and worry that his sense of smell may not come back.

147.     Soren has treated with Holt regularly since June 18, 2020.  Her current recommendation is that regular therapy continue for one or more years.

148.     Soren's post-visit summary from Holt reads as follows:  "The client's affective and emotional state appeared withdrawn, detached, somewhat flat and mildly anxious.  The client's mental state included a post-traumatic reaction.  The client's estimated global assessment of functioning suggest some serious emotional and psychological difficulties and quite serious impairment in relational, work and/or school functioning."

149.     Life as Soren knew it changed due to the May 31, 2020 shooting.

150.     Soren's extensive treatment, including surgical intervention during a global pandemic, continues and will for the foreseeable future.

151.     To date, Soren's medical bills total more than $50,000.

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AND
### FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant John Doe 1*

152.      Soren realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

153.    By the actions described above, Defendant John Doe 1, under color of state law, violated and deprived Soren of his clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

154.    Defendant John Doe 1 subjected Soren to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

155.    As a direct and proximate result of the acts and omissions of Defendant John Doe 1, Soren suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

156.    Punitive damages in an amount exceeding $5,000,000 are available against Defendant John Doe 1 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

157.    Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### 42 U.S.C. § 1983 – FIRST AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendants John Does 1-6*

158.    Soren realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

159.    Soren engaged in constitutionally protected acts of speech and assembly in the form of peaceful protesting in Minneapolis.  He did so in a public place before curfew and at all times obeyed the requests by City leaders.

160.    Defendants John Does 1-6, under color of state law, retaliated against Soren for engaging in said constitutionally protected activity.

161.    Soren's First and Fourteenth Amendment rights were violated when he was deliberately targeted and shot during the course of the protest, and in the cover-up perpetrated by Defendants John Does 1-6 afterward.

162.    The conduct of Defendants John Does 1-6 tends to chill citizens from continuing to engage in constitutionally protected activity.

163.    Defendants John Does 1-6 subjected Soren to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

164.    As a direct and proximate result of the aforementioned unconstitutional conduct, Soren has been damaged in an amount exceeding $5,000,000.

165.    Punitive damages in an amount exceeding $5,000,000 are available against Defendants John Does 1-6 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

166.    Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### 42 U.S.C. § 1983 – CONSPIRACY TO INTERFERE
### WITH THE ASSERTION OF SOREN'S RIGHTS
### UNDER THE CONSTITUTION AND 42 U.S.C. § 1983
### *Plaintiff v. Defendants John Does 1-6*

167.    Soren realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

168.    Defendants John Does 1-6 agreed either to improperly report, or not report at all, the incident regarding Soren.

169.    Defendants John Does 1-6 improperly reported, or did not report at all, the incident regarding Soren.

170.    Defendants John Does 1-6 did so in concert and with the intent to shield Defendant John Doe 1 and thereby prevent the assertion of Soren's civil rights.

171.    Defendants John Does 1-6, under color of state law, committed the above misconduct maliciously or with reckless disregard for whether Soren's rights would be violated.

172.    As a direct and proximate result of the actions described above, which are tantamount to obstruction of justice, Defendants John Does 1-6 have conspired to interfere with and interfered with the assertion of Soren's civil rights, and Soren was thereby damaged in an amount exceeding $5,000,000.

173.    Punitive damages in an amount exceeding $5,000,000 are available against Defendants John Does 1-6 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

174.     Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT IV

### SUPERVISORY LIABILITY
*Plaintiff v. Defendants John Does 7-8 and Medaria Arradondo,*
*in their individual capacities*

175.     Soren realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

176.     Defendants John Does 7-8 and Medaria Arradondo at all times material hereto were members of the Minneapolis Police Department with supervisory responsibilities over Defendants John Does 1-6.

177.     These supervisory Defendants at the City of Minneapolis had actual knowledge of the constitutionally infirm force reporting in widespread use among officers.

178.     As such, rank and file, such as Defendants John Does 1-6 with regard to Soren, freely and fragrantly violate citizens' constitutional rights using department-wide reporting methods to cover it up.

179.     The supervisory Defendants had actual knowledge of the improper reporting by Defendants John Does 1-6 regarding the Soren incident and other similar incidents, further evidencing a policy or custom of constitutional misconduct.

180.     These supervisory Defendants, under color of state law, acted with deliberate indifference to, authorized or acquiesced in the violation of Soren's constitutional rights by Defendants John Does 1-6.

181.    As a direct and proximate result of the acts and omissions of Defendants John Does 7-8 and Medaria Arradondo, Soren suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

182.    Punitive damages in an amount exceeding $5,000,000 are available against Defendants John Does 7-8 and Medaria Arradondo and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

183.    Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT V

### CIVIL RIGHTS VIOLATIONS
### MONELL V. DEP'T OF SOCIAL SERVICES
### *Plaintiff v. Defendant City of Minneapolis, Arradondo and Does 7-8, in their official capacities*

184.    Soren realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

185.    Before May 31, 2020, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers, including the Defendants herein, of the improper use of force, including deadly force.

186.    Through policymakers Defendants John Does 7-8 and Chief Arradondo, and with the department's ratification and approval, by failing to discipline all officers consistently on this point, there has been an approval of a deficient policy, custom, or practice of the improper use of force, including deadly force.

187.     Soren's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices and the City of Minneapolis is thereby liable in an amount exceeding $5,000,000.

188.     Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Soren Stevenson prays for judgment as follows:

1.     That this Court find that the Defendants committed acts and omissions violating the First, Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.     As to Count I, a money judgment against Defendant John Doe 1 for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.     As to Count II, a money judgment against Defendants John Does 1 through 6 for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4.     As to Count III, a money judgment against Defendants John Does 1 through 6 for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendants John Does 7 and 8 and MPD Chief Medaria Arradondo for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

6.      As to Count V, a money judgment against the City of Minneapolis for compensatory damages in an amount in excess of $5,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

7.      For an order mandating changes in the policies and procedures of the Minneapolis Police Department requiring, among other things, policy and training measures in the proper use of "non-lethal weapons," the proper reporting of use of force, adherence to policies to ensure the identities of officer-shooters and witnesses are not shielded from victims, and relations and policing with those exercising their First Amendment rights; and

8.      For such other and further relief as this Court may deem just and equitable.

Dated:  September 21, 2020          **ROBINS KAPLAN LLP**

s/Robert Bennett
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone:  612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com

*Attorneys for Plaintiff Soren Stevenson*

- 30 -