## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Soren Stevenson,                                        Civ. No. 20-2007 (SRN/TNL)

             Plaintiff,

    v.                                                    **PLAINTIFF'S**
                                                        **MEMORANDUM IN**
                                                        **OPPOSITION TO THE CITY**
John Doe 1, acting in his individual                    **DEFENDANTS' MOTION**
capacity as a Minneapolis Police Officer;               **TO DIMISS**
John Does 2-6, acting in their individual
capacities as Minneapolis Police Officers;
John Does 7 and 8, acting in their individual
and official capacities as supervisory Minneapolis
Police Officers; Medaria Arradondo, acting in his
individual and official capacities as the Minneapolis
Chief of Police; and the City of Minneapolis,

             Defendants.

_____

      Outraged by the murder of George Floyd in broad daylight by Minneapolis police

officer Derek Chauvin, Plaintiff Soren Stevenson gathered with others near University

Avenue and I-35W late in the afternoon on May 31, 2020, to demonstrate against

continued brutality by the Minneapolis Police Department ("MPD"). There was no

curfew in place at the time, nor any other restriction impeding Soren's lawful, and

peaceful, exercise of his First Amendment rights. Nevertheless, an MPD officer, whose

identity remains unknown, shot Soren in the face – without any warning – with a 40-

millimeter "blunt impact projectile," resulting in the loss of his left eye and other

extensive injuries. That shooting, like Floyd's murder, was simply another example of

the long history of unbridled use of force by the MPD.

Soren later commenced this action against the still-unknown shooter (Defendant John Doe 1) and the other officers on, or otherwise in control of, the scene who helped Doe 1 attempt to avoid the consequences for his unconstitutional misconduct. Soren also has sued MPD Chief Medaria Arradondo and the City, based on the MPD's history of excessive force and the failure by those in charge to put an end to the practices that enable it. Yet despite that history and Soren's shooting, Arradondo and the City have now moved the Court, before any discovery has taken place, to dismiss the claims against them, alleging throughout their Motion that Soren's claims are "conclusory" and "generalized" and "formulaic." But simply invoking those *Twombly* and *Iqbal* buzzwords words does not make it so, and Soren's Complaint is more than adequate to plausibly allege his *Monell* and supervisory-liability claims, especially when viewed in light of Soren's minimal pleading standard at this early stage of the case. Defendants' Motion should be denied.

## BACKGROUND

Soren's Complaint alleges the following facts, which must be accepted as true for purposes of the instant Motion, *e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017) (*en banc*).

On May 25, 2020, MPD officer Derek Chauvin murdered George Floyd while three other MPD officers stood idly by. Compl. ¶ 12. His murder was but a recent example of the long, unchecked history of racial bias and unconstitutional use of force by MPD officers. *Id.* ¶ 13. The murder was captured on video and rightly caused outrage around the country and the world. *Id.* ¶¶ 13-14. That outrage manifested itself locally in

- 2 -

protests around the City, which were encouraged by officials at both the state and local levels. *Id.* ¶¶ 20-24. This included Arradondo, who encouraged people "to continue to protest and gather peacefully." *Id.* ¶ 23. Though some of those protests (primarily those at night) caused significant damage, most daytime activity was peaceful and aimed at effecting change and restoring damaged neighborhoods. *Id.* ¶¶ 14-15.

Rank-and-file MPD officers, however, would have none of the protests. Consistent with MPD's history of heavy-handed tactics, officers met the protests with force, including the use of "less lethal" munitions. *Id.* ¶ 16. At least three City Councilmembers recognized the impropriety of this use of force and denounced it. *Id.* ¶¶ 20-22. As Councilmember Jeremiah Ellison stated, MPD's disproportionate use of force was consistent with how it had "always" acted. *Id.* ¶ 19; *see also id.* ¶ 79.

Soren was an unfortunate victim of that pattern and practice of excessive force. A recent Master's graduate from the University of Minnesota's Humphrey School of Public Affairs, *id.* ¶ 5, Soren joined a peaceful protest on May 31, 2020, near the entrance to I-35W from University Avenue. *Id.* ¶ 25. The protesters gathered long before the 8:00 pm curfew imposed days earlier by Governor Walz. *Id.* The assembled group was peaceful, with several raising signs or holding their hands up in the air while facing a large group of MPD officers not far away. *Id.* ¶¶ 31-32. But without any warning, and for no lawful reason, an unknown MPD officer (Defendant John Doe 1) shouldered a 40-millimeter launcher, took aim, and fired a blunt-impact projectile directly into Soren's face. *Id.* ¶¶ 32-33. Soren had done *nothing* to justify the use of any force against him, let alone the lethal force (despite the "less lethal" label) employed by Doe 1. The scene was not

- 3 -

chaotic; Soren was unarmed and had not committed any crime; he did not display any

aggression or threaten the officers or anyone else; and he did not ignore any commands.

*Id.* ¶¶ 36-41.  Indeed, no MPD officer gave any commands or warnings to Soren before

Doe 1 shot him.  *Id.* ¶¶ 42-44.

