_____

Soren Stevenson,

                              Plaintiff,

v.

Benjamin M. Bauer, acting in his individual
capacity as a Minneapolis Police Officer;
Matthew Severance and Ryan McCann, acting in
their individual capacities as supervisory
Minneapolis Police Officers; Medaria Arradondo,
acting in his official capacity as the Minneapolis
Chief of Police; and the City of Minneapolis,

                             Defendants.

_____

Case No. 20-cv-2007 (SRN.TNL)

**SECOND AMENDED
COMPLAINT
Jury Trial Demanded
Under FRCP 38(b)**

For his Second Amended Complaint, Soren Stevenson ("Soren"), states and alleges as follows:

1. This is an action for money damages for injuries sustained by Soren as a result of Defendant Benjamin M. Bauer's unreasonable use of deadly force on May 31, 2020, in addition to other violations of his constitutional rights, by Defendants Bauer, Matthew Severance and Ryan McCann, all Minneapolis Police Officers. The conduct of these Defendants violated Soren's clearly established federal civil rights, all while acting under the color of state law.

2. Soren also asserts claims against Defendants Severance and McCann (the supervisory defendants) with regard to their roles as trainers and supervisors, and against Medaria Arradondo, the Chief of and policymaker for the Minneapolis Police Department.

3.     Soren further asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

4.     Soren is, and was at all times material herein, a citizen of the Unites States and a resident of the State of Minnesota.  He is a recent Master's graduate of the University of Minnesota's Humphrey School of Public Affairs.

5.     Defendant Benjamin M. Bauer was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly appointed and acting as an officer of the Minneapolis Police Department.  He is sued in his individual capacity.

6.     Defendants Matthew Severance and Ryan McCann were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as supervisory officers of the Minneapolis Police Department. They are sued in their individual capacities.

7.     Defendant Medaria Arradondo ("Chief Arradondo") was at all times material herein the Chief of the Minneapolis Police Department and a policymaker for the MPD.  He is sued in his official capacity.

8.     Defendant City of Minneapolis is a municipality duly incorporated under the laws of the State of Minnesota.

9.     Soren brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer

original jurisdiction of the Court over this matter. State-law claims and, by consequence, limitations and defenses under state law are not applicable to this civil-rights lawsuit.

10.     The events giving rise to this action occurred in the City of Minneapolis. Venue is thus proper under 28 U.S.C. § 1391(b)(2).

## THE BACKDROP – THE MURDER OF GEORGE FLOYD BY MINNEAPOLIS POLICE OFFICERS

11.     On May 25, 2020, George Floyd was killed by former Minneapolis Police Officer Derek Chauvin while three fellow officers stood by and refused to intervene.

12.     Video of the murder sparked worldwide outrage and many protests ensued as a call to finally change systemic racism in our nation's police departments. Mr. Floyd was one of many tragic casualties of the Minneapolis Police Department's long history of racial bias and unchecked, unconstitutional use-of-force practices.

13.     Some of the protests nationwide, including in Minnesota and Minneapolis in particular, caused severe destruction. But, most of this occurred during nighttime hours.

14.     During the daytime in Minneapolis, the vast majority of activity was peaceful and aimed at effecting change.

15.     But as was typical for the Minneapolis Police Department's heavy-handed tactics, the protests – peaceful or not – were met with force by the MPD, including the improper use of tear gas, 40 millimeter blunt-impact projectiles, and other supposedly "less lethal" munitions.

16.     On May 26, 2020, Minneapolis Councilmember Andrew Johnson denounced the police use of chemicals and projectiles, stating: "What I saw from some of the scenes

last night looked to be disproportionate and escalating force…It's extremely concerning, and we need answers and accountability for that."

17.     Another Minneapolis Councilmember, Steve Fletcher, described on May 28, 2020, that the police had flipped the script on peaceful protesters:  "The community gathered Tuesday night to mourn and express their outrage, peacefully.  Tactical decisions by MPD shifted the dynamic of the crowd…to confrontation."

18.     Days prior to Soren's injury, Minneapolis Councilmember Jeremiah Ellison described the same phenomenon.  Councilmember Ellison said:  "The police always respond this way to crowds, and things get out of hand…And I don't know how the strategy doesn't change. And I'll tell you right now I've made calls requesting that the strategy change and it still has not."

19.     On May 27, 2020, Minneapolis Mayor Jacob Frey told residents that he understood their anger and he encouraged peaceful protests: "What we need now in terms of protesting is peaceful protesting. . . No one out there will fight harder for their right (to protest). . . But those rights stop at a line when public safety is at risk and we need to be making sure that we're looking out for the safety of our residents."

20.     On May 28, 2020, the City of Minneapolis held a press conference and issued this statement: "The City encourages everyone to exercise caution and stay safe while participating in demonstrations, including wearing masks and physical distancing as much as possible to prevent the spread of COVID-19. The City has made hundreds of masks available to protesters this week."

21.     Minnesota Governor Tim Walz, too, recognized the value of protesting. As part of his Emergency Executive Order 20-67 issued on May 30, 2020, Governor Walz stated: "Thousands of Minnesotans have expressed their frustration in a peaceful and constructive manner."

22.     On May 30, 2020, Chief Arradondo stated: "We want to make sure that people continue to protest and gather PEACEFULLY. We don't want them to be in harms way by others."

23.     Also on May 30, 2020, Minneapolis City Council President Lisa Bender called the right to protest "sacred."

### THE UNDERLYING WRONGS
### THAT PROMPTED THE PROTESTS

24.      The protesters grievances with the MPD and a good many of its officers have been objectively confirmed by separate citizen bodies charged with finding facts and making judgments on the state of affairs within the Department.

25.     On April 20, 2021, the Hennepin County petit jury in the criminal trial of former MPD officer Chauvin found him guilty on all of the three criminal charges leveled against him in connection with the murder of George Floyd.

26.     On May 6, 2021, a federal grand jury in the District of Minnesota returned an Indictment in 21-CR-00108 (PAM/TNL) against former MPD officers Chauvin, Tou Thao, J. Alexander Keung and Thomas Lane charging criminal civil-rights violations in connection with their treatment, and the death, of George Floyd.

27.     On May 6, 2021, a federal grand jury in the District of Minnesota returned an Indictment in 21-CR-00109 (WMW/HB) charging that on September 4, 2017, then-MPD

officer Chauvin deprived then-Juvenile 1 of the right secured and protected by the Constitution of the United States to be free from unreasonable search and seizure, which includes the right to be free from the use of unreasonable force.

28.     That latter Indictment, in Count I, charged that Chauvin, without legal justification, held Juvenile 1 by the throat and struck him multiple times with a flashlight, a dangerous weapon.

29.     That Indictment, in Count II, charged that Chauvin "held his knee on the neck and upper back of Juvenile 1 even after Juvenile1 was lying prone, handcuffed and unresisting."

30.     For these actions, Chauvin was not disciplined or terminated by the MPD and continued to perform such acts until he was arrested for the murder of George Floyd.

## THE DAY OF THE INCIDENT

31.     Following the advice and encouragement from the Governor, the Mayor, the Chief of Police, and City Councilmembers, Soren joined the chorus of those peacefully protesting, gathering on May 31, 2020, with a group of other protesters near Interstate 35W and University Avenue, well before the 8:00 p.m. curfew.

32.     The City responded by shooting Soren in the face and permanently injuring him.

33.     The City of Minneapolis's severe and pervasive history of police misconduct and unchecked excessive force prevailed again.

34.     The City of Minneapolis has long ignored the problem. So the outcome befalling Soren was predictable and not surprising as City leadership seemed to implicate.

35.     Soren took part in classic First Amendment-protected activity. To paraphrase Councilperson Ellison, the MPD did what it always does.  Soren therefore became one of the many victims of the MPD's pattern and practice of excessive force without fear of repercussion.

36.     The events culminating in Soren's shooting were broadcast on live television as depicted in the photographs below.

37.     The group was peaceful and many had their hands up. Soren (circled) was wearing a mask, a dark-colored T-shirt and light-colored khaki shorts.



### THE CHAIN OF COMMAND AT 35W AND UNIVERSITY AVENUE

38.     On May 31, 2020, Bauer was assigned as a member of SWAT 1280, also known as 1280 CART team.

39.     On May 31, 2020, SWAT 1280 comprised nine MPD officers, with Defendant McCann as its Team Leader.

41.     Shortly after SWAT 1280 was assigned to the police event, the approval for any "less lethal" munitions was given.

42.     MPD officer Daniel Ungurian drove SWAT 1280, including Bauer and McCann, to the area of 35W and University Avenue in a white van.

43.     Bauer was under both McCann's and Severance's command and supervision.

44.     Severance was in charge of the operations and decisions at and around 35W and University Avenue on May 31, 2020, including at the time that Bauer shot Soren.

## THE DECISION TO USE FORCE ON PEACEFUL PROTESTERS

45.     Approximately 13 minutes prior to Bauer's shooting of Soren, Defendants Severance and McCann devised a plan to disperse the group of peaceful protesters so that MPD officers could take a bridge over 35W at University Avenue.

46.     Severance described the overview to McCann and MPD Sergeant Darcy Klund: make it look like the police presence was leaving, come back up and trap the protesters, and keep them off the bridge over 35W.

47.     Severance requested McCann's insight as to what could feasibly be accomplished.

48.     McCann stated: "You'd have to almost let us hit them with munitions first."

49.     Severance approved the action: "Munitions first. Scatter them a little bit."

50.     Severance also approved chemical agents – "Here's the deal, if you gassed them. Give me a fucking gap right there (pointing towards University Avenue bridge as depicted in the still frame from McCann's body-worn camera ("BWC") below) and I want to

fucking caravan. Get ready to go that way. When I say on the ready."



51.     McCann agreed: "We can do that."

52.     Severance: "And I'm going to get all these mother fuckers doing 60, that way" (again pointing towards the University Avenue bridge) to clear protesters off 35W.

53.     After further discussion, Severance stated to McCann: "Work on that. When I ask for it – Strike Team 1, CART Team, be ready to go. Execute that fucker. Get these guys."

54.     At no time after this plan was devised was it communicated to the peaceful protesters that they were engaged in an unlawful assembly.

55.     At no time after this plan was devised were the peaceful protesters directed to

56.     At no time after this plan was devised were the peaceful protesters provided a clearly and loudly communicated dispersal order.

57. Instead, the plan hatched by Severance and McCann was antithetical to providing clear and loud verbal warnings.

58. Their plan was antithetical to providing clear and loud directions to the peaceful protesters to disperse.

59. Their plan was antithetical to providing adequate time for dispersal of the group of protesters.

60. Further, no warnings were provided to the group of peaceful protesters prior to deploying blast balls and various chemical agents into the group of peaceful protesters.

61. Likewise, no warnings were provided to the group of peaceful protesters prior to the firing of 40 mm "less-lethal" launchers.

## THE SHOOTING

62. At the time of his shooting of Soren, Bauer was located within the front line of MPD officers on the entrance ramp from University Avenue to 35W South.

63. Specifically, Bauer was located in the grass to the right of the entrance ramp as depicted in the below still frame from SWAT 1280 member and fellow-MPD officer Austin Seely's BWC. Bauer is denoted by the red arrow:



64.     Bauer was wearing a short sleeved MPD uniform.  He was not wearing gloves and had a watch on his left hand with the watch face worn on the inside of his wrist.

65.     Bauer was carrying a 40-millimeter optically-sighted "less lethal" launcher.

66.     Further, Bauer mostly fired the silver blunt impact projectile ("BIP") rounds as depicted below:



67.     These BIP rounds "enable kinetic energy to be applied over a larger surface area of the body, targeting the lower torso or extremities. These areas provide sufficient pain stimulus."[1]

68.     However, the Defense Technology Spec Sheet for the BIP rounds warns that impacts "targeting the subject's head, neck or upper torso can result in serious injury or death."[2]

69.     These BIP rounds are "designed to be highly effective in law enforcement situations that require greater accuracy and delivered energy."[3]

---

[1] Defense Technology 40mm-BIP Spec Sheet ("Spec Sheet"), available at https://www.defense-technology.com/wp-content/uploads/2020/06/40mm-BIP-Collapsible-Gel-Round.pdf (last visited May 28, 2021).

[3] https://www.policemag.com/360113/defense-technology-introduces-40mm-blunt-impact-projectile-collapsible-gel-round (last visited May 28, 2021).

70. Further, these BIP rounds "enable the projectile to engage the target with higher kinetic energy across the operational range."

71. These BIP rounds have a minimum safe range of 5 feet and a maximum effective range of 131 feet.

72. The purpose of these BIP rounds is to strike individuals, causing pain from blunt trauma.

73. These BIP rounds were intended for the "incapacitation of an aggressive, non-compliant subject."[4]

74. At approximately 18:48:33 on Bauer's body-worn camera, he can be seen lifting up, pointing and aiming his 40-millimeter optically-sighted "less lethal" launcher at the group of peaceful protesters. Soren is denoted below with a red arrow:



---

[4] Spec Sheet.

75. Bauer was in close proximity to the group of protesters, including Soren, and his shot at Soren's head was much closer to the minimum safe range of the BIP round than its maximum effective range.

76. Bauer panned his 40-millimeter optically-sighted launcher from left to right – towards Soren (again denoted by the red arrows), as depicted in the below stills from his BWC:







77.   Bauer's wrist eventually obscured Soren from view of his BWC.

78.   Bauer aimed at Soren's head.

79.   Bauer shot at Soren's head at approximately 18:48:38:



80.     Seely's BWC captured Soren being shot and immediately turning to his right and grabbing his left eye:



81.     Soren was struck in the left eye with a 40-millimeter BIP, ultimately resulting in the loss of that eye.

82.     From the television coverage of the scene, Soren can be seen holding his face and attempting to move away in the immediate aftermath of being shot:



83.     Soren was shot before the 8:00 p.m. curfew.

84.     Soren had not committed any crime and was never charged with any crime.

85.     Soren had not displayed any aggression.

86.     Soren had not thrown any items at officers.

87.     Soren was unarmed.

88.     Soren posed no threat to the officers or others.

89.     Soren was not engaged in any unlawful assembly.


91.     The scene did not contain rioters or looters.

92.     No warnings were given to Soren regarding a potential use of force.

93.     No directions were given to Soren.

94.     No commands were given to Soren.

95.     No dispersal orders were given to Soren.

96.     Soren had not failed to heed any warnings, nor failed to follow any directions, commands or dispersal orders.

97.     In order to shoot Soren with a blunt-impact projectile from a 40-millimeter launcher, Defendant Bauer had to execute a series of volitional acts.

98.     Defendant Bauer volitionally pulled back the hammer, cocking the 40-millimeter launcher:



99.     Defendant Bauer volitionally held the launcher in firing position, requiring his non-firing hand to hold the foregrip of the launcher and placing his firing hand on the pistol grip of the launcher.

100.    The foregrip helps stabilize the launcher, aiding in aiming and increasing accuracy.

101.     Defendant Bauer volitionally moved the safety lever on the launcher from the "safe" position to the "fire" position.

102.     When the safety lever of the launcher is in the "safe" position, the launcher is unable to be fired.

103.     Defendant Bauer volitionally inserted his finger inside the trigger guard.

104.     Defendant Bauer volitionally aimed the weapon at his intended target – Soren.

105.     Defendant Bauer volitionally placed his finger on the trigger.

106.     Defendant Bauer volitionally exerted sufficient trigger-pull pressure to fire the launcher loaded with 40-millimeter "less lethal" rounds at Soren.

107.     Defendant Bauer volitionally fired at Soren's head.

108.     The impact caused devastating injuries resulting in the loss of Soren's left eye, multiple facial fractures, a severe concussion, and other significant physical and mental injuries.

109.     Soren's injuries in the immediate aftermath were captured and displayed on social media.  Stills from the same are depicted below:





110.     Making matters worse, no MPD officer, sworn to "protect and serve,"
rendered aid to Soren after he was shot.

111.     Instead, several bystanders (who happened to be nursing students) provided
immediate first aid before rushing Soren to M Health Fairview by vehicle.

## **THE UNAUTHORIZED USE OF DEADLY FORCE**

112.     Several MPD policies in place on May 31, 2020, addressed the 40mm that Defendant Bauer used to shoot the projectile into Soren's eye.

113.     Under Policy 5-317(I), for example, the "MPD recognize[d] that combative, non-compliant, armed and or otherwise violent subjects cause handling and control problems that requires special training and equipment. The MPD has adopted the less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations." *See also,* Policy 5-317(V)(C), noting the launcher "can be used when the incapacitation of a violent or potentially violent subject is desired."

114.     Policy 5-317(II) defined a 40mm less-lethal round as a "[d]irect fire round used in situations where maximum deliverable energy is desired for the incapacitation of an aggressive, non-complaint subject."

115.     Policy 5-317(III)(B)(1) noted that "[t]he use of the 40mm less-lethal round should be considered a level slightly higher than the use of an impact weapon and less than deadly force when deployed to areas of the subject's body that are considered unlikely to cause death or serious physical injury."

116.     Policy 5-317(IV)(B)(1) outlined the acceptable "target areas" as follows:

- Large muscle groups in the lower extremities (buttocks, thigh, knees);

- Alternative target areas (ribcage area to waist and larger muscle areas of shoulder).

117.     Policy 5-317(IV)(B)(1) noted the following **as areas to avoid**:

- Head;

- Neck;

- Spinal cord;

- Groin; and

- Kidneys.

118.    Policy 5-317(IV)(B)(2) stated that "[o]fficers shall be aware that delivery of the 40mm impact projectiles to certain parts of the human body can cause **grievous injury** that can lead to **permanent physical or mental incapacity or possible death**" (emphasis added).

119.    Policy 5-317(IV)(B)(2) stated that the "[a]reas susceptible to death or possible severe injury are the **head, neck, throat, and chest**" and that these areas should be avoided **"[u]nless deadly force is justified**" (emphasis added).

120.    Policy 5-317(V) required medical assistance to be rendered to anyone injured by a 40mm "less lethal" round.  Further, if possible, officers were to take photographs of any injuries to the subject.

121.    Policy 3-517(V)(G)(1)-(2) required officers who deployed 40mm rounds to document the force in a written report and notify a supervisor.

122.    Supervisors, in turn, were required to review the incident and ensure that the spent rounds are collected and property inventoried, if possible.

123.    Though the policies and procedures differed in some respects for SWAT officers, MPD policies still constrained the use of less-lethal munitions by such officers, still required supervisor notification when 40mm rounds were fired, still required uses of "less

lethal" munitions to be documented, and still required officers to render aid to any persons injured by "less lethal" projectiles.

124.    Defendant Bauer's actions in shooting Soren contravened MPD training regarding the use of the 40mm launcher.

125.    Defendant Bauer's actions in shooting Soren contravened MPD policies regarding the use of the 40mm launcher.

126.    No permissible use of the 40mm launcher in MPD's policies applied to Soren.

127.    Defendant Bauer utilized deadly force when no force was authorized, and this was clearly established law as of May 31, 2020 in the United States of America.

128.    A January 13, 2021 open letter to the editor regarding law enforcement's use of "less-lethal" weapons during the George Floyd protests *in Minneapolis* was featured in the New England Journal of Medicine.

129.    The letter described a retrospective analysis of patients treated at two Minnesota hospitals – M Health Fairview and Hennepin County Medical Center – for injuries from "less-lethal" weapons during the protests.

130.    The study found that "[a] substantial percentage of projectile injuries were to the head, neck, or face (in 23 of 57 patients [40%])."

131.    Further, the study noted that 37 out of 86 "absolute strike counts" – **43%** - were to the **head, face and neck**.

132. The study also found "a substantial number of patients with serious injuries, including many injuries to the **head, neck and face**" (emphasis added). This was true "[a]lthough less-lethal weapons are designed as an alternative to lethal weapons."

133. The study noted the United Nations guidelines, which state that "less-lethal" weapons "should only be aimed directly at the extremities and that hits to the head, neck, and face are potentially unlawful."

134. From the data, the authors concluded that "under current practices, [these] projectiles are not appropriate for crowd control."

135. Notably, Soren is patient number 5 and his imaging from M Health is featured as Figure 1 in the publication.

136. The study describes, quite literally, a pattern and practice of head hunting.

### THE POST-INCIDENT
### CONDUCT OF DEFENDANTS

137. The events surrounding the shooting of Soren became particularly suspicious when all of the MPD officers at the scene, including Defendant Bauer, failed to render aid to a seriously injured person.

138. Instead, Bauer, McCann and the rest of SWAT 1280 retreated to their white van shortly after MPD took the University Avenue bridge, where members laughed and drove away.

139. These actions and inactions were more than immoral; they were inhuman.

140. The involved officers, who did not care about Soren's constitutional rights, showed they had no concern about him as a human being who was acutely injured – a person they had sworn "to protect with courage and serve with compassion." While they

- 24 -

abandoned their duty to the Constitution, they also abandoned their humanity in order to shield their identities and avoid the consequences of even providing aid for what could have been a fatal wound.

141. Similarly, and not surprisingly, none of MPD's policies were followed by Defendant Bauer in the moments *after* the shooting of Soren.

142. This was no isolated occurrence. MPD has allowed its officers to get away with policy and constitutional violations without fear of repercussion for decades (at least).

143. The failure to report, or to accurately report, the use of deadly force by MPD officers occurred repeatedly in the days following George Floyd's death by the Minneapolis Police Department.

144. Indeed, the same pattern occurred with regard to the blinding of Ethan Marks, a citizen exercising his First Amendment rights during daytime hours on May 28, 2020, a mere three days before Soren was blinded, when Defendant Bauer fired without warning a "less lethal" 40-millimeter direct-impact OC round directly into Marks's eye socket, destroying the eye and the socket, as well as other facial bones, and then failed to render him any aid or properly document the incident.

145. This was completely antithetical not only to the stated goals of transparency and accountability embodied in the MPD Policy and Procedure Manual, but also to Chief Arradondo's public pronouncements in the wake of George Floyd's murder. Those pronouncements were mere lip service given MPD's long and unremedied history of flouting the Constitution.

146. The central tenet of MPD's Policies and Procedures is to enable the MPD, the

involved citizens, and the public to learn:

- What acts each MPD officer took
- What use of force was employed
- What weaponry was used and in what fashion
- If any MPD officer injured any individuals
- If and what aid was rendered by any MPD officer

147.    Yet, there has been *no* such transparency with regard to Soren's incident, in an effort to *prevent* accountability.

148.    Additionally, upon information and belief, Defendant Bauer and the others who fired their 40-millimeter launchers upon peaceful protesters either failed to follow MPD policies with regard to report writing and supervisor notification *or* falsified reports, utilizing systematic buzz words, strategic omissions, and phrases in an attempt to conceal or justify the unauthorized use of deadly force on Soren.

149.    For example, Defendant Bauer's unauthorized use of deadly force caused injury to Soren and therefore, Defendant Bauer was **required** to document the use of force in a "CAPRS" report *and* notify a supervisor.  This did not occur.

150.    Defendant Bauer claimed to have informed Defendant McCann regarding his deployment of approximately 20 BIP rounds at the group of protester at 35W and University Avenue.  But no additional details were recorded by Defendant Bauer.

151.    From the additional reports regarding this incident, including those of Defendant McCann, none of the required details were provided to or pursued by Bauer's supervisors.

152.    Instead, only the number of less lethal and chemical munitions were inventoried and the fact that force as used, generally, on the group of protesters was documented.

153.    The CAPRS report was to be "completed as soon as practical, **but no later than the end of that shift."**  This did not occur.

154.    Upon information and belief, the first – and only – written report regarding Defendant Bauer's deployment of 20 BIP rounds at 35W and University Avenue on May 31 was created on June 1, 2020.

155.    Defendant Bauer's singular report regarding his deployment of approximately 20 BIP rounds lacks all of the required details for his use of force against Soren or others, including, but not limited to, the information that would permit a reader to know he was **the** MPD officer who shot Soren.

156.    Similarly, Policy 4-602(A) mandated that "[a] short public narrative statement describing the offense or incident" shall be prepared. Yet even this simple synopsis of events was not completed with regard to the shooting of either Soren or Ethan Marks.

157.    If the applicable MPD policies outlined above had been followed, the following information would be readily available:

- A description of the scene and events leading up Defendant Bauer pulling the trigger
- The shooter's (Bauer's) identity
- The identities of witness officers
- The identities of lay witnesses at the scene
- The treatment and aid rendered by MPD officers (if any)
- A description of the injuries Soren suffered
- Identification of the launcher used and projectile deployed by Bauer

158.    But rank-and-file MPD officers have felt free to flagrantly violate subjects' constitutional rights under department-wide reporting methods to cover up their misconduct.

159.    Despite policies stating otherwise (*see* MPD Policy 5-105 – requiring officers to "immediately report any violation of rules, regulations or laws that come to their attention, including force-related misconduct"), candor with regard to fellow officers' obvious constitutional violations is nonexistent at the MPD.

160.    Instead, rank-and-file MPD officers (and beyond) have helped said unconstitutional actors to hide behind the Blue Wall of Silence, even where the officer becomes a convicted murderer.

161.    MPD officers have been instructed by their Union (the Minneapolis Police Federation) not to aid in investigations into other officers, and they follow said instruction.[5]

162.    The supervisory Defendants – Severance and McCann – and policymakers at the City of Minneapolis and the Minneapolis Police Department had actual knowledge of the lack of adherence to MPD policies among officers or were deliberately indifferent to the need for proper reporting by turning a blind eye.

163.    MPD officers are routinely not disciplined when they fail to truthfully or accurately report the unauthorized use of deadly force or fail to cooperate with investigations into fellow officers.

---

[5] https://www.startribune.com/noor-trial-unfolding-amid-debate-over-blue-wall-of-silence/508574012/

164.    Other than lip service, there has been no response by the City and Chief
Arradondo to curb this practice of behavior by MPD officers and the Minneapolis Police
Federation.

165.    Consequently, MPD officers know that they can act in the above-described
ways with complete impunity.

166.    The actions of the uncooperative and policy-violating MPD officers, and the
failures of the City and Chief Arradondo to discipline the officers for such conduct, fly in
the face of MPD's Code of Conduct, embolden officers to act without regard for the rights
of citizens, and were a moving force behind the deprivation of Soren's federal civil rights.

167.    Some combination of the failure to report, the failure to report truthfully, the
Blue Wall of Silence, and the failure to cooperate in investigations has occurred here.

168.    Defendants Severance and McCann directed, authorized, and actively
encouraged Defendant Bauer's use of excessive force at the scene and failed to prevent
the same.

169.    Severance and McCann were personally, causally, and directly involved in the
violation of Soren's constitutional rights.

170.    Other MPD officers, in addition to Severance and McCann, further
encouraged Defendant Bauer's use of excessive force in collaboration with Defendant
Bauer and one another to abandon or render useless the requirements of report writing and
supervisor notification, orto the obligation to report truthfully.

171.    Many of the reports regarding the May 31, 2020 police event at 35W and
University Avenue include chatter regarding earlier protests – all of which have no bearing

on the subject event. Past behavior of other protesters does not justify the excessive use of deadly force on Soren at the time he was shot by Bauer.

172. Defendants Bauer, Severance, and McCann, along with other MPD officers, used theabsence of truthful and complete report writing and proper supervisor notification to frustrate Soren's assertion of his civil rights.

173. Defendants Bauer, Severance, and McCann, along with other MPD officers, acted in away to skirt responsibility and accountability for their and their officers' actions and inactions on May 31, 2020.

174. Defendants Severance and McCann, the City and Chief Arradondo have acquiesced in the same by failing to require adherence to policies regarding report writing, particularly with regard to the intentional and improper use of deadly force, supervisor notification and policy-violation notifications.

175. Defendants Severance and McCann, the City and Chief Arradondo have acquiesced in the unauthorized use of deadly force by Defendant Bauer going unpunished by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

176. The supervisory Defendants were causally and directly involved in the violation of Soren's constitutional rights.

177. As a result of the department-wide reporting and cover-up methods, Soren was unaware of the identity of his shooter for almost an entire year.

178. During that year, Soren, by and through his counsel, made repeated attempts to identify the officer or officers who fired at him.

179.     Soren's counsel sent letters describing these events in detail, with images, and asked for assistance in locating all recordings and any reports relevant to the incident and the aftermath to Chief Arradondo, the City Attorney's Office and the Minnesota Bureau of Criminal Apprehension.

180.     Similarly, Soren's counsel made calls and sent emails to County and City officials inquiring what, if any, progress had been made in identifying the offending officers.

181.     Additionally, a public data request was submitted by Soren's counsel, as they were instructed to do by the City.

182.     Despite these entreaties, neither the shooter nor the other involved officers were affirmatively identified by the City.

183.     The City still maintains that it cannot identify the shooter.

184.     Proof of the identification of the shooter as Bauer was only possible by an intense and time consuming review of all BWC evidence, together with documentary evidence, by counsel for Soren.

185.     Had the MPD required Bauer to comply with its policies, he would have been identified as the shooter immediately after the shooting itself.

186.     Instead, the Blue Wall of Silence remains alive and well, operating as it has historically, within the MPD and the City.

187.     The lack of consequences imposed upon MPD officers who protect their own or who, in violation of their sworn duties as peace officers, fail to cooperate with investigations into such matters or a complete failure to investigate such matters ensures that

the Blue Wall of Silence remains intact. Chief Arradondo has repeatedly failed to hold such officers accountable for such actions.

188. Numerous MPD officers and the City continue to hamper Soren's ability to investigate and vindicate his civil rights.

189. MPD Policy 5-101.01 provides that:

The integrity of police service is based on truthfulness. Officers shall not willfully or knowingly make an untruthful statement, verbally or written, or knowingly omit pertinent information pertaining to his/her official duty as a Minneapolis Police Officer.

MPD employees shall not willfully or knowingly make an untruthful statement or knowingly omit pertinent information in the presence of any supervisor, intended for the information of any supervisor or before any court or hearing. Officers shall not make any false statements to justify a criminal or traffic charge or seek to unlawfully influence the outcome of any investigation.

These requirements apply to any report, whether verbal or written, concerning official MPD business including, but not limited to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business.

MPD employees are obligated under this policy to respond fully and truthfully to questions about any action taken that relates to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business

190. The MPD's continued failure to discipline officers, through policymaker Defendant Chief Arradondo, causes MPD officers to act with impunity and without due regard for the Constitution and laws of the United States. The consequences of this are becoming all the more apparent and pervasive.

## <u>SOREN'S INJURIES</u>

191. Soren sustained devastating and permanently disfiguring physical injuries as a result of being shot.

192.    After being rushed to the hospital by bystanders, a CT scan was taken at 7:24 p.m. on May 31, 2020, which revealed that Soren had sustained multiple facial fractures including comminuted fractures of the nasal bones and nasal septum, comminuted fractures of the bilateral lamina papyracea/medial orbital wall, comminuted fractures of frontal sinuses/orbital roofs, and displaced fractures of the anterior and posterior walls of the left maxillary sinus and floor of the left orbit:





193.    Soren also had sustained a concussion.

194.    The CT scan showed a small right superior medial subperiosteal hematoma without significant mass effect, extensive intraocular gas, and layering debris in the left maxillary sinus, suspicious for intrasinus hemorrhage.

195.    The CT scan also revealed a global rupture with hyperdense material within the left vitreous compatible with hemorrhage, as well as extensive left-sided preseptal premaxillary edema/hematoma.

196.    In other words, Soren had suffered extensive injuries to his face and sinuses and catastrophic injuries to his left eye.

197.    Soren underwent emergent globe repair surgery on May 31, 2020, but ultimately the damage to his left eye was too extensive to save it.

198.    On June 10, 2020, Soren underwent further surgery for enucleation (removal) of his left eye and the implantation of a prosthetic eye in its place.

199.   As part of that procedure, tissue in his eye socket was sewn together in order to create a pocket for the prosthetic eye. The pocket had not held together, however, and Soren will be required to undergo further surgery in which skin from his cheek will be grafted into his eye socket in order to create a stronger pocket.

200.   Since the enucleation surgery, Soren also has had ongoing difficulties around his left eye, including bloody drainage from the area and allergic reactions around his eye patch.

201.   In addition, Soren suffered from headaches and had cognitive difficulties, including stuttering, memory issues, problems with diction and having trouble finding the right words, as a result of being shot. He also suffered from light sensitivity, impaired balance, and difficulties from the loss of stereovision.

202.   At his July 7, 2020 concussion consultation, Soren expressed continued cognitive issues, but the most pressing issue was the loss of stereovision and his balance issues.  He required large print books due to the loss of his left eye.

203.   Soren's left eye continued to discharge bloody drainage and to address the ongoing issues he required a conjunctivoplasty in August 2020 and a conjunctivoplasty with Alloderm graft from his cheek in September 2020.

204.   It was a month after the September 2020 surgery that he was able to be fitted with his left eye prosthesis.

205.   The bloody discharge issue arose again in late January and early February 2021, frequently leaving Soren's eye glued shut. He required an additional surgeries in February and March 2021.  Each of these surgeries is a painful procedure.

206.     Soren also has suffered significant emotional injuries as a result of the force deployed against him.

207.     He has experienced nightmares since the incident, as well as states of unreasonable fear.

208.     He sought counseling with Heather Marie Holt, MSW LICSW ("Holt"), at Brave Choices Counseling, who diagnosed Soren with Post-Traumatic Stress Disorder.

209.     The PTSD diagnosis is unquestionably related to being shot in the face and gravely injured.  Holt wrote:  "[PTSD] due to the life-altering injury he has suffered, the loss of an eye.  He exhibits avoidance symptoms as well as anxiety related symptoms."

210.     Holt suggested that Soren's difficulty expressing emotions since the injury is likely due to "dealing with psychological shock and continuing to experience some of his threat responses."

211.     She recorded other injury-related symptoms including continued bleeding from the left eye, hopelessness, anxiety, irritability, feeling constrained, difficulty sleeping and worry that his sense of smell may not come back, among others.

212.     Soren has treated with Holt regularly since June 18, 2020. Her current recommendation is that regular therapy continue for one or more years.

213.     Soren's post-visit summary from Holt reads as follows:  "The client's affective and emotional state appeared withdrawn, detached, somewhat flat and mildly anxious. The client's mental state included a post-traumatic reaction. The client's estimated global assessment of functioning suggest some serious emotional and psychological difficulties and quite serious impairment in relational, work and/or school functioning."

214. Life as Soren knew it changed due to the May 31, 2020 shooting.

215. Soren is down an eye:



216. The loss of his left eye has left him limited with regard to: 3D stereovision, background light, contrast, depth perception, diffuse light, direct light, glare, hand-eye coordination, near and far acuity, visual attention and visual field.

217. Soren also has difficulty switching targets – for example, when reading he has trouble switching from the end of one line to the beginning of the next.

218. Soren has (started) occupational therapy at HCMC to learn a number of monocular vision strategies to help him deal with his deficits.

219. Soren was prescribed glasses to help with the light issues.

220. Soren is learning how to navigate his prosthesis.

221.     Soren's glabella remains deformed.

222.     Soren's extensive treatment, including surgical intervention during a global pandemic, continues and will for the foreseeable future.

223.     To date, Soren's medical bills total more than $144,360.

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff v. Defendant Benjamin M. Bauer*

224.      Soren realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

225.     By the actions described above, Defendant Benjamin M. Bauer, under color of state law, violated and deprived Soren of his clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

226.     Defendant Benjamin M. Bauer subjected Soren to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

227.     As a direct and proximate result of the acts and omissions of Defendant Benjamin M. Bauer, Soren suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

228.     Punitive damages in an amount exceeding $5,000,000 are available against Defendant Benjamin M. Bauer and are hereby claimed as a matter of federal common law

under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

229.    Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### 42 U.S.C. § 1983 – FIRST AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff v. Defendants Bauer, Severance and McCann*

230.    Soren realleges and incorporates by reference herein each and every allegationcontained in each paragraph above as if fully set forth herein.

231.    Soren engaged in constitutionally protected acts of speech and assembly in the form of peaceful protesting in Minneapolis.  He did so in a public place before curfew and at all times obeyed the requests by City leaders.

232.    Defendants Bauer, Severance and McCann, under color of state law, retaliated against Soren for engaging in said constitutionally protected activity.

233.    Soren's First and Fourteenth Amendment rights were violated when he was deliberately targeted and shot in the head during the course of the protest, and in the cover-up perpetrated by Defendants Bauer, Severance and McCann afterward.

234.    The conduct of Defendants Bauer, Severance and McCann would tend to chill citizens from engaging in constitutionally protected activity and did in fact chill Soren's exercise of his First Amendment rights.

235.    Defendants Bauer, Severance and McCann subjected Soren to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

236. As a direct and proximate result of the aforementioned unconstitutional conduct, Soren has been damaged in an amount exceeding $5,000,000.

237. Punitive damages in an amount exceeding $5,000,000 are available against Defendants Bauer, Severance and McCann and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

238. Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

<h2 style="text-align:center;">COUNT III</h2>

**SUPERVISORY LIABILITY**
*Plaintiff v. Defendants Severance and McCann*

239. Soren realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

240. Defendants Severance and McCann at all times material hereto were members of the Minneapolis Police Department with supervisory responsibilities over Defendant Bauer.

241. These supervisory Defendants were present at the scene of Defendant Bauer's shooting of Soren and directed, authorized, and encouraged Defendant Bauer's use of excessive force.

242. These supervisory Defendants personally participated in the violation of Soren's constitutional rights and failed to prevent the same.

243. In addition, these supervisory Defendants at the City of Minneapolis had actual knowledge of the constitutionally infirm force reporting in widespread use among

officers.

244. As such, rank and file, such as Defendant Bauer with regard to Soren, freely and flagrantly violate citizens' constitutional rights using department-wide reporting methods to cover it up.

245. The supervisory Defendants had actual knowledge of the improper reporting by Defendant Bauer regarding the Soren incident and other similar incidents, further evidencing a policy or custom of constitutional misconduct.

246. These supervisory Defendants, under color of state law, acted with deliberate indifference to, authorized or acquiesced in the violation of Soren's constitutional rights by Defendant Bauer.

247. As a direct and proximate result of the acts and omissions of Defendants Severance and McCann, Soren suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

248. Punitive damages in an amount exceeding $5,000,000 are available against Defendants Severance and McCann and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

249. Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT IV

### CIVIL RIGHTS VIOLATIONS
### MONELL V. DEP'T OF SOCIAL SERVICES
*Plaintiff v. Defendant City of Minneapolis and Medaria Arradondo in his official capacity*

250. Soren realleges and incorporates by reference herein each and every allegation

contained in each paragraph above as if fully set forth herein.

251.    Before May 31, 2020, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers, including the Defendants herein, of the improper use of force, including deadly force.

252.    Through policymaker Defendant Chief Arradondo, and with the department's ratification and approval, by failing to discipline all officers consistently on this point, there has been an approval of a deficient policy, custom, or practice of the improper use of force, including deadly force.

253.    Soren's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices and the City of Minneapolis is thereby liable in an amount exceeding $5,000,000.

254.    Soren is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Soren Stevenson prays for judgment as follows:

1.    That this Court find that the Defendants committed acts and omissions violating the First, Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.    As to Count I, a money judgment against Defendant Benjamin M. Bauer for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.     As to Count II, a money judgment against Defendants Bauer, Severance and McCann for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4.     As to Count III, a money judgment against Defendants Severance and McCann for compensatory damages and punitive damages in an amount in excess of $10,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5.     As to Count IV, a money judgment against the City of Minneapolis for compensatory damages in an amount in excess of $5,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

6.     For an order mandating changes in the policies and procedures of the Minneapolis Police Department requiring, among other things, policy and training measures in the proper use of "non-lethal weapons," the proper reporting of use of force, adherence to policies to ensure the identities of officer-shooters and witnesses are not shielded from victims, and relations and policing with those exercising their First Amendment rights; and

7.     For such other and further relief as this Court may deem just and equitable.

Dated: October 14, 2021      **ROBINS KAPLAN LLP**

 s/Robert Bennett
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com

*Attorneys for Plaintiff Soren Stevenson*