## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Soren Stevenson,

                              Plaintiff,

v.

Benjamin Bauer, acting in his individual
capacity as a Minneapolis Police Officer, *et al.*,

                              Defendants.

_____

Civ. No. 20-2007 (SRN/TNL)

**DECLARATION OF ROBERT
BENNETT IN SUPPORT OF
PLAINTIFF'S MOTION FOR
AWARD OF COSTS,
INCLUDING REASONABLE
ATTORNEYS' FEES, UNDER
42 U.S.C. § 1988**

I, Robert Bennett, state and depose as follows:

1.      I am lead counsel representing Plaintiff Soren Stevenson (Soren) in connection with the above-entitled action.  I make this Declaration in support of Soren's Motion for Award of Costs, Including Reasonable Attorneys' Fees, Under 42 U.S.C. § 1988.

## BACKGROUND

2.      On May 31, 2020, Defendant Benjamin Bauer was working as a member of Minneapolis Police Department (MPD) SWAT 1280.

3.      MPD SWAT is considered the most highly trained tactical team within the MPD.  As part of their training, each SWAT team member must demonstrate proficiency in the use of the 40-mm "less lethal" launcher, a weapon with a 14-inch, rifled barrel designed to fire a variety of munitions, including gas rounds and direct-impact rounds aimed at a specific individual target.

4.      On May 31, Defendant Bauer was equipped with a 40-mm single shot "less lethal" launcher, with a variety of 40-mm blunt impact projectile (BIP) rounds at his disposal – including a gel round with an "optimal" shooting distance between 10 and 90 feet.  Defendant Bauer generally used the weapon in single action (meaning he manually cocked the hammer before pulling the trigger), making the weapon even more accurate. Further, it was equipped with a nearly $600 EOTECH holographic weapon sight (HWS) that allows its shooter to place a reticle precisely where he is aiming.

5.      While the 40-mm launcher is called a "less lethal" weapon, the depositions in this case, and in other post-George Floyd murder operational cases, illustrate that MPD officers, including Defendant Bauer, understand that the weapon is not *non*-lethal.

6.      In fact, MPD policy and procedure, MPD training, and manufacturer warnings – both of the launcher and the specific BIP round at issue in this matter – inform officers that the head, neck, throat and chest cannot be targeted without **deadly force authorization**.  Defendant Bauer understood this.  The pertinent excerpt from his deposition in the *Marks*[1] matter is attached as Exhibit 1.

7.      As the Court knows, on May 31, 2020, Soren was exercising his First Amendment rights and protesting George Floyd's murder by then-Minneapolis police officer Derek Chauvin.

---

[1] Ethan Marks also was blinded in one eye after having been shot by Defendant Bauer three days before Soren.  He too commenced an action against Bauer, currently pending before the Honorable Ann D. Montgomery.

8.     Soren did so on the advice and encouragement of state and city leaders and did so peacefully.  He joined a group of peaceful protesters near the onramp to southbound I-35W from University Avenue.

9.     Soren was not armed.  He was not breaking curfew.  He was not part of any riot.  He was not an arsonist or a looter.

10.     Yet, as he stood in the grassy area next to the onramp to the highway,  he was shot by Defendant Bauer – who was within the front-line of the police contingent that had responded to the onramp, and well within the "optimal" shooting distance for his gel BIP round.

11.     Defendant Bauer shot Soren in his left eye.  The projectile's so-called "blunt" impact was nothing of the sort, penetrating and destroying Soren's eye and causing other catastrophic facial fractures and injuries.

12.     We undertook representation of Soren in June 2020, shortly after he was shot, but the final paperwork was signed in July.  A lawsuit was filed on September 21, 2020.

## THE LITIGATION TEAM

13.     I received my undergraduate education at the University of Notre Dame, where I graduated with honors in English in 1973.  I graduated from the University of Minnesota Law School in 1976.  My biographical information, and that for the other attorneys who billed time on this case, is attached hereto as Exhibit 2.

14.     I have been admitted to practice before the following bars and courts, and from the dates of admission forward, have remained a practicing member in good standing:

     a.     1976:  Bar of the State of Minnesota and U.S. District Court, District of Minnesota;

     b.     1982:  U.S. Court of Appeals for the Eighth Circuit;

     c.     1998:  U.S. Court of Appeals for the Federal Circuit;

     d.     1999:  U.S. District Court, District of North Dakota and U.S. District Court, Eastern District of Wisconsin;

     e.     2000:  U.S. Court of Appeals for the Seventh Circuit,

     f.     2001:  U.S. Supreme Court; and

     g.     2005:  U.S. Court of Appeals for the Eleventh Circuit.

15.     I am a Fellow of the American College of Trial Lawyers and a member of the Minnesota State Bar Association, American Bar Association, American Association for Justice, and the Minnesota Association of Justice.  In 1989, I received certification from the Minnesota State Bar Association as a Civil Trial Specialist.  Also, in 1989, I received a certification in civil trial advocacy from the National Board of Trial Advocacy. I remain certified with both organizations.

16.     In October 2008, I was recognized as an Associate in the American Board of Trial Advocates ("ABOTA"), and I have remained in good standing with that organization since that time.  Further, I have received the following recognitions:

     a.     "Minnesota Super Lawyer," *Super Lawyers* for 26 years;

      b.      Attorney of the Year, *Minnesota Lawyer* (2007, 2008, 2013, 2014, 2016, 2017);

      c.      Power 30 List, *Minnesota Lawyer* (2021);

      d.      "Midwest Trailblazer," *The American Lawyer* (2021); and

      e.      "Minnesota ICON," *Finance & Commerce* and *Minnesota Lawyer* (2021).

17.     I have lectured at various venues, including the National Institute of Trial Advocacy, the Walter F. George School of Law at Mercer University, the Public Agency Training Counsel (a national seminar held in Las Vegas), the University of Minnesota School of Law, the University of California, Irvine School of Law, the 2016 Congressional Briefing entitled "Gun Violence Prevention," the Minnesota Association for Justice Annual Meeting and Virtual Convention, and the LTL International Leadership Institute, among others.

18.     My practice consists almost exclusively of trial work, including civil ligation, personal injury, and civil-rights law.  Over the past 35-40 years, my practice has been at least 95% contingent fee work, in general, with at least 70% of that consisting of civil-rights litigation.

19.     My current hourly billing rate of $855 applies to clients who typically pay a retainer against which fees are billed and collected monthly.

20.     The three attorneys from Robins Kaplan LLP (RK) most involved in the representation of Soren in this case are Kathryn (Katie) Bennett, Marc Betinsky, and

myself.  But, the other three members of our team – Andrew Noel, Esther Mignanelli, and Greta Wiessner – also contributed in various ways.

21.     Katie Bennett is a 2008 graduate of St. Olaf College and a 2011 graduate of Mitchell Hamline School of Law (f/k/a William Mitchell).  She joined my team as an associate immediately after passing the bar in 2011 and went on to become a partner at Gaskins Bennett Birrell Schupp, L.L.P. in 2017.  Currently, Katie is a partner at RK and continues to practice exclusively in plaintiff's civil rights and personal injury litigation.  Katie prepared for all, and took several, depositions in this case.  She was intimately involved in every aspect of this case, including the crucial task of shooter identification.  Katie also handled much of the writing, document review, analysis and strategy, and arguing of motions.  In 2021, Katie was named to *Law360's Access to Justice* Editorial Board.  She has received the following additional recognitions:

      a.     "Minnesota Rising Star," *Super Lawyers* (2015-2021);

      b.     "Attorney of the Year," *Minnesota Lawyer* (2014); and

      c.     "Rising Stars of the Plaintiffs Bar," *National Law Journal* (2021).

22.     Katie's current hourly billing rate of $685 applies to clients who typically pay a retainer against which fees are billed and collected monthly.

23.     Marc Betinsky is a 1995 High Honors graduate from the University of Florida and a 1998 *cum laude* graduate of Cornell Law School.  He joined our civil rights team in January 2018, when we were with Gaskins Bennett Birrell Schupp, L.L.P.   Since joining the team, Marc has practiced extensively in plaintiff's civil rights and personal injury litigation.  Prior to joining the team, Marc spent more than 11 years as the career

law clerk for Judge Richard H. Kyle in the U.S. District Court, District of Minnesota. Prior to his time with Judge Kyle, he served as career law clerk for U.S. Magistrate Judge Barry S. Seltzer in Fort Lauderdale, Florida, worked as a term law clerk for two other federal judges, and engaged in private legal practice at large law firms in Boston and New York City. As of January 2020, when our civil rights team joined RK, Marc has served as Counsel. He handled much of the necessary legal research and writing, but was also involved in document review, analysis and strategy, and arguing of motions.

24. Marc's current hourly billing rate of $530 applies to clients who typically pay a retainer against which fees are billed and collected monthly.

25. Andrew (Andy) Noel graduated from the University of Wisconsin, Madison and went on to graduate *magna cum laude* from Mitchell Hamline School of Law (f/k/a Hamline University School of Law). In 2002, shortly after taking the bar exam, he joined my team when we were at Flynn, Gaskins & Bennett, L.L.P. Currently, Andy is a partner at RK and continues to practice exclusively in plaintiff's civil rights and personal injury litigation. He has received the following recognitions:

a. "Minnesota Rising Star," by *Super Lawyers* (2005 to 2015);

b. "Minnesota Super Lawyer*,"* by *Super Lawyers* (2016 to 2021); and

c. "Attorney of the Year" by *Minnesota Lawyer* (2014).

Andy drafted the initial Complaint in this case and thereafter was an important consultant on many aspects, from strategies to valuation to innovative ways to use the body worn camera (BWC) videos at depositions.

26.     Andy's current hourly billing rate of $730 applies to clients who typically pay a retainer against which fees are billed and collected monthly.

27.     Esther Mignanelli is a 2008 *cum laude* graduate of Bethel University and a 2014 *magna cum laude* graduate Chicago-Kent College of Law, where she was also an Honors Scholar and member of the Order of the Coif.  Esther began her career as a litigator at a regional law firm in Pittsburgh, Pennsylvania, where she handled commercial litigation matters.  She then became an Assistant U.S. Attorney in Chicago, where she worked in the criminal division of the U.S. Attorney's Office and led the prosecution of federal crimes ranging from bank fraud and identity theft, to money laundering, narcotics, human trafficking and child-exploitation offenses.  Esther joined RK in July 2021, bringing additional trial and appellate experience to our team.  She dove into deposition preparation in this and the related *Marks* matter.

28.     Esther's current hourly billing rate of $580 applies to clients who typically pay a retainer against which fees are billed and collected monthly.

29.     Greta Wiessner is a 2013 *summa cum laude* graduate from Boston College and a 2019 *summa cum laude* graduate from University of Pennsylvania Law School, where she was also a member of the Order of the Coif.  She joined RK in September 2021 following two federal clerkships, one on the U.S. Court of Appeals for the Third Circuit and the other on the U.S. District Court of the Eastern District of Pennsylvania. These clerkships honed Greta's legal research and writing in all areas of federal litigation, making her another great addition to our team.

30.     Greta's current hourly billing rate of $485 applies to clients who typically pay a retainer against which fees are billed and collected monthly.

31.     The newest additions to our team recognize RK's commitment to our practice by adding immense technical support in the presentation of our work and enabling our team to add very qualified and talented associates with federal court and clerkship experience.  The entire team was helpful in evaluating the strength and value of this case.

32.     In addition to the individual recognitions described above, the RK civil-rights team was awarded the *National Law Journal's* 2021 Elite Trial Lawyers Award for Civil Rights.  The award recognizes law firms that have provided cutting-edge representation and achieved major wins on behalf of civil-rights plaintiffs.

33.     Based on my experience and decades of knowledge of the market for civil-rights attorneys in the local area, it is my opinion that the hourly rates set forth above for RK attorneys who worked on this case are reasonable and within the range of hourly rates charged by comparable law firms in the Twin Cities.

34.     Though a number of different lawyers worked on this matter for Soren, Defendants similarly staffed this complex case.  Three attorneys from the City Attorney's Office appeared in this matter, and several additional staff members were involved in discovery.

### AN OVERVIEW TO THE PENDING FEE MOTION

35.     The time RK spent on this litigation has been completely contingent on the outcome of the action.  RK has not been paid for any of the time or out-of-pocket

9

expenses spent throughout the litigation.  There was no guarantee that any of the attorney time or costs would be recovered.

36.     Soren's Retainer Agreement included a split-fee agreement with 80% of the attorneys' fees going to RK and 20% to Ronn Kreps if the case ended prior to the filing of an appeal to the United States Court of Appeals for the Eighth Circuit, as it did here.[2]

37.     On February 9, 2022, Defendants served their latest Rule 68 Offer on Soren, attached hereto as Exhibit 3.

38.     After due consideration and discussions with the litigation team and with Soren, we sought clarification of the offer and Soren accepted the clarified Rule 68 Offer in which he was allowed to take judgment in the amount of $2.4 million plus reasonable attorneys' fees and costs against Defendants Bauer (the shooter), Ryan McCann (SWAT 1280 Team Leader), and Matthew Severance (on-site incident commander) "on all claims made or which could have been made in Plaintiff's Complaint, Amended Complaint or Second Amended Complaint."   The attorneys' fees and costs were to be set by the Court, if the parties could not otherwise agree.  The clarified acceptance is attached hereto as Exhibit 4.  As set forth in more detail in my Meet and Confer Statement, the parties have been unable to reach agreement on the fees, necessitating the pending Motion.

---

[2] Ronn Kreps is a 1980 graduate of Bethel University and 1983 graduate of Mitchell Hamline School of Law (f/k/a William Mitchell).  Ronn was first named to "Super Lawyers" in 2004.  He previously was a partner at RK and currently is with Norton Rose Fulbright.  He is a long-time friend of the Stevenson family and referred this matter to me based on my experience and success.

## THE LITIGATION HISTORY

39.    RK has spent substantial time on this litigation.  At many stages of the case, the prosecution of Soren's claims required that the members of our team described above work exclusively, or nearly so, on this matter.  At times, team members were inhibited from doing other, equally important, professional work on other matters.  In addition, the case required work by other RK lawyers, as well as the civil-rights team's paralegal, Angela Koob, and other RK staff professionals.

40.    The reasons for the substantial time expended are best explained by providing an overview of the work required at each phase in the litigation, which is included herein at paragraphs 42 through 157. Suffice it to say, this was no "simple" or "normal" civil-rights case.  Each phase presented different roadblocks and mountains to climb to successfully vindicate Soren's constitutional rights.  Having looked back on my more than 40 years practicing law, I can fairly say this case has been one of the most uniquely complex, if not **the** most uniquely complex, I have ever worked on.

41.    Furthermore, the entirety of this case took place during a global pandemic. Absent a pandemic, the civil-rights team, who primarily work on a single floor in RK's Minneapolis office, would conference in-person and often.  But, the pandemic required Zoom and even more telephone conferences than would have typically occurred.

### *Preliminary and Investigation Phase*

42.    The Preliminary and Investigation Phase began two days after Soren was shot.  First, there were Zoom conferences and telephone calls with the client, Kreps, RK investigators and the entire civil-rights team at that time (aside from Esther and Greta,

11

who joined RK after the lawsuit had begun).  At this stage it was all-hands-on-deck due to seriousness of the injuries and constitutional violations at issue.  Further, I did not know who would end up staffing this matter and we needed the team to have a working understanding of what we were up against, which we would soon learn we had originally underestimated.  It was clear to me that the identities of the individual officers involved, particularly the shooter and his direct supervisors, were mission critical to the most successful prosecution of Soren's rights.

43.     In mid-June we had gathered enough information to send our first letter demanding information regarding the identity of the officer(s) who fired at Soren.  We provided still frames from news broadcasts showing the officers that were on the front-line when Soren was hit, information about the specific location of the incident and still frames of Soren himself.  We requested reports, video footage and audio recordings regarding the same in our letter to then-Chief Medaria Arradondo and then-Minneapolis City Attorney Erik Nilsson.  The letter is attached hereto as Exhibit 5.

44.     A week later, we received a response from Assistant City Attorney Kristin Sarff, who made it clear that a) no investigation regarding the shooting of Soren had been started; and b) Soren would have to identify his own shooter.  Historically, this has been the case with the MPD and the City Attorney's Office:  either there is no investigation, or a tainted, sham investigation by either the Department's Internal Affairs unit or the always impotent civilian-review mechanism, which has had several names and iterations over the years.  Given the size of the post-George Floyd murder protests and the enormity

of the police response by various law enforcement agencies, finding one's own shooter would prove to be as Herculean a task as I anticipated.

45.     The City Attorney's Office suggested we make a Public Data Request under the Minnesota Government Data Practices Act (MGDPA) as a means of obtaining information before a Protective Order, which we did, to no avail.  This, too, was expected.

46.     We also corresponded with Minnesota Bureau of Criminal Apprehension (BCA), which sometimes investigates officer-involved shootings in Minnesota, to further attempt to gather information regarding the shooting of Soren. The BCA informed us that the MPD was investigating itself with regard to the post-George Floyd murder operational period.

47.     We diligently reviewed the MPD policy and procedure manual, and conducted further research, in attempts to find paths to obtaining the materials we requested in mid-June.  This resulted in additional correspondence with the City Attorney's Office regarding the failure to identify Soren's shooter – a fact they and the MPD should have been able to easily ascertain if policy and procedure with regard to report-writing was followed.  (As we know from our depositions in this and the *Marks* matter and the public now knows from the March 7, 2022 Hillard Heintze After-Action Report, it wasn't.  That Report is attached hereto as Exhibit 6.)

48.     After approximately two months focusing on the futility of obtaining any information regarding the shooter's identity from the City or the State voluntarily, we switched our focus to initiating the lawsuit on Soren's behalf.

***Complaint and Initial Response Phase***

49.     Our team's complaints are not mere notice pleading.  When we can, we flush out the facts surrounding the constitutional violations and provide as many details regarding our clients' injuries as possible, to ensure compliance with *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Further, we have found we encounter fewer motions to dismiss with such complaints.  Also, complaints written in this fashion help outline areas of discovery and introduce the defendants to the serious nature of the injuries involved.

50.     As such, we obtained and reviewed all available medical and billing records to accurately describe Soren's multifaceted injuries, need for future treatment, and medical specials.

51.     We conducted further review and research into MPD and MPD SWAT policies and procedures, the 40-mm launcher involved in Soren's shooting, the BIP rounds the launcher fires, the EOTECH sight, and the timeline of events after the murder of George Floyd, including the shooting of Ethan Marks (who we later uncovered was also shot by Defendant Bauer).

52.     In mid-September 2020, we filed a 30-page Complaint against eight John Doe Defendants, then-Minneapolis Chief of Police Medaria Arradondo, and the City of Minneapolis.

53.     Approximately two months after our filing – likely due to the issues with service of process – Defendants moved to dismiss Soren's claims, in part.  Notably, Count I – alleging Fourth and Fourteenth Amendment Violations against the John Doe

14

shooter – was not part of the motion.  Responding to Defendants' Motion required time for researching, drafting and preparing for the argument.

54.   The Motion to Dismiss effectively put the case on hold.  During the hold, we had no way to identify the John Doe Defendants and, therefore, could not effect service upon them.  We requested an extension, which defense counsel tied to our agreeing to a Stipulation for Protective Order.  We pushed back on the proposed Protective Order and we were able to file the Stipulation for Extension approximately a month after our initial request.

55.   Shortly thereafter, defense counsel agreed that the parties should partake in a late-February or early-March private mediation, if we would provide Soren's medical records and a demand.  We agreed.  The parties agreed to use Gregory Weyandt, and mediation was scheduled for March 1, 2021.

56.   We began all tasks necessary to work up the case including having Soren's extensive and specialized medical records reviewed and distilled by an eye-injury expert – Neal A. Sher, MD, FAAO, FACS – to obtain a report that explained the many issues and risks associated with monocular vision, the result of Soren being shot.  Dr. Sher's Report is attached hereto as Exhibit 7.

57.   Further, we obtained and reviewed the significant amount of medical records necessary and related to Soren's injuries.  We reached out to witnesses and drafted "Offers of Proof" from a few individuals who spent the most time with Soren in the acute stages of his recovery.  We held conference calls with his treating providers, stayed up to date on developments in other MPD cases stemming from the post-George

15

Floyd murder operational period, had discussions with Soren regarding medical appointments and procedures, and strategized as a team regarding the mediation submission and forthcoming demand to the Defendants.

58.     Since we had nothing to hide, we shared our working draft of the mediation submission with defense counsel a few weeks ahead of the mediation.  The 18-page, single-spaced document included details of Soren's injuries, medical status, medical specials, professional photographs of his injuries and prosthetic, citations to the Offers of Proof, and our estimation of trial risks and their impact on valuation.  It took significant time to gather and process the information included in the submission and to draft the submission itself in a manner that we believed would help the Defendants, defense counsel, the Minneapolis City Council and Weyandt understand the need for a significant amount of money to resolve the case.

59.     In a further attempt to foster settlement discussions, we offered defense counsel an informal meeting with Soren, to understand first-hand the toll the shooting had taken on him.  The offer was not accepted.

60.     Our investigation and strategizing continued ahead of the mediation. Through this, we uncovered an Instagram video depicting Soren in the moments after he was shot in the right eye, as well as a recent eye-out verdict obtained by RK partner Teresa McClain.  We shared this information with defense counsel, as well as Weyandt.

61.     Four days ahead of mediation, our fees and costs were approximately $310,000 and $15,000, respectively.

62.     The March 1, 2020 mediation failed.  The parties were millions of dollars apart.  It was a frustrating process for Soren and only solidified his desire to continue to prosecute this matter and find the truth about the events of May 31, 2020, that so drastically altered the course of his life and plans therefor.

63.     As such, we continued forward in the litigation process.

64.     We began drafting identification discovery and attempting to schedule the Rule 26(f) meeting with defense counsel, which reportedly could not be accomplished for nearly four weeks.

65.     Before that meeting occurred, the parties received the Order granting in part and denying in part Defendants' Motion to Dismiss, and the Pretrial Conference was scheduled.

66.     We drafted a Proposed Rule 26(f) Report and provided it to defense counsel.

67.     On March 25, 2020, Defendants' Answer was filed, in which they formally claimed they could not identify Soren's shooter.

68.     The Rule 26(f) meeting occurred at the end of March.  There was much disagreement about timing of discovery and the scope of any Protective Order.

69.     These discussions hinted that MPD defendants, in this and other cases, intended to use Protective Orders to hinder plaintiffs' prosecution of federal civil-rights claims under a misguided claim of confidentiality.  We knew this issue would have to be litigated, but also understood compromise was necessary at this juncture because it was

imperative to name the individual Defendants – particularly, the shooter – and finalize service of the Complaint.

70.    On March 29, 2021, the same day as the meeting regarding the Rule 26(f) Report, Soren received a Rule 68 Offer for $1.9 million plus fees and costs.  Soren did not accept the Offer.

### *Written Discovery Phase*

71.     Soren served his "identification discovery" – Interrogatories and Requests for Production – on March 29, 2021.

72.    April was filled with negotiations regarding outstanding issues on the Rule 26(f) Report and the Stipulation for Protective Order.

73.    Our internal conversations and the negotiations regarding the Protective Order spilled into May 2020.  Eventually, Soren agreed to the filing of the same Stipulation for Protective Order entered in the *Marks* matter.

74.    On May 3, 2021, Defendants served their responses to Soren's identification discovery, again claiming they could not identify his shooter and providing several alternative theories as to how he was injured.  The alternatives speculated that Soren's injuries might have been caused by protesters throwing objects, or by other law-enforcement agencies in the vicinity that were armed with 40-mm launchers.

75.    With Defendants' May 3, 2021 discovery responses were nearly 1,300 pages of documents and scores of body worn camera (BWC) videos, all of which were completely unorganized and not labeled in a manner that permitted the contents to be

known.  They were produced as individual PDFs, named for the first Bates label of the document.  These PDFs had to be opened one by one to ascertain their contents.

76.     Below are screen grabs depicting the Defendants' Initial Production, described in paragraph 76, including the list of BWC (MPLS_STEVENSON001100-001219) and Stevenson Prod. 01 that opens up into: 1) data; 2) images; and 3) natives:



77.   Then, by opening "Images," you arrived at the below PDFs – Bates label range from MPLS_STEVENSON000001 to 001282.



78.   By opening "Natives," you arrived at the below WAV files and Excel spreadsheets listing MPD names/badge numbers and MPD trainings.  In later production sets, Defendants would include PowerPoint training presentation courses on topics such as munitions and use of force and lists of BWCs.



79.     Further complicating our review, Defendants' Answers to Interrogatories and the Responses to Requests for Production did not point to any specific documents or Bates label(s).  Instead, they directed Soren *generally* to Defendants' document production, as depicted below from the Defendants City of Minneapolis and Medaria Arradondo's Responses to Plaintiff's First Set of Identification Document requests from May 3, 2021:

## REQUESTS FOR PRODUCTION

1.      All documents in your possession, custody, or control, relating to the subject incident, including but not limited to: emails; text messages; voicemails; memoranda; public statements; social media posts and messages; letters; incident reports; supplemental reports; internal affairs reports; statements; use of force reports; investigative files and reports.

**RESPONSE:**  Defendants object to this Document Request as being overly broad, unduly burdensome, and seeking information protected by the attorney-client privilege or work product doctrine.  Subject to and without waiving these objections and the foregoing General Objections, the Defendants direct the Plaintiff to its document production. Discovery is ongoing and the Defendants reserve the right to supplement this Response.

2.      All videotapes, audiotapes, photographs, or drawings, or any other visual or audio depictions of any person, place, or thing, relating to the subject incident.  This request includes transcripts of any audio.

And, the City's Responses to Plaintiff's Request for Production of Documents served September 13, 2021:

23

2.      All documents referring to or relating in any way to any allegations of misconduct by an individual Defendant. This includes, but is not limited to: any and all complaints from the general public regarding any individual Defendant; any and all administrative complaints regarding any individual Defendant or notices to the Minneapolis Police Department or the City of Minneapolis for improper police conduct or violation of police regulations by any individual Defendant; any documents regarding any civil lawsuits filed against any individual Defendant; and any other separate file on or regarding any individual Defendant.

**RESPONSE:**      Defendant objects to this Document Request as being compound. Defendant also objects to this Document Request as being overly broad, unduly burdensome, and seeking irrelevant information, particularly to the extent it seeks information and complaints wholly unrelated to the conduct or allegations in the Amended Complaint and because it contains no temporal limitation. Additionally, Defendant objects to this Document Request as seeking information outside of its possession and control, or equally withing the Plaintiff's possession, particularly in so far as it seeks information maintained by Defendants that is publicly available. Defendant also objects to this Document Request to the extent it calls for attorney-client information or work product information regarding civil lawsuits. Subject to and without waiving these objections and the foregoing General Objections, Defendant directs Plaintiff to the documents that will be produced by the City of Minneapolis.

80.      When we requested Defendants provide an index of their production, we were told Defendants would not do so and we should have one of our team members do it instead. So, we did. This took significant time, but ultimately was necessary to understand what we had, what was purportedly provided but was not actually included, and what additional discovery we needed to request. Further, the index was a helpful

24

reference tool as we headed further into discovery and, particularly, deposition preparation.

81.     Compounding the issues of using the information in this first batch of discovery was MPD's failure to require adherence to report-writing policies on use of force during the post-George Floyd murder operational period.  Normally, one can review police reports, incident reports or supplements and decipher which officer(s) were involved and which officer(s) used force because officers are to include the material facts surrounding the use-of-force in their written reports.  This was not the case on May 31, 2020, or during most of, if not the entire, post-George Floyd murder operational period. Instead, the reports we reviewed from this period of time left nearly all material facts to a guessing game.  For example, they failed to specify the location of many MPD officers. They provided only approximations of the number of munitions used.  They failed to describe the targets of the shots, the result of the shots, or if injuries had occurred, which 40-mm shooters are trained to do for each round they fire.  Notably, the $600 EOTECH optical sight on the SWAT 1280 40-mm launchers should have enabled this to be done even at night, and Soren was shot in clear daylight at a range of only about 50 feet or so. Sometimes, the reports failed to include that force was used at all.  Sometimes, officers failed to write reports at all.   We simply could not tell from the written documents who had shot Soren, because of the breakdown and lack of adherence to MPD Policies meant to ensure that there would be self-identification by the force-user of the force used. Defendant Bauer and SWAT and other MPD officers took great advantage of MPD's failure to require adherence to these policies during this period.  This was a driving factor

25

in the need for painstaking BWC review and the consequent amount of time expended to identify the shooter.

82.    The hardships posed by such vague reporting is best evidenced by our internal correspondence regarding Soren's shooter's identity.  Our initial guesses ended up being people we never even contemplated deposing once we had a full grasp on the entire production (and facts).

83.    As such, a detailed review of the hours and hours of BWC video was required.  Yet, key portions of the BWC videos provided by Defendants were obscured with the a "Confidential" stamp, which made reviewing the materials difficult, as depicted in the below still frame from Defendant Bauer's BWC:



84.     Three days after receipt of the first batch of discovery from the Defendants, at the Pretrial Conference, we alerted defense counsel to the issues with the placement of the "Confidential" stamp over the video evidence.

85.     From there, we made many attempts to further discuss the "Confidential" stamp issue and other discovery deficiencies, with no response from defense counsel until May 13, 2021, when we learned of their unavailability to discuss the issues until May 19.

86.     On May 14, 2021, we received correspondence from defense counsel stating they produced video "related to the incident" but that "did not reflect the actual incident" – an admission that irrelevant information was produced.  Yet, they still did not provide any index of the videos that depicted the incident itself.

87.     On May 18, 2021, in a telephone conference with defense counsel, it was steadfastly maintained that we provide a list of the BWC videos we wanted produced without the obscuring "Confidential" stamp – a request that flipped discovery obligations on their head.  It became our job to comb through the admittedly irrelevant – but not obviously so – BWC footage in order to provide such a list so that we could obtain the relevant video without the evidence-obscuring stamp.

88.     To do so meant opening and viewing the 125 BWC videos that were produced on May 3, 2021, which ranged from 35 seconds to over an hour.  This was necessary because we were unable to tell the officers' locations and if the video contained relevant information without opening and playing each one (see paragraph 81 regarding MPD report-writing issues).  Just creating the list demanded by defense counsel took significant time.

89.     Meanwhile, parallel work was being done by the team throughout May 2021.  We were reviewing, analyzing, conferencing, drafting memoranda, and strategizing regarding the discovery provided.  We were in contact with our expert regarding the same.  We were strategizing regarding our next discovery steps.  All of these steps aided in the drafting of the Amended Complaint.  Further, we were working to respond to Defendants' discovery requests to Soren and putting together his Initial Disclosures.  We continued to monitor publications that would aid in the prosecution of Soren's civil rights, including the Letter to the Editor of the *New England Journal of Medicine* regarding local medical providers' observations of the improper use of 40-mm launchers during the post-George Floyd operational period that caused serious injuries.

90.     On June 1, 2021, we emailed to defense counsel an Amended Complaint that included photos from the BWC evidence and described recorded conversations captured on the videos.  We offered five dates to meet and confer on confidentiality issues regarding these images and conversations.

91.     The same day, we received the BWC videos without the obscuring stamp, as well as Internal Affairs materials that we previously requested.  Further, we received Defendants' Initial Disclosures that were again unorganized and not labeled in a manner that permitted the contents to be known.  Like the first production set, the documents were produced as individual PDFs, named for the first Bates label of the document, and had to be opened one by one.  We first indexed the documents to figure out what we had received and then continued with a hard review of the materials.

28

92.     On June 7, 2021, we received an additional 4,100 pages of documents,[3] which were produced in the same fashion as the others.  Except, this time, upon our indexing, it was clear that many of the documents marked "native" were missing.

93.     On June 8, 2021, we emailed defense counsel demanding the missing "native" documents.  It would be months before these materials were disclosed.

94.     The same day, defense counsel advised they would not agree to the filing of Soren's Amended Complaint as drafted, requiring a stipulation to file it under seal.  Even that stipulation required extensive back-and-forth negotiation.

95.     On July 2, 2021, the parties received the Order permitting Soren to file the First Amended Complaint under seal.  On July 9, 2021, we filed Soren's sealed Amended Complaint and a redacted public version of the same – naming Bauer as the shooter and McCann and Severance as supervisory defendants, identities we had only learned through our painstaking review of Defendants' dumped documents and the hours upon hours of BWC video.

96.     Then, we began working on a second round of discovery to the now named-defendants.

97.     Defendants filed their Answers to the Amended Complaint on July 30, 2021, maintaining they did not know who shot Soren.  Attachments were referenced by the Answer, but were not served or filed therewith.  We analyzed and compared each Answer to the Amended Complaint to guide deposition preparation.

---

[3] Some of these documents included upwards of 80 pages of MPD training PowerPoint presentations.

98.   On August 4, 2021, Magistrate Judge Leung scheduled a settlement conference for November 2, 2021.

99.   On August 12, 2021, we began attempting to schedule the depositions of the now-named Defendants in this matter and proposed the week of October 4-8, 2021. The depositions of Bauer, McCann, and Severance were eventually scheduled for that week.

100.   On August 13, 2021, we served additional document requests and interrogatories to Defendants Bauer, McCann, Severance and the City of Minneapolis. These requests were served early enough that the responses would be able to be analyzed and used in the depositions scheduled for the first week of October.

101.   The following months were filled with much deposition preparation, which included:

      a.   Continued review and analysis of document production;

      b.   Creating lists of "hot documents" and potential exhibits and circulation and discussions regarding the same;

      c.   Detailed review of the BWC evidence.  This was a new, non-repetitive viewing of the videos that differed greatly from our initial review to identify Bauer as Soren's shooter and McCann and Severance as his commanding officers on May 31, 2020.  Instead, in light of the defense's insistence that Soren could have been injured by someone other than Bauer, we were required to view the videos with scrupulous attention to detail in order to construct a working

timelines of events not only to pinpoint Bauer as the shooter, but also to *exclude* other potential shooters or causes of Soren's injury. Thus, far from simply pushing play and watching the events unfold, this required carefully analyzing the BWC videos from the numerous officers at the University Avenue onramp to southbound I-35W on May 31, 2020, to enable us to understand:

i. The SWAT 1280 van officer position line-up;

ii. The identification of other law enforcement personnel at the scene;

iii. Individual weapon identification for law enforcement personnel at the scene;

iv. Conversations at the scene;

v. Decisions made at the scene;

vi. Authorizations from command staff to those at the scene;

vii. The location(s) of each individual throughout the planning, strategizing and preparation for the second volley[4] of munitions fired at the protesters (including when Soren was shot);

---

[4] There was a first volley of munitions used on protesters at this scene, but Soren was not within the group at that time having arrived in the area after the protester group had re-formed.

    viii.    The physical location and vantage point of each law enforcement officer during the second volley;

    ix.    The actions of each law enforcement officer during the second volley;

    x.    The order of the use of force (which was analyzed from both the visible actions of officers and the sounds made from hand-held munitions and the 40-mm launchers);

    xi.    The actions and reactions of the protesters; and

    xii.    The actions and reactions of Soren upon his arrival to front line of the protesters just prior to the second volley.

d.    Conferences regarding BWC evidence and the results of the review described above.

e.    Legal research and strategy discussions regarding less lethal weapons, EOTECH sights used by MPD SWAT team members, use of force during crowd control situations, and Defendants' purported justification for use of force.

102.    The BWC review and analysis described above in paragraph 101(c) was further complicated by the fact that the time stamps on the BWC videos did not align. This was contrary to product literature from the BWC manufacturer (Axon), but confirmed by picking observable events in the pertinent BWCs and comparing the time stamps. Some were synchronized, but the majority were from 1 to 5 seconds different. As such, the *sequencing* of events became all the more important.

103.   Examples of the time stamp issues are included in the below still frames from two SWAT 1280 team members BWCs – Michael Meath's BWC (X6039A824) at 18:48:40, and Rian Jensen's BWC (X6039A7LW) at 18:48:37.  Each depicts the same water bottle arching towards the police line, but as can be seen, the time stamps are approximately 3 seconds apart:



104.   On September 9, 2021, Defendants requested a two-week extension to respond to Soren's then-pending discovery requests, which we denied because it would not provide enough time to incorporate the information for use in the then-scheduled depositions.  Alternatively, we offered to extend the deadline to September 20, 2021, if Defendants would agree to allow the use of documents produced in the *Marks* matter in the depositions, since the *Marks* incident involved the same shooter – Bauer – and some of the same SWAT 1280 personnel.

105.   On September 13, 2021, the Defendants' responses were served by mail.[5] We received them September 16, 2021.  They were deficient in several ways, most glaringly: *no documents were provided with the production*.  This was designed to avail Defendants of an extension not agreed to by the parties.

106.   On September 17, 2021, we sent a letter to defense counsel outlining several issues with the discovery produced thus far, including: a) we were still missing the native documents from the June 7, 2021 production; b) attachments mentioned in documents produced were missing; c) the attachments referenced in the Answers to the Amended Complaint were missing; d) the multitude of unlabeled documents, untethered to Defendants' Answers to Interrogatories that simply directed Soren to "see document production" was improper; e) lack of documents in the September 13, 2021 production; f) artificial limitations imposed on discovery responses were improper; and g) defense

---

[5] This was the only time Defendants served discovery in this manner, that is, not electronically (and hence immediately available).

counsel made themselves witnesses by being the only signatories on the Answers to Interrogatories from the City.

107. On September 22, 2021 – less than *two weeks* before the scheduled depositions –we received an additional production set from Defendants comprising over **4,500** pages of documents. Within the production were the natives requested months earlier. This document dump was produced in the same manner as those described above – unlabeled, unindexed and untethered to any specific request or interrogatory. And, again, there were missing documents.

108. Given that depositions were scheduled to begin in short order, we undertook a quick review of the production to ascertain which documents were missing.

109. On September 23, 2021, we requested the missing documents. They were provided to us the same day.

110. We continued our indexing and hard review of the newly produced documents and strategized and conferenced regarding their implications and use for the upcoming depositions. As the depositions were on the immediate horizon, this required a "drop everything" approach given the sheer number of newly produced documents.

111. On September 26, 2021, it became clear conducting depositions via Zoom in this matter would be problematic. Many of the depositions would require heavy BWC review to (i) disprove Defendants' theory that something other than Bauer's 40-mm launcher shot struck Soren in the left eye and (ii) affirmatively prove Bauer fired at his face. After testing the BWC videos, the sound and footage did not air correctly over the Zoom platform, which would have made an already tedious process nearly impossible.

112.    On September 27, 2021, we wrote to defense counsel cancelling the Zoom depositions and explaining that we could utilize a large conference center with ample space for social distancing.  Additionally, we planned to outfit the room with screens to allow counsel and witnesses to more easily view BWC and other exhibits, while providing power sources to counsel tables and breakout rooms for defense counsel's use, if needed.  The parties agreed to this setup.

113.    The same day, we received an additional 600 pages of documents from the Defendants, produced in their usual fashion – unlabeled, unindexed, untethered to written responses and with documents missing.

114.    On September 28, 2021, the parties agreed to move Defendant McCann's deposition to October 18 and postpone the depositions of Defendants Bauer and Severance until after the settlement conference.

### Deposition Phase

115.    Ahead of the start of depositions, we engaged in significant preparation, including, but not limited to: continuation of our hard review of the various document productions, which by then exceeded 10,000 pages; conferencing regarding the findings from the video evidence and key documents; strategizing regarding use of key video and document evidence at the depositions; creating van and weapons identification diagrams; creating diagrams of the line-up of law enforcement personnel on the front-line at the time Soren was shot; creating a BIP exhibit; meeting with our trial specialist team regarding the conference center set-up and use of equipment for depositions; drafting, reviewing and revising detailed deposition outlines to ensure we obtained testimony

sufficient to overcome summary judgment on qualified immunity and to prove Soren's case; meeting in-person to run through the BWC evidence and outlines; strategizing regarding exhibits to use for each deponent; reviewing deposition transcripts of MPD SWAT team members and 40-mm launcher trainers that were available from other post-George Floyd murder operational period cases; among other tasks geared towards winning the case at the depositions.

116.   It can be fairly stated that with each individual or group review of the BWC evidence, something new and material would appear to one, some or all of the reviewers. The reviewers ranged from myself and other attorneys on the civil-rights team to our private investigators, Nick Adler and Brian Cade, who have law enforcement and even SWAT backgrounds with experience in less-lethal weaponry. We also had contemporaneous discussions with our police practices expert, Jack Ryan, about his views of our evidence, Soren's allegations and plans for depositions.

117.   Further, during this time, we worked to draft and revise a Second Amended Complaint clarifying the nature of the supervisory liability claims against Defendants McCann and Severance. We provided the draft to defense counsel on September 29, 2021 and a Stipulation to file, which was revised and filed on October 1, 2021. The Defendants were given until after the settlement conference to answer.

118.   On October 4, 2021, ahead of the settlement conference and to inform any demand to the Defendants, we pulled the fees and costs. At that time, they totaled $809,868 and $19,500, respectively.

119.    On October 7, 2021, we emailed defense counsel regarding additional missing documents.

120.    On October 12, 2021, the parties received Magistrate Judge Leung's approval of the Stipulation to file the Second Amended Complaint.  It was filed two days later.

121.    Also on October 14, 2021, we received 500 missing additional pages of documents that were absent from the previous production sets.  They were again unlabeled, unindexed, untethered to discovery responses and had to be opened individually to ascertain the contents.  We began the indexing process and review the same day so that we could include questions and materials from this production in our deposition strategy for McCann.

122.    On October 18, 2021, we deposed McCann.  This was an all-hands-on-deck deposition given its importance as the only deposition that would be taken prior to the settlement conference.  We used this deposition to lay the groundwork to show we could establish Bauer as Soren's shooter through the video.  This took a coordinated effort at the deposition, with the attorney most familiar with the video evidence – Katie Bennett – airing the key portions and informing the questioner – myself – which answers were needed.  We had additional team members in the room to ensure the transcript included the material needed to both prove the case and destroy qualified immunity. This deposition was used as training for a new member of our team (Esther Mignanelli) and we have removed the fees associated with this time from the bill, marking it as "no charge."  (See FN5).  Further, McCann's deposition was key to establish his liability and

38

that of Severance, especially in light of the January 27, 2022 Eighth Circuit decision in

*Baude v. Leyshock.*

123.    We began attempting to schedule other depositions in this matter in the last

week of October 2021.

124.    Ahead of the settlement conference, we reviewed the depositions transcript

of McCann.  We drafted, reviewed and revised our settlement submission to Magistrate

Judge Leung.  We prepared to show the BWC to Magistrate Judge Leung or, at least,

describe the process we undertook and how the videos pieced together to show Bauer was

the shooter.

125.    At the settlement conference on November 2, 2021 (Election Day), a

mediator's number was provided.  We were asked to place the litigation on hold for two

weeks in part due to the uncertainty surrounding the City Council election and the

referendum on the police department's continued existence.  We were also requested to

provide a letter to Magistrate Judge Leung regarding MGDPA issues raised at the

settlement conference and to outline the reasons we believed the BWC videos were not

confidential.  We complied via emailed letter on November 4, 2021.

126.    On November 16, 2021, Defendants filed their answers to the Second

Amended Complaint.

127.    The same day, we requested an update regarding the litigation hold.  It

appeared Defendants had not gotten back to Magistrate Judge Leung.  As such, we

resumed working on this matter in earnest, including preparing to depose Bauer and

Severance in the same manner as McCann.

128.    On December 1, 2021, we deposed Defendant Bauer in the *Marks* matter.

At his deposition, he testified as follows with regard to Soren:

> 3 Q Do you claim that you didn't shoot Soren
> 4 Stevenson in the face?
> 5 **A I don't know who shot Soren Stevenson, sir.**
> 6 Q You don't know?
> 7 **A No, sir.**
> 8 Q Could have been you? Even according to
> 9 you. Right?
> 10 **A It's a possibility, yes, sir.**

129.    This admission was key to Soren's case.  We did not bill his file for any

portion of the taking of Bauer's deposition or the preparation therefor in *Marks*.

130.    As we continued deposition preparations, we also reviewed the production

sets in order to correspond with defense counsel regarding the removal of certain

confidential designations.  In our view, the defense had improperly designated the vast

majority of the discovery provided in this case as confidential in a gross abuse of the

Protective Order.  By letter sent December 7, 2021, we alerted the Defendants to our

position on the over-designations and our intent to file a motion to remove the

confidentiality designations, including unsealing Soren's Second Amended Complaint, if

we could not reach an agreement.  Knowing Defendants' position from prior

communications, we began researching for and drafting our motion and supporting

documents.

131.    Further, defense counsel informed of us their desire to depose Soren and

three lay witnesses.  These were scheduled for mid-February 2022.

132.    On December 12, 2021, we deposed Severance and solidified Soren's supervisory claims and further bolstered his *Monell* claims.

133.    On December 22, 2021, we met and conferred with defense counsel regarding our December 7, 2021 letter on the confidentiality issues.  Defendants requested we wait until after the holidays to file our motion and informed us they would respond more fulsomely to our letter the first week of January.  We agreed to accommodate defense counsel's request and held off filing our motion, expecting the promised fulsome response by January 7, 2022.

134.    On January 6, 2022, we attempted to schedule additional deponents.

135.    By Friday, January 7, 2022, we still had not received a response from defense counsel regarding confidentiality, so we filed our motion in late afternoon.

136.    The response from defense counsel finally arrived at 6:06 pm on January 7 and provided no compromise to Defendants' over-designations.

137.    Also on January 7, we received deposition dates for some of Bauer's fellow SWAT 1280 team members.

138.    On January 13, 2022, we added requested dates for additional deponents.

139.    In total, we were planning to depose the following 13 individuals:

    a.      Anthony Caspers – MPD Bike Rapid Response Team (BRRT) Commander;

    b.      Lt. Gary Nelson – MPD SWAT Commander;

    c.      Lt. Kevin Angerhofer – MPD SWAT Executive Officer;

    d.      Medaria Arradondo – former MPD Chief of Police;

e.   Defendant Benjamin Bauer – SWAT 1280 40-mm launcher and Soren's shooter;

f.   The following members of SWAT 1280:

  i.   Rian Jensen – lethal cover

  ii.   Michael Meath – lethal cover

  iii.   Adam Hakanson – lethal cover

  iv.   Matthew Kaminski – 40-mm operator

  v.   Austin Seely – 40-mm operator

  vi.   Mark Hanneman – lethal cover

g.   Sgt. Ryan Johnson – BRRT;

h.   Dominic Manelli – BRRT 40-mm operator; and

i.   Any additional 40-mm launcher operators whose names we learned at the above depositions.

140.   Given the number of deponents and difficulties with scheduling, we requested a 30-day discovery extension; Defendants agreed.

141.   We waited on finalized dates for many of the above-listed deponents for weeks with little fruitful communication in-between.

142.   Given that – even with the informally agreed to 30-day extension – the close of discovery was quickly approaching, we engaged in extensive deposition preparation in our usual fashion so that the waiting did not disadvantage Soren.

143.   Simultaneously, we were preparing for the depositions of Soren, and lay witnesses Griffin Merry, Jamee Snyder and Elizabeth Heehn.

144.    After receiving Defendants' opposition to our confidentiality motion, we requested leave to send a letter requesting permission to file a Reply.  The request was granted without needing to file the formal request letter.  As such, we strategized regarding our memorandum and began drafting the same.

145.    Due to Defendants' continued theory that Soren was not shot by Bauer, we subpoenaed information from the Mille Lacs County Sheriff's Office, whose officers were at the scene on May 31, 2020, and were often suggested as the possible shooter of Soren by the Defendants.  Upon receipt and review of the requested information, it was clear that the shot that struck Soren's left eye could not have come from any Mille Lacs County deputies.  We provided the information received to the Defendants in a timely fashion.  Bauer's alternative theories were crumbling.

146.    On January 25, 2022, we requested that our memorandum in support of our motion to unseal be unsealed.

147.    On January 26, 2022, we provided a draft Stipulation for extension of discovery.  The same day, we filed our reply memorandum in support of our motion to unseal the Second Amended Complaint and re-designation.

148.    On January 27, 2022, Defendants denied our request to unseal our memorandum, necessitating the filing of a disputed motion for continued sealing.

149.     On January 31, 2022 we deposed Caspers.

150.    The following day, we received word from defense counsel that there was some difficulty regarding the scheduling of the outstanding deponents, as some no longer worked for the City.

151.    On February 2, 2022, we provided many dates we were available for the outstanding deponents.  There was much additional back and forth regarding the schedule of the outstanding deponents, with limited success, up to and including the day of the Rule 68 Offer.

152.    On February 8, 2022, the parties attended the hearing on Soren's motion to unseal and re-designate.  After a recess in the hearing, Magistrate Judge Leung continued it to March 18, 2022, and ordered Defendants to produce the disputed videos for *in camera* review.

153.    The following day, Soren received Defendants' Rule 68 Offer allowing judgment against Bauer, McCann and Severance.

154.    The deposition schedule at the time we received the Rule 68 Offer was as follows:

February 14:        Elizabeth Heehn

February 15:        Soren Stevenson

February 22:        Jamee Snyder, Griffin Merry

February 23:        Defendant Bauer

February 25:        Michael Meath

February 28:        Matthew Kaminski, Rian Jensen.

March 9:            Angerhofer

March 10:           Lt. Gary Nelson

March 11:           Medaria Arradondo

March 14-18:         holding for Sgt. Ryan Johnson, Dominic Manelli, Mark

                     Hanneman, Adam Hakanson and Austin Seely.

155.   Given that we had started attempting to schedule the depositions in earnest

in January 2022 and with discovery originally ending March 1 (with no filed Stipulation

to Extend or corresponding Order), we engaged in much preparation for the above-listed

deponents ahead of our unanticipated receipt of the Rule 68 Offer.  Any time spent in

preparing for them after the Offer, but before a decision was made by Soren to accept,

has been excluded from the bill provided to the Court.

156.   In addition to the above, throughout the litigation, Soren was required to

provide status updates to Magistrate Judge Tony Leung, which we did via letter every

three months.

157.   While the foregoing provides a reasonable summary of the tasks undertaken

in this case and the chronology of events from Soren's shooting through the Rule 68

Offer, it cannot serve as a stand-in for the 101 pages of billing records submitted

herewith.  The foregoing is merely intended to illustrate the complexity of this case, the

roadblocks Soren encountered, and the massive efforts necessarily undertaken in

prosecution of his claims.

## THE REASONABLENESS OF THE REQUESTED FEES

158.   Rule 1.5 of the Minnesota Rules of Professional Conduct supports the

request for fees and their reasonableness.  The eight factors to be considered include:

(1)    the time and labor required, the novelty and difficulty of the
       questions involved, and the skill requisite to perform the legal
       service properly;

45

    (2)     the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

    (3)     the fee customarily charged in the locality for similar legal services;

    (4)     the amount involved and the results obtained;

    (5)     the time limitations imposed by the client or by the circumstances;

    (6)     the nature and length of the professional relationship with the client;

    (7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

    (8)     whether the fee is fixed or contingent.

159.   Of particular importance in this matter are the following:

    a.     With regard to Factors 1 and 7, the novelty of these matters is acknowledged by Congress and is known to the federal judiciary in Minnesota. The degree of novelty and difficulty of proof was made much worse by the lack of adherence to MPD's use-of-force and use-of-force reporting policies and the level of police response without such adherence. Our team described in paragraphs 13 to 32 have the proper skills, experience, reputations and ingenuity to deal with the issues presented in this Section 1983 action;

    b.     With regard to Factors 3 and 8, our retainer agreement and fee split is not atypical for representation in the difficult and specialized area of civil-rights litigation. It was agreed to with Soren, who holds a Master's degree from the University of Minnesota's Humphrey School of Public Affairs.

c.     With regard to Factor 4, Soren has a $2.4 million judgment against three individual MPD officers to be paid by the City of Minneapolis.  To date and to our knowledge, this is the largest settlement stemming from injuries sustained by citizens during the post-George Floyd murder operational period.

d.     With regard to Factor 6, we've represented Soren since two days after he was shot in the eye by Bauer and for nearly two years thereafter.  He was kept apprised of the litigation, included in strategy discussions, and even attended McCann's deposition.

e.     Soren's own Declaration speaks further to the factors included in Rule 1.5 and the appropriateness of the fees and costs requested herein.

160.    In order to effectively prosecute the case, RK had to incur costs with recovery of the same again completely contingent on the outcome. The total costs incurred by RK for work on this case were $31,934.60.  This number reflects an increase from the February 28, 2020 costs provided to the Defendants due to the addition of Dr. Sher's final bill and the bill for the videotaping of Defendant Severance's deposition, which were added after the cost information was sent.

161.    In accordance with the case law, we did not include the costs associated with legal research on Pacer, LexisNexis or Westlaw in the figure in paragraph 161.  We likewise subtracted costs for meals.  In total, we voluntarily subtracted that $504.50 from the original cost total.

162.    Attached hereto as Exhibit 8 are the details regarding the recoverable costs incurred with this litigation.  *See* pgs. 97-101.  I believe that the costs incurred were reasonable and necessary to ensure the successful relief obtained on behalf of Soren.

163.    In connection with this litigation, the attorneys and staff billers at RK have billed a total of 2,367.60 hours[6] from inception through February 9, 2022 for a total lodestar of $1,481,258.00.  *See* Exhibit 8 at pg. 97.

164.    A breakdown of each biller's hours and fees is included below:

| Timekeeper | Title | Hours | Rate | Fee |
|------------|-------|-------|------|-----|
| Robert Bennett | Partner | 548.00 | 855.00 | 468,540.00 |
| Andrew Noel | Partner | 101.20 | 730.00 | 73,876.00 |
| Kathryn Bennett | Partner | 731.50 | 685.00 | 501,077.50 |
| Esther Mignanelli | Associate | 78.70 | 580.00 | 45,646.00 |
| Marc Betinsky | Counsel | 606.40 | 530.00 | 321,392.00 |
| Greta Wiessner | Associate | 9.80 | 485.00 | 4,753.00 |
| Angela Koob | Paralegal | 224.6 | 230.00 | 51,658.00 |
| Paul McCaffrey | Trial & Multimedia Consultant | 12.10 | 295.00 | 3,569.50 |
| Chris Sullivan | Trial & Multimedia Consultant | 15.00 | 280.00 | 4,200.00 |
| Ricardo Ehramjian | Trial & Multimedia Consultant | 1.70 | 280.00 | 476.00 |
| Travis Wilhelmi | Trial & Multimedia Consultant | 0.70 | 280.00 | 196.00 |
| Nick Adler | Investigator | 20.70 | 220.00 | 4,554.00 |
| Brian Cade | Investigator | 6.00 | 220.00 | 1,320.00 |

165.    Attached hereto as Exhibit 8 are the billing records reflecting RK attorneys' and staff billers' time.  I believe that the time expended by RK in connection with the

---

[6] Certain times within Exhibit 8 are noted at "No Charge," denoting reductions for .4 hours Marc spent correcting a document filed in error and 10.80 hours for Esther's Section 1983 deposition training.

litigation, taking into account the items listed in paragraphs 42 through 157 and the excellent result achieved for Soren, is reasonable and was necessary to ensure the successful relief obtained on behalf of Soren.

166.    The figures in paragraph 164 and RK's fee exhibits are taken directly from contemporaneously maintained billing records.

167.    Katie Bennett and I independently scrutinized the initial billings and exercised our billing judgment to make the billings as accurate and as reasonable as possible, including deleting entries that were unrecoverable and reducing time entries that appeared excessive or duplicative.

168.    Substantial attorney time was necessarily spent preparing for witnesses whose depositions were scheduled prior to receipt of the Rule 68 Offer, as well as those whose depositions were pending and looming, particularly given the discovery cut-off of March 1, 2022.

169.    Our plan was to depose SWAT 1280 members and others, to use their testimony to rule out the other 40-mm launcher operators as Soren's shooter.  This would have been done through careful questioning while reviewing various BWC video with each witness.  All of the predicate work for this was done.

170.    This preparation occurred over many weeks, with much collaboration. And, the preparation of each witness served as a stepping stone in our preparation for the deposition of Defendant Bauer.  With the continued BWC review and deposition preparation for other witnesses, the plan for Defendant Bauer crystalized.  We had a

49

systematic plan to clearly identify *the* shooter and rule out all others.  This systematic and repeated review of the BWC evidence was necessitated by Soren's slate of depositions.

171.    This preparation time was reasonable given the immense difficulty we had in scheduling depositions with defense counsel in this matter.  It would have been to Soren's peril if we did not continue on-course so that we were at-the-ready whenever defense counsel saw fit to get back to us with dates and times.

172.    Further, substantial attorney time was spent researching, writing, preparing for and arguing a motion regarding the unsealing of Soren's Second Amended Complaint and re-designation of documents and BWC videos that were improperly marked as confidential by defendants.  While a decision has not and will not be handed down by Judge Leung, it appears the hearing was the catalyst for the Rule 68 Offer, which arrived *the day after said hearing*.  Soren properly seeks reimbursement for attorneys' fees spent on this motion.

173.    Soren's Second Amended Complaint included the following Counts:

    a.    Count I – 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations against Defendant Bauer;

    b.    Count II – 42 U.S.C. § 1983 – First and Fourteenth Amendment Violations against Defendants Bauer, Severance and McCann;

    c.    Count III – Supervisory Liability against Defendant Severance and McCann; and

      d.      Count IV – Civil Rights Violations – *Monell v. Dep't of Social Services* against Defendants City of Minneapolis and Medaria Arradondo in his official capacity as then-Chief of the MPD.

A $2,400,000 judgment was entered against Defendant Bauer, as the shooter, and two supervisors, Defendants Severance and McCann, in relation to Counts I through III. Any work undertaken on Court IV was completely intertwined with those three Counts because proof of an underlying constitutional violation is required in order to prevail on a *Monell* claim. As such, using the "partial recovery" theory to reduce the fees is unwarranted.

## FEES IN RELATION TO THE MOTION

174. Upon receipt of the latest Rule 68 Offer on February 9, 2022, we engaged in efforts to review and scrutinize the initial billings. This was both for purposes of any settlement discussions and necessary for drafting this document and the others filed concurrently relating to the reasonableness of the attorneys' fees, billing entries and costs in Soren's case.

175. On February 28, 2022, upon our final review of the fees and costs, we provided the same to counsel for the Defendants for purposes of settlement discussions in accordance with Rule 408 of the Federal Rules of Evidence. This correspondence is attached as Exhibit 9.

176. Thereafter, the parties engaged in further communications regarding the Section 1988 fees and costs without need for Court involvement and, to-date, there was been no response to the numbers provided to the Defendants on February 28, 2022.

177.    As such, our team devoted substantial time to drafting the materials submitted in support of Soren's Motion for costs, including reasonable attorneys' fees.

178.    Outside of the detailed review of the costs and bills through February 9, 2022, this included:

    a.  Conducting legal research;

    b.  Drafting this Declaration;

    c.  Engaging and communicating with experts regarding our hours, fees and costs;

    d.  Providing a fulsome draft of this Declaration to said experts to provide the necessary context for our billing records;

    e.  Drafting the Memorandum of Law;

    f.  Conferencing with members of RK's pricing, legal project management and financial analytics team;

    g.  Engaging RK's CFO/CEO to provide a Declaration regarding our team's hourly rates;

    h.  Communicating and updating Soren;

    i.  Engaging Soren to provide his Declaration; and

    j.  A detailed review of the fees incurred in relation to this work, in which Katie and I again exercised our billing judgment.

179.    In connection with the filing of Soren's Motion and the work outlined above, RK attorneys and staff billed a total of 278.20 hours from February 10, 2022, for a gross total of $187,642.00.

180.    A breakdown of each biller's hours and fees in relation to the Motion is
included below:

| Timekeeper | Title | Hours | Rate | Fee |
|---|---|---|---|---|
| Robert Bennett | Partner | 55.5 | 855.00 | 47,452.50 |
| Andrew Noel | Partner | 3.50 | 730.00 | 2,555.00 |
| Kathryn Bennett | Partner | 141.70 | 685.00 | 97,064.50 |
| Marc Betinsky | Counsel | 75 | 530.00 | 39,750.00 |
| Ester Mignanelli | Associate | .70 | 580.00 | 406.00 |
| Angela Koob | Paralegal | 1.80 | 230.00 | 414.00 |

181.    Attached hereto as Exhibit 10 are the billing records reflecting RK
attorneys' time going forward from February 10, 2022, including time in connection with
the instant Motion.  Katie Bennett and I independently scrutinized the billings and
exercised our billing judgment to delete entries that were, in our view, unrecoverable and
to reduce time entries that appeared excessive or duplicative.  The figures in paragraph
180 and RK's fee exhibits are taken directly from contemporaneously maintained billing
records.

182.    While I believe the entirety of time expended by RK was reasonable, we
have decided not to request any time associated with the work relating to reviewing,
clarifying and responding to the Rule 68 Offer.

183.    As such, we have excluded many of the time entries on pages 1 and 2 of
Exhibit 10, including:

      a.  3.5 hours for Andrew Noel;

      b.  5.6 hours for Katie Bennett;

      c.  0.7 hours for Esther Mignanelli;

      d.  6.0 hours for Marc;

e.  0.1 hour for Angela Koob; and

f.   6.3 hours for myself.

184.   We did not exclude the hours within the highlighted portions of Katie's February 10, 2022 entry or my February 14, 2022 entry on Exhibit 10 as that time related directly to rate information required for this Declaration.

185.   As such, the total requested fees accrued after the accepted Rule 68 Offer and in conjunction with the work performed with the entirety of Soren's submissions totals $172,255.50.  That is our requested lodestar for the fees on fees portion of this Motion.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 4th day of April, 2022.


_s/ Robert Bennett_

Robert Bennett