The blunt impact from the projectile was catastrophic.  It caused devastating

injuries, destroying Soren's left eye and causing comminuted fractures of his nasal bones

and septum, displaced sinus and left-orbital factures, a subperiosteal hematoma, and a

severe concussion, among other injuries.  *Id.* ¶¶ 56, 130-133.  Despite this, no MPD

officer provided aid to Soren after he was shot.  *Id.* ¶¶ 57, 68, 75.  Instead, bystanders

rushed him to M Health Fairview, where he underwent emergency eye surgery in the

hopes of saving his left eye.  *Id.* ¶¶ 58, 135.  Unfortunately those efforts proved

unsuccessful, and Soren's eye was completely removed 10 days later, with a prosthetic

implanted in its place.  *Id.* ¶¶ 136-137.  Soren will require additional future surgeries,

both for his eye and for his facial and other fractures.  *Id.* ¶¶ 137, 140.

MPD policies mandated that Doe 1 notify a supervisor and prepare a report

documenting his use of force against Soren.  *Id.* ¶¶ 86-88.  Doe 1 also was required to

have his body-cam activated and recording, as were the other officers on scene.  *Id.*

¶ 112.  Had these policies been followed, Soren would at least know the identity of his

shooter and the (ostensible) reason he was shot.  But MPD officers – including Doe 1 and

the other officers present at the time (Defendants John Does 2-6) – have for many years

ignored their reporting obligations, with full knowledge of MPD superiors (including

Arradondo and John Does 7-8), in order to shield their brothers in blue from

- 4 -

repercussions for misconduct. *Id.* ¶¶ 78-79, 92-94. This has prevented Soren from learning the identity of his shooter or obtaining any reports or body-cam footage regarding his shooting. *Id.* ¶¶ 110, 118-123.

MPD officers act in this way in accordance with instructions from the police union, the Minneapolis Police Federation, which has encouraged officers not to properly document uses of force and, along the same lines, not to cooperate with investigations into use-of-force incidents. *Id.* ¶¶ 95-99. As a result, officers are "embolden[ed] to act without regards for the rights of citizens" and "act . . . with complete impunity." *Id.* ¶¶ 99-100. And Chief Arradondo, his predecessors, and City leaders have done nothing to stop it. *Id.* ¶¶ 96, 98, 100, 125.[1] In one of the more notable recent examples of this put into practice, dozens of MPD officers failed to cooperate in the investigation surrounding Justine Ruszczyk's murder by MPD officer Mohamed Noor, resulting in Hennepin County Attorney Mike Freeman taking the unprecedented step of empaneling a grand jury to compel the officers' testimony and cooperation. *Id.* ¶ 95 n.1; Complaint, *Ruszczyk v. Noor*, Civ. No. 18-2086 (PAM/TNL), ¶¶ 210-215, 218-223.[2] Noor's criminal

---

[1] Indeed, the widespread and known use of excessive force by MPD officers is no recent phenomenon – it dates back to at least the early 1990s. *See Mische v. Sauro*, Civ. No. 3-94-217, slip op. at 1-2 (D. Minn. Aug. 17, 1994) (noting a jury had found the City "liable under Section 1983 for being deliberately indifferent to the use of excessive force by officers of the Minneapolis Police Department"). Although a public record, given its age, a copy of the referenced order in *Mische* is attached to the Declaration of Robert Bennett submitted with this Memorandum.

[2] The Court may consider the pleadings in *Ruszczyk* and other cases when evaluating the instant Motion, as they are public records. *See, e.g.*, *Verto Med. Solutions, LLC v. Allied World Specialty Ins. Co.*, No. 4:19-cv-1532-NCC, 2019 WL 5696145, at *3 (E.D. Mo. Nov. 4, 2019) (collecting cases holding that court may consider complaint filed in separate action when evaluating Rule 12(b)(6) motion), *appeal docketed*, No. 19-3511

prosecution was hampered because he and his partner, Matthew Harrity, failed to properly document their activities by consciously choosing to leave their body-worn cameras off, in violation of MPD policy – a widespread and known issue that had long gone unremedied. *Ruszczyk* Complaint ¶¶ 98, 100-101, 103, 116, 118, 124-125, 234-252. The failure to accurately document the events leading to Ruszczyk's shooting allowed Harrity to change his story after consulting with the union's counsel, contriving a so-called justification (a thump on the side of the squad car) that he had not provided to his supervisors shortly after the shooting. *Id.* ¶¶ 153, 171-174, 207, 220.  Notably, Harrity's and the other officers' obstructionism coincided with the prosecution of MPD officer Efrem Hamilton for shooting into an occupied car.  In that case, under likely pressure from union officials, several MPD officers testified at trial differently from what they had previously told the Hennepin County Attorney's Office. *Id.* ¶¶ 217-18.  Hamilton ultimately was acquitted.

The same type of intentional opacity is alleged to have taken place here.  The involved officers in this case (Defendants John Does 1-6) have attempted to protect their brother in blue by "fail[ing] to follow MPD policies with regard to report writing and supervisor notification or falsif[ying] reports . . . in an attempt to conceal the unauthorized use of deadly force on Soren."  Compl. ¶ 85 (emphasis deleted).  "[R]ank-and-file MPD officers have felt free to flagrantly violate subjects' constitutional rights under [these] department-wide reporting methods to cover up their misconduct." *Id.* ¶ 92.

---

(8th Cir. Nov. 25, 2019); *see also Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007) (court records, as public records, may be considered).

This "blue wall of silence" was present in Ruszczyk and Hamilton and continues to this day, playing a key part in Soren's shooting. *Id.* ¶¶ 94, 98, 101; *Ruszczyk* Complaint ¶¶ 216-218. And Arradondo and the City knew about it but acquiesced in it, including by failing to discipline officers for their misconduct. Compl. ¶¶ 105-109, 177-178; *Ruszczyk* Complaint ¶¶ 222-223.

It thus comes as no surprise that what happened to Soren also happened to dozens of other people in the wake of George Floyd's death. Indeed, a mere three days before Soren was shot, another still-hidden MPD officer fired "less lethal" munitions into the face of 19-year-old Ethan Marks without any justification, and then failed to properly document it. Compl. ¶ 81; *see also* First Am. Compl., *Marks v. Doe*, Civ. No. 20-1913 (ADM/ECW). At least six other lawsuits are also now pending against MPD, Arradondo, and numerous MPD officers for their widespread, improper uses of force during the George Floyd demonstrations, in particular the use of "less lethal" munitions such as tear gas and rubber bullets. *See, e.g.*, *Goyette v. City of Minneapolis*, Civ. No. 20-1302 (WMW/DTS) (putative class action with six named individual plaintiffs); *Williams v. City of Minneapolis*, Civ. No. 20-1303 (DSD/BRT); *Tirado v. City of Minneapolis*, Civ. No. 20-1338 (JRT/ECW); *Armstrong v. City of Minneapolis*, Civ. No. 20-1645 (SRN/DTS) (putative class action with five named plaintiffs); *Samaha v. City of Minneapolis*, Civ. No. 20-1715 (SRN/DTS) (putative class action with seven named plaintiffs); *Cisneros v. City of Minneapolis*, Civ. No. 20-1957 (PJS/BRT).[3] Soren alleges

---

[3] It makes no difference that Defendants dispute liability in these cases. *See, e.g.*, *Brenner v. Asfeld*, No. 18-CV-2383, 2019 WL 2358451, at *9 (D. Minn. June 4, 2019)

that the same deficient MPD policies and customs giving rise to these other incidents –

encouraging the use of excessive force by shielding officers from accountability – were

the moving force behind his own shooting and support City liability under *Monell v.

Department of Social Services*, 436 U.S. 658 (1978), as well as for Chief Arradondo. *See*

Counts IV and V of the Complaint.

But Defendants apparently demand more. They now argue that Soren's Complaint

does not plausibly allege municipal- or supervisory-liability claims – the same tired

arguments they have made in nearly all of the lawsuits arising out of George Floyd's

death.[4] Yet their arguments cannot withstand scrutiny, as they ask for too much of Soren

at the pleading stage, particularly in a case in which it is alleged the Defendants have

hidden the ball. In any event, Defendants' arguments collapse under the weight of the

numerous plaintiffs making similar allegations and MPD's long history of misconduct.

## ARGUMENT

## I.     The applicable legal standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asks whether

the plaintiff has failed to state a claim upon which relief can be granted. Such a motion

attacks the legal sufficiency of the allegations in the complaint and, hence, must be read

in harmony with the liberal pleading standard enunciated in Federal Rule of Civil

---

(relying on allegations in other actions when resolving motion to dismiss, even though
"Defendants either dispute liability or are not a party" to them).

[4] The plaintiffs in these other cases have filed their own responses to the City's motions,
which include many arguments that are equally applicable to Soren. Accordingly, he
respectfully directs the Court's attention to the plaintiffs' memoranda opposing the
motions to dismiss in those actions.

Procedure 8(a)(2).  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

Under that Rule, a plaintiff need only provide a "short and plain statement of the claim

showing that [he] is entitled to relief."  This is no less true in civil-rights litigation – the

Court may not apply a standard "more stringent than the usual pleading requirements of

Rule 8(a)" in "civil rights cases alleging municipal liability."  *Leatherman v. Tarrant*

*Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *accord*

*Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (*per curiam*) ("[N]o heightened

pleading rule [applies to] plaintiffs seeking damages for violations of constitutional

rights.").

By design, Rule 8 does not pose a substantial hurdle.  Rather, it sets forth a

"liberal pleading standard" in which a plaintiff "need only give the defendant fair notice

of what the . . . claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551

U.S. 89, 93-94 (2007) (internal quotation marks and citation omitted).  The test is

whether the Complaint – when read as a whole and not parsed allegation by allegation –

sets forth a "plausible" claim.  *Braden*, 588 F.3d at 594 (citing *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In

answering that question, the Court must accept as true all of the facts pleaded in the

Complaint and construe all reasonable inferences from those facts in the light most

favorable to the plaintiff.  *Id.* at 594-95.

Ultimately, the bar confronting a plaintiff is low.  *Plausibility* does not equal

*probability*, and a complaint may not be dismissed "even if it strikes a savvy judge that

actual proof of [the alleged] facts is improbable, and that a recovery is very remote and

unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks and citations omitted);

*accord, e.g.*, *Swierkiewicz v. Sorema*, 534 U.S. 506, 515 (2002) ("Rule 8(a) establishes a

pleading standard without regard to whether a claim will succeed on the merits.  Indeed it

may appear on the face of the pleadings that a recovery is very remote and unlikely but

that is not the test.").  "When a federal court reviews the sufficiency of a complaint,

before the reception of any evidence either by affidavit or admissions, its task is

necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *Scheuer v.*

*Rhodes*, 416 U.S. 232, 236 (1974).  Thus, a motion to dismiss "should be granted as a

practical matter . . . only in the unusual case in which the plaintiff includes allegations

that show on the face of the complaint that there is some insuperable bar to relief." *Skaff*

*v. Fairview Health Servs.*, Civ. No. 12-312, 2012 WL 1466775, at *1 (D. Minn. Apr. 27,

2012) (quoting *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)).

## II.    Soren's *Monell* claim

Despite the detailed allegations contained in Soren's 188-paragraph, 29-page

Complaint, Defendants argue that Count V does not plausibly allege *Monell* liability

against the City and Arradondo in his official capacity.  Their arguments are all meritless.

Defendants foot-fault right out of the gate, by arguing dismissal is appropriate

because "Plaintiff does not identify an unconstitutional policy."  Def. Mem. at 6.

Expounding further, they point to the host of (supposedly) constitutional MPD policies

laid out by Soren in the Complaint – which, notably, were repeatedly violated by the John

Doe Defendants – and argue that Soren "does not identify any purported shortfalls with"

91086345.1

them.  *Id.* at 7-8.  Putting aside that the crux of Soren's *Monell* claim focuses on MPD's unconstitutional *customs* and *deliberate indifference*,[5] there is simply no requirement that he identify any unconstitutional policy in the Complaint.  The Eighth Circuit has said so repeatedly.  *See Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (noting that a plaintiff "need not [] specifically plead the existence of an unconstitutional policy . . . to survive a motion to dismiss"); *Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003) (same).  This Court has recognized the same principle. *See, e.g.*, *Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 867 (D. Minn. 2015); *Shqeirat v. U.S. Airways Grp., Inc.*, 515 F. Supp. 2d 984, 995 (D. Minn. 2007). *Doe* aptly explained why:

> [A] plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right.  Moreover, such a holding would disregard the liberality of Fed. R. Civ. P. 8(a)(2) which requires merely "a short and plain statement of the claim showing that the pleader is entitled to relief," and 8(f), which states "pleadings shall be so construed as to do substantial justice."

---

[5] That MPD's written policies might be facially constitutional is of no moment, for at least two reasons.  For one thing, a jury might conclude that such policies were "nothing more than a facade to cover the violent behavioral patterns of police officers under investigation, to protect them from disciplinary action, and thereby perpetuate the City's custom of acquiescing in the excessive use of force by its police officers." *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996).  In addition, the Complaint alleges that MPD officers repeatedly flouted these policies, *see* Compl. ¶¶ 59-73, 78, 86-102, 111-116, which is sufficient to plausibly allege a failure to supervise, yet another species of *Monell* liability.  *See, e.g.*, *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016) ("Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, *or* a deliberately indifferent failure to train or supervise an official or employee.") (emphasis added).

340 F.3d at 614; *accord Estate of Osuna v. Cnty. of Stanislaus*, 392 F. Supp. 3d 1162,

1175 (E.D. Cal. 2019) (denying motion to dismiss *Monell* claims and noting that a

complaint need only allege a policy or custom "in general terms" because "information

concerning a town's customs or policies, the policymakers' motivations behind such

policies, or the facts surrounding police department customs, are typically unavailable to

an outsider") (internal quotations and citations omitted).  Indeed, Soren need not even

have "provide[d] specific facts in support of [his] allegations." *In re Pre-Filled Propane

Tank Antitrust Litig.*, 860 F.3d at 1070.

Perhaps recognizing this flaw in their Motion, Defendants shift gears, arguing that

Soren has not pleaded enough facts to suggest a *custom* of "persistent and widespread"

unconstitutional misconduct by MPD officers.  Def. Mem. at 8-11.  They claim that he

has identified only two other instances of misconduct pre-dating his shooting – the killing

of George Floyd and the shooting of Ethan Marks – which they contend are too limited in

number to adequately allege a *Monell* claim.  *Id.* at 9-11.[6]  Of course, Defendants'

argument ignores the Complaint's reference to Ruszczyk's murder, Compl. ¶ 95 n.1, and

---

[6] Defendants also claim that George Floyd's killing was "too dissimilar to [Soren's]
incident" to matter.  Def. Mem. at 9.  But this contention ignores the very tenor of
Soren's claims, which allege that the "blue wall of silence" by rank-and-file MPD
officers has emboldened them "to flagrantly violate subjects' constitutional rights," and
that Arradondo and other policymakers were aware of it yet did nothing.  Compl. ¶¶ 94,
98, 101, 105-109, 177-178.  Defendants offer no explanation why Floyd's murder is any
less relevant to those assertions than Soren being unjustifiably shot in the face.  *See
Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) ("This Court has held
municipalities liable under *Monell* when the plaintiffs have produced evidence of prior
complaints sufficient to demonstrate that the municipalities and their officials ignored
police misconduct.").

- 12 -

Councilmember Ellison's statement about how the MPD has "always" acted, *id.* ¶ 19. Regardless, Defendants' argument runs headlong into contrary Supreme Court precedent, namely, *Leatherman*.  There, the Fifth Circuit had affirmed the dismissal of the plaintiff's *Monell* claim for failing to comply with that court's then-existing pleading standard for such claims.  On appeal to the Supreme Court, the defendants sought affirmance because, they claimed, in order "[t]o establish municipal liability under § 1983, . . . a plaintiff must do more than plead a single instance of misconduct.  This requirement, respondents insist, is consistent with a plaintiff's Rule 11 obligation to make a reasonable prefiling inquiry into the facts."  507 U.S. at 167.  The Supreme Court disagreed, concluding the defendants' argument was "impossible to square" with "the liberal system of notice pleading set up by the Federal Rules."  *Id.* at 168.

Leatherman spells the death knell for Defendants.  As the Eighth Circuit has recognized, *Leatherman* made clear "that requiring a plaintiff to allege particular instances of similar constitutional violations in order to defeat a motion to dismiss for failure to state a claim is inconsistent with the liberal system of 'notice pleading' set up by the Federal Rules."  *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir. 1993); *see also White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (A plaintiff simply is "not required to identify every other *or even one other* individual who had been [injured] through the complained-of" unconstitutional conduct.) (emphasis added).  Notably, *Leatherman* remains good law even after *Twombly* and *Iqbal*.  *See Baribeau v. City of Minneapolis*, Civ. No. 06-4953, 2007 WL 2123307, at *2 n.5 (D. Minn. July 20, 2007) (Nelson, J.) (noting the "Supreme Court did not retreat from its holdings in *Leatherman*"); *see also*

*White*, 829 F.3d at 844 (concluding that *Leatherman* "has survived the Court's later civil pleading decisions in *Iqbal* and *Twombly*"); *Gearin v. Rabbett*, No. 10-CV-2227, 2011 WL 317728, at *9-10 (D. Minn. Jan. 28, 2011) (same).[7]  And as a result, Soren need not have alleged any other incidents in order to plausibly allege his *Monell* claim – regardless of whether such incidents are cast in terms of "a continuing, widespread, pervasive pattern of misconduct," Def. Mem. at 10, or "notice" of such misconduct to Defendants, *see id.* at 9-11, which is simply another way of arguing that Soren needed to plead additional incidents in his Complaint.  To hold otherwise would run afoul of *Doe*'s admonition that plaintiffs at the pleading stage "may not be privy to the facts necessary to accurately describe or identify" the basis for their *Monell* claims.  340 F.3d at 614.  And this is precisely why the Judges of this Court have repeatedly rejected the argument Defendants now make.  *See, e.g.*, *Brenner v. Asfeld*, No. 18-CV-2383, 2019 WL 2358451, at *9 (D. Minn. June 4, 2019); *Sagehorn*, 122 F. Supp. 3d at 867; *R.S. ex rel. S.S. v. Minnewaska Area School District No. 2149*, 894 F. Supp. 2d 1128, 1137-38 (D. Minn. 2012); *Gearin*, 2011 WL 317728, at *8-10.

In any event, even if Soren were required to offer allegations concerning other, similar misconduct, he has done so.  For example, Defendants simply ignore that he has alleged the absence of reporting "repeatedly in the days following George Floyd's death," Compl. ¶ 80, specifically identifying the Marks shooting as one such incident, *id.* ¶ 81.  Moreover, Soren's shooting alone evidences the type of widespread misconduct alleged

---

[7] Indeed, *Twombly* relied upon *Leatherman* in reaching its holding.  550 U.S. at 569 n.14.

in the Complaint.  As the pictures in the Complaint make clear, there were numerous

officers present when Doe 1 fired a blunt-impact projectile at Soren.  If MPD policies

indeed "require[] report writing and notifications to superiors by officers," Def. Mem. at

8, then there should have been a slew of supervisors notified about Soren's shooting and

written reports documenting it, in addition to body-cam videos.  And yet despite all of

that, the City apparently has been unable to identify who shot Soren.  *See* Compl. ¶ 123.

The apparent absence of such information, in contravention of MPD policies, supports

Soren's allegations regarding the "blue wall of silence."  Furthermore, Soren was shot in

a strikingly similar way to several of the plaintiffs in *Goyette*, *Tirado*, *Armstrong*,

*Samaha*, and *Cisneros*, all of whom have sued their police assailants pseudonymously

because they do not know the officers' identities.[8]  This is more than enough to plausibly

suggest the existence of an unconstitutional policy or custom concerning the MPD's use

of force, including "less lethal" munitions, and improper (or utter lack of) reporting,

especially when the Court draws inferences in Soren's favor.  *See Crumpley-Patterson*,

388 F.3d at 591 (plaintiff must only plead facts from which one "could begin to draw an

inference" that misconduct occurred due to unconstitutional policy or custom); *see also*

*Forrest v. Parry*, 930 F.3d 93, 115-16 (3d Cir. 2019) (complaints of similar incidents of

---

[8] The City cannot hide those identifies by invoking the Minnesota Government Data
Practices Act.  State law simply cannot be used to frustrate the vindication of Soren's, or
any of the other plaintiffs', civil rights.  *See, e.g.*, *Sagehorn v. Indep. Sch. Dist. No. 728*,
No. 14-cv-1930, slip op. at 7 (D. Minn. Feb. 3, 2015) (collecting cases and agreeing that
"the MGDPA cannot be used as a basis to thwart or otherwise impede the discovery
process in a federal lawsuit"); *R.S. ex rel. S.S. v. Minnewaska Area School District No.
2149*, No. 12-cv-588, 2013 WL 12149246, at *6 (D. Minn. Mar. 20, 2013) (same).

- 15 -

excessive force were probative for *Monell* claim where they "came in a narrow period of time and were of a similar nature," even though they were not "causally related to the incident involving" the plaintiff); *Cantu v. City of Portland*, No. 3:19-CV-01606-SB, 2020 WL 2952972, at *1 (D. Or. June 3, 2020) (denying motion to dismiss *Monell* claim alleging unconstitutional custom where complaint included a "general time period and description of related protests" during which the Portland police used excessive force).

Further compounding the errors in their Motion, Defendants also argue that "one other similar incident" – the Marks shooting – "is clearly insufficient to *establish* a continuing, widespread, pervasive pattern of misconduct." *Id.* at 10. This fallacy is sprinkled throughout their brief, arguing repeatedly – albeit with different lingo – that Soren has failed to substantiate his claims. *See, e.g.*, *id.* at 6 ("The [C]omplaint fails to *establish* …"); *id.* at 8 ("For a municipality *to be held liable* …"); *id.* at 11 ("generalized allegations of misconduct . . . are insufficient to *establish* . . ."); *id.* at 13 (arguing the alleged facts "cannot *establish* deliberate indifference"); *id.* at 14 ("The complaint is wholly devoid of any facts *showing* …"). But this argument conflates pleading with proof; at this juncture, Soren need not prove his claims, but rather only plausibly allege them. And this is why nearly all of the cases cited by Defendants in their Motion are inapposite, as they addressed whether plaintiffs could *prove* their claims, either at summary judgment or at trial.

At this early juncture, Soren "need not prove the facts that *establish* a *Monell* claim—only that such a claim is plausible." *Brenner*, 2019 WL 2358451, at *9 (emphasis in original); *accord, e.g.*, *Owens v. Baltimore City State's Attorneys Office*,

767 F.3d 379, 403 (4th Cir. 2014) ("Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier.").  Asking him to do otherwise would foist an evidentiary standard upon him at the pleading stage, and that is simply "not a proper measure of whether a complaint fails to state a claim."  *Ring v. First Interstate Mortg.*, *Inc.*, 984 F.2d 924, 926 (8th Cir. 1993); *see also Swierkiewicz*, 534 U.S. at 512, 515 (declining to "transpose" an evidentiary standard for a pleading one and noting that "Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits.  Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.").

    Defendants next argue that Soren has failed to plead facts adequately alleging deliberate indifference to, or tacit approval of, the unlawful use of force by MPD officers.  Def. Mem. at 11-15.  Largely recycling their argument that Soren has not pleaded a sufficient number of similar incidents to plausibly state his claims, they contend the Complaint is "wholly devoid of any facts showing that [they] made a deliberate choice to ignore the alleged misuses of less-lethal projectiles." *Id.* at 14.  This argument is flawed for at least two reasons.[9]

    First, Defendants attack a straw-man.  Soren does not allege that MPD officers misuse only "less lethal" munitions, but rather that the MPD has tolerated, ratified, and

---

[9] Soren submits that it would be particularly inappropriate to resolve the question of "deliberate" indifference on a motion to dismiss, as that issue turns on the subjective motivations of City policymakers.  *See* Def. Mem. at 14-15 (arguing "[t]he complaint is wholly devoid of any facts showing that the City Defendants 'made a deliberate choice'").

91086345.1

promoted a custom of the use of *excessive* force, in various forms, by failing to adequately investigate the uses of such force, failing to enforce policies regarding accurate reporting and body-cam usage, and failing to discipline officers afterwards, all of which embolden officers to act with impunity and violate the constitutional rights of citizens.  Compl. ¶¶ 78-117, 125-128.  This misconduct, Soren alleges, has occurred "for decades," *id.* ¶ 79, including in the Ruszczyk, Hamilton, and George Floyd matters and, more recently, in *Marks, Goyette*, *Tirado*, *Armstrong*, *Samaha*, and *Cisneros.*

Second, Defendants ignore that the protests following George Floyd's death were widely reported in the media, and it was abundantly clear from the outset that officers were using excessive force – yet it continued unabated.  Multiple City Councilmembers recognized this and denounced it long before Soren was shot.  Compl. ¶¶ 17-19.  Under MPD's own policies, there should have been supervisors notified all over the City each time force was used during the protests.  *See* Compl.¶¶ 69-70, 86-88.  These facts permit the reasonable inference that the use of excessive force was known at the highest levels of the MPD, and a conscious decision was made by its policymakers to do nothing, *see Thelma D. ex rel. Delores A. v. Bd. of Educ. of St. Louis*, 934 F.2d 929, 933 (8th Cir. 1991) (constructive knowledge can be inferred from widespread nature of misconduct), which is sufficient to allege *Monell* liability either via an unlawful custom or a failure to supervise, *see Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016) ("Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, *or* a deliberately indifferent failure to train or supervise an official or employee.") (emphasis added).  And

- 18 -

while Defendants claim the "limited" period of time during the protests is not enough,

Def. Mem. at 13, unconstitutional customs or policies existing *before* the protests can be

inferred from the misconduct that occurred *during* the protests themselves.  Indeed,

several courts have recognized that "[p]ost-event evidence can shed some light on what

policies existed in the city on the date of an alleged deprivation of a constitutional right."

*Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Cantu*, 2020 WL

2952972, at *1 (denying motion to dismiss *Monell* claim alleging unconstitutional custom

during short period of protests).[10]

Next, Defendants argue that Soren has failed to state a claim because "there is no

constitutional right to an accurate police report, or any police report for that matter."  Def.

Mem. at 15.  But this argument, too, takes aim at a ghost.  Soren has not alleged, and

simply does not claim, that the failure to report, or accurately report, is itself

unconstitutional.  His contention, instead, is that such failures are emblematic of systemic

deficiencies at the MPD in curbing unconstitutional uses of force.  This is why the

Complaint alleges that "rank-and-file MPD officers have felt free to flagrantly violate

subjects' constitutional rights," but that they do so using "department-wide reporting

methods to cover up their misconduct."  Compl. ¶ 92.  The plague infecting the MPD is

the improper use of force; the lack of proper reporting is but one cause.  *See also id.*

---

[10] Defendants also argue "it would be pure speculation to assume" MPD's failure to curb misconduct resulted from deliberate indifference.  Def. Mem. at 13.  But it is Soren, not Defendants, who gets the benefit of all reasonable inferences at this juncture.  *See Braden*, 588 F.3d at 595 (reversing order granting motion to dismiss where district court had drawn inferences in the defendants' favor and then "fault[ed plaintiff] for failing to plead facts tending to contradict those inferences").

- 19 -

¶¶ 94, 97, 102, 110 (distinguishing between the unconstitutional use of force by MPD officers and the lack of candor with regard to it).

Along the same lines, Defendants also argue that Soren has not identified another incident in which an officer failed to properly document a use of force.  Def. Mem. at 16.  They are wrong again, as the Complaint specifically alleges a lack of reporting in Ethan Marks' case.  Compl. ¶ 81 (alleging officers "failed to . . . properly document the incident").  Equally unavailing is Defendants' argument that the failure to use body-cams is not a widespread MPD issue.  Def. Mem. at 15-16.  That failure was well-documented in Ruszczyk, *see Ruszczyk* Complaint ¶¶ 98, 100-101, 103, 234-252, was present in Ethan Marks' case, Compl. ¶ 81, and as already noted was equally present with regard to Soren.  Defendants are simply wrong that the Complaint "does not identify even a single specific example of an officer . . . failing to record" an improper use of force.  Def Mem. at 16.  Regardless, as set forth earlier, Soren is not obligated at this stage to "allege particular instances of similar constitutional violations in order to defeat a motion to dismiss." *Kohl*, 5 F.3d at 1148.

Finally, Defendants argue that Soren's *Monell* claim falters to the extent it is based on the failure of MPD officers to cooperate in use-of-force investigations.  Def. Mem. at 17-18.  But this argument once again misapprehends the nature of Soren's claim.  As with reporting, Soren does not allege that the failures to cooperate in investigations were unconstitutional in and of themselves.  Rather, his contention is that such failures are part of a custom of allowing officers "to hide behind the Blue Wall of Silence," Compl. ¶ 94, which emboldens them to violate the rights of citizens by using excessive force, *id.* ¶¶ 96-

- 20 -

97, 99-100.  Hence, it makes no difference that officers' failures to cooperate in investigations purportedly resulted from "advice lawfully provided by union representatives," Def. Mem. at 18, as those failures are alleged to (1) have been designed to cover-up misconduct and (2) violate MPD reporting policies.

## III.   The supervisory claim against Arradondo

Defendants next take issue with supervisory-liability claim against Chief Arradondo, Count IV of the Complaint.  *See* Def. Mem. at 18-22.  Their arguments are largely regurgitations of the meritless ones discussed above, all of which ring hollow in any event.

*First*, Defendants argue that Soren has asserted in "conclusory" fashion that Arradondo was involved in the violation of his rights.  Def. Mem. at 18.  But the Complaint specifically alleges that Arradondo failed to enforce policies regarding report writing or impose discipline for policy violations, Compl. ¶¶ 96-100, 105-107, 117, 125, which "causes MPD officers to act with impunity and without due regard for the Constitution and laws of the United States," *id.* ¶ 128 – including Doe 1 shooting Soren in the face, *id.* ¶¶ 108, 128, 185-187.  Soren need not gild his Complaint with any further factual detail.  *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d at 1070.

*Second*, Defendants argue the Complaint "does not plausibly plead that Chief Arradondo failed to properly supervise the Defendant Does such that the failure caused the Plaintiff's alleged constitutional violation."  Def. Mem. at 19.  Yet as already discussed, the Complaint's allegations easily suggest Arradondo knew that officers were using excessive force during the protests (and before) but failed to stop it.  It also alleges

- 21 -

there were numerous violations of MPD policies regarding the use of "less lethal" munitions.  Together, this supports a failure-to-supervise claim.  *See, e.g.*, *Ramsey v. St. Charles Cnty.*, No. 4:15–CV–00776, 2017 WL 2843572, at *7 (E.D. Mo. June 30, 2017) (evidence that correctional officers did not understand jail policies and applied them inconsistently sufficient for failure to train or supervise claim).

*Third*, Defendants contend "[t]here was no notice to Chief Arradondo of a pattern of unconstitutional acts."  Def. Mem. at 20.  Of course, "[p]roof of actual knowledge of constitutional violations is not . . . an absolute prerequisite for imposing supervisory liability."  *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989).  Regardless, as recounted above, it can be easily inferred that Arradondo was aware unlawful force was occurring across the City during the George Floyd protests.  It is equally easy to infer that he was aware of the failures by Harrity and Noor to activate their body-cams in the Ruszczyk case, as well as Harrity's ever-evolving story about what happened, which were widely known and reported.  *See* Compl ¶ 95 n.1 (citing Libor Jany & Chao Xiong, *Noor trial unfolding amid debate over 'blue wall of silence'*, Star Tribune (Apr. 15, 2009), available at https://www.startribune.com/noor-trial-unfolding-amid-debate-over-blue-wall-of-silence/508574012/).

*Fourth*, Defendants again argue "there is no constitutional right to an accurate police report."  Def. Mem. at 21.  But this is not Soren's claim; his Complaint alleges the deficient reporting was known to and tolerated by Arradondo and directly led to officers' use of excessive force.  Compl. ¶¶ 96-100, 105-107, 117, 125, 128.

- 22 -

*Fifth*, Defendants repeat their bald allegation that "Chief Arradondo was not deliberately indifferent to and did not tacitly authorize" constitutional misconduct, Def. Mem. at 22, an argument just as unavailing as the same one made by the City, *see supra* at 17-19.

*Lastly*, Defendants argue that Soren has "failed to identify even a single specific instance of a deadly force incident that went unreported." Def. Mem. at 22. But this is a red herring, as it misstates Soren's claim, and it ignores the attempted cover-ups in Ruszczyk and Hamilton, as well as the unreported shooting of Ethan Marks three days before Soren.

## IV.    If the Court intends to dismiss, Soren should be allowed to amend

In one final act of legal *chutzpah*, Defendants ask the Court to dismiss Soren's claims against them *with prejudice*. In other words, they argue that he *cannot* adequately plead his claims, a particularly galling contention when there has been no discovery and the City claims it does not even know his shooter's identity. Defendants' request is patently improper. In the event the Court is inclined to grant all or part of the Motion, Soren should be afforded the opportunity to replead any claims found wanting. *See Michaelis v. Neb. State Bar Ass'n*, 717 F.2d 437, 438-39 (8th Cir. 1983) ("Ordinarily dismissal of a plaintiff's complaint for failure to comply with Rule 8 should be with leave to amend.").

## CONCLUSION

Instead of taking ownership of the systemic problems plaguing the Minneapolis Police Department, the City has opted instead to waste this Court's time – both here and

- 23 -

in the other cases arising out of George Floyd's murder – with baseless motions that will do nothing to stop this case, and all the others, from moving forward.  The Court should not countenance this, and Defendants' Motion should be denied.

Respectfully submitted,

**ROBINS KAPLAN LLP**

Date:  December 3, 2020

s/Robert Bennett
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc Betinsky, #0388414
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com

***Attorneys for Plaintiff Soren Stevenson***

- 24 -

91086345.1