## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Soren Stevenson,

                              Plaintiff,

v.

Benjamin Bauer, acting in his individual
capacity as a Minneapolis Police Officer, *et al.*,

                              Defendants.

_____

Civ. No. 20-2007 (SRN/TNL)

**PLAINTIFF'S MEMORANDUM
OF LAW IN SUPPORT OF
MOTION FOR AWARD OF
COSTS, INCLUDING
REASONABLE ATTORNEYS'
FEES, UNDER 42 U.S.C. § 1988**

## INTRODUCTION

Plaintiff Soren Stevenson is a 2020 Master's graduate from the University of

Minnesota's Humphrey School of Public Affairs.  On May 31, 2020, he took part in

classic First Amendment-protected activity, joining the chorus of those peacefully

protesting the murder of George Floyd by former Minneapolis Police Department (MPD)

officer Derek Chauvin.  Soren gathered with others near the onramp to southbound I-

35W from University Avenue, well before the 8:00 pm curfew then in effect.  The crowd

was peaceful, chanting George Floyd's name and other slogans to oppose the actions of

law enforcement, such as "Hands up, don't shoot!"  Soren broke no laws.  He was

unarmed.  He was not a rioter.  He was not an arsonist.  He was not a looter.  He was

simply out in public to voice his opposition to the actions of MPD.

Shortly after 6:00 pm, a large number of MPD officers descended on the protest

from the area of the I-35W bridge deck over the Mississippi River, where earlier a tanker

truck had entered the highway and driven into a group of protesters.  The officers –

92683472.1

including Defendant Benjamin Bauer, a member of MPD SWAT 1280; Defendant Ryan McCann, the SWAT 1280 Team Leader; and Defendant Matthew Severance, the MPD incident commander at the scene – were agitated.  Severance wanted SWAT to create "a fucking gap" in the protesters so that a contingent of law-enforcement personnel from MPD, the Minnesota State Patrol, and the Mille Lacs County Sheriff's Office could exit the highway in caravan fashion.  Severance directed McCann to have his SWAT officers deploy munitions and "scatter them a little bit," telling officers to "execute that fucker. And get these guys."  Bauer and his SWAT 1280 teammates then met the protesters with force, including chemical munitions and blunt-impact projectiles (BIPs).  They threw hand-tossed munitions such as gas canisters and "blast balls" (concussive grenades) at the crowd before Bauer raised his 40-millimeter launcher with 14-inch rifled barrel, aimed it with its attached $600 EOTECH holographic weapon sight, and shot Soren with a BIP directly in his left eye, effectively obliterating it, while also causing multiple facial fractures, a severe concussion, and other significant physical and mental injuries that will affect Soren for the remainder of his life.

There was absolutely no excuse for Bauer's use of such force against Soren.  But it was no aberration – indeed, Soren's was not the first eye Bauer shot out that week.  Three days earlier, he admittedly shot 19-year-old Ethan Marks in the eye during a daytime community clean-up effort near the damaged Target store on Lake Street.  Ethan, like Soren, is partially blinded and traumatized as a result.

Though Soren now understands the chain of events leading to him being maimed on May 31, 2020, as well as the identity of the officer who actually shot him, he was

2

almost entirely in the dark at the time he filed this action under 42 U.S.C. § 1983.  He

learned the truth only after laborious efforts by his undersigned counsel to painstakingly

review scores of body-worn camera (BWC) videos and thousands of pages of documents

in discovery.  This scrupulous review of the BWC and other evidence was necessary

because (1) dozens of officers had responded to the scene, (2) not all of the officers

recorded the events on their BWCs, or did so only intermittently, and (3) the officers had

been instructed they could ignore MPD's own force-reporting policies, ultimately leaving

Soren's shooting undocumented.  This meant his counsel would need to figure out who

had shot him and why, piecing it together like a jigsaw puzzle from various snippets of

BWC footage (including audio capturing the firing of "less-lethal" launchers) recorded

by different officers at different angles and different times.  Ultimately, undersigned

counsel were able to figure out the timeline of events via careful BWC video analysis,

which was used effectively at the depositions in this case to establish Bauer as Soren's

shooter – and the same would have been used in convincing fashion at trial.

But identifying Bauer as the shooter was only one hurdle confronting Soren.  He

also had to establish the clear unlawfulness of the shot sufficient to overcome a defense

of qualified immunity, as well as the involvement of supervisors Severance and McCann

in order to establish their liability.  The discovery in this case ultimately made that plain,

too.  Deposition testimony and documents produced in discovery revealed that MPD

SWAT officers are trained to avoid shooting at "Zone 3" – the head, neck, spine, and

center mass of chest – unless the officer has *deadly force* authorization.  See R. Bennett

Decl. (filed herewith) ¶ 6.  Further, Defense Technology, the manufacturer of the BIP

92683472.1

round that struck Soren, warns that impacts "targeting the subject's head, neck or upper torso can results in serious injury or death."  At no point was Bauer or any other officer authorized to use deadly force against Soren – as all of the deponents confirmed.  The discovery proved that every reasonable officer in Bauer's shoes would have understood his shooting of Soren was unconstitutional, indisputably unlawful and contrary to clearly established law.  Moreover, the careful review of BWC video, scouring of documents, and obtained deposition testimony established that the plan and authorization for Bauer's use of force was hatched by Severance and McCann as they stood along I-35W confronting a peaceful, non-violent crowd.  Hence, discovery revealed the unconstitutionality of their conduct was as plain as Bauer's.

Though incredibly time-consuming and tedious, the undersigned's efforts in establishing Bauer as the shooter and the unlawfulness of his and his supervisors' conduct ultimately bore significant fruit:  in February 2022, Soren accepted a Rule 68 Offer of Judgment for $2.4 million, plus fees and costs as determined by the Court, from Bauer, McCann, and Severance.[1]  As such, Soren successfully vindicated his constitutional rights.  Pursuant to the Offer of Judgment and in accordance with 42 U.S.C. § 1988, Soren now moves for an award of costs, including reasonable attorneys' fees.

---

[1] Soren later clarified with defense counsel that the City of Minneapolis would indemnify the officers and pay the resultant judgment.

92683472.1

## COSTS AND FEES SOUGHT

The costs and fees sought by Soren's counsel are set forth in the Declaration of

Robert Bennett and the exhibits thereto.[2]  The following summarizes those costs and fees:

1. Attorneys' Fees:                            $1,481,258.00

2. Costs:                                      $31,934.60

3. Expert fee services of Eric Hageman:        $0

4. Expert fee services of Terrance Fleming     $0

5. Attorneys' Fees relating to this motion:    $172,255.50

   **Total:**                                  **$1,685,448.10**

## ARGUMENT

### I.   Legal principles governing fee and cost awards under Section 1988

Federal Rule of Civil Procedure 54(d)(1) provides that the "prevailing party" in

any civil action is entitled to recover his "costs."  Though the term "costs" in Rule 54

generally means those taxable under 28 U.S.C. § 1920, *Crawford Fitting Co. v. J.T.*

*Gibbons, Inc.*, 482 U.S. 437, 441 (1987) ("§ 1920 defines the term 'costs' as used in Rule

54(d)"), costs in civil-rights actions are different.  Indeed, in 1976 Congress passed the

Civil Rights Attorney's Fees Awards Act, codified at 42 U.S.C. § 1988, which provides

that "in any action or proceeding to enforce a provision of [Section 1983] . . . the court, in

its discretion, may allow the prevailing party, other than the United States, a reasonable

attorneys' fee *as part of the costs*." (emphasis added).  While phrased using the

---

[2] A complete summary of attorney time at is found on Page 97 of Exhibit 8.  The costs are itemized on Pages 97-101.

permissive "may," the Supreme Court subsequently recognized that a prevailing plaintiff in civil-rights litigation "should ordinarily recover an attorney's fee." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). Indeed, such an award serves the salutary purposes behind the statute, namely, ensuring "'effective access to the judicial process' for persons with civil rights grievances." H.R. Rep. No. 94-1558, p. 1 (1976), U.S. Code Cong. & Admin. News 1976 p. 5908 (quoted in *Hensley*, 461 U.S. at 429); *accord Emery v. Hunt*, 272 F.3d 1042, 1046 (8th Cir. 2001) ("In providing for attorney fee awards in civil rights cases, Congress intended to 'promote diffuse private enforcement of civil rights law by allowing the citizenry to monitor rights violations at their source, while imposing the costs of rights violations on the violators.") (quoting *Casey v. City of Cabool*, 12 F.3d 799, 805 (8th Cir. 1993)).

Here, there can be no doubt Soren is a prevailing party. A civil-rights plaintiff who obtains a "judgment for damages in any amount" qualifies as a prevailing party under Section 1988. *Farrar v. Hobby*, 506 U.S. 103, 113 (1992). Soren accepted a Rule 68 offer in which he was allowed to take judgment in the amount of $2,400,000 against Defendants Bauer, Severance, and McCann. That Judgment has already entered. *See* Dkt. No. 80. It makes no difference that the Judgment was not against all Defendants or on all claims: "a 'prevailing party' is one who has been awarded *some* relief." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Res.*, 532 U.S. 598, 603 (2001) (emphasis added); *see also Oldham v. Ehrlich*, 617 F.2d 163, 168 n.9 (8th Cir. 1980) ("[A] party may be considered prevailing for purposes of section 1988 attorneys' fees without meeting success on every claim he has made."). And, Defendants

6

agreed that Soren was entitled to a fee and cost award as part of the accepted Rule 68 offer, concerning he is, in fact, a prevailing party.  His right to such recovery is beyond dispute.

## II.    Soren is entitled to the full amount of fees and costs sought

### A.    Calculating a fee award

The ultimate guidepost for setting a fee award under Section 1988 is reasonableness.  *Hensley*, 461 U.S. at 429, 433.  The "starting point" in calculating that reasonable fee is the lodestar, that is, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Id.* at 433; *accord, e.g.*, *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 529 (8th Cir. 2019).  The lodestar amount may then be adjusted upward or downward based on the results obtained.  *Hensley*, 461 U.S. at 434.  Because the "essential goal" is to do "rough justice, not to achieve auditing perfection," *Fox v. Vice*, 563 U.S. 826, 838 (2011), an appellate court will "tamper with a district court's award of attorney fees only if there has been an abuse of discretion."  *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 358 (8th Cir. 1997) (internal citation omitted).

### B.    The requested hourly rates are reasonable and adequately supported

A fee applicant bears the burden of establishing the reasonableness of his attorneys' hourly rates.  *Blum v. Stenson*, 465 U.S. 886, 897 (1984).  Reasonable hourly rates are calculated "according to the prevailing market rates in the relevant community."  *Id.* at 895.  As *Blum* noted:

92683472.1

> [C]ourts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable.

*Id.* at 896 n.11. Soren has submitted such evidence to satisfy his burden here.

As set forth in the accompanying Declaration of Robert Bennett, several attorneys and staff members at Robins Kaplan, LLP ("RK") performed work on this matter, and a detailed description of that work, including contemporaneous billing records, is included. Also attached to the Bennett Declaration is a biography for each attorney who worked on the matter setting forth their qualifications, experience, and recognition in the legal community. Their 2022 hourly rates are listed below:[3]

| Attorney | Rate |
|---|---|
| Robert Bennett | $855 |
| Andrew Noel | $730 |
| Kathryn Bennett | $685 |
| Esther Mignanelli | $580 |
| Marc Betinsky | $530 |
| Greta Wiessner | $460 |
| Angela Koob (Paralegal) | $230 |
| RK Trial & Multimedia | $280-295 |
| RK Investigators | $220 |

---

[3] Although these rates have increased over the two years since Soren was shot, the current billing rates rather than historical ones are properly used when affixing a fee award. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 & n.6 (1989) (approving use of current rates when determining fees, since "compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings"); *Schaub v. Cnty. of Olmsted,* No. 06-2725 (JRT/FLN), 2011 WL 3664565, at *2 (D. Minn. Aug. 19, 2011) (same).

These rates are set by RK based upon several factors, including timekeeper title; years of experience after graduation from law school; geographic location; practice area; comparison of rates internally between titles and experience; and through two external market intelligence sources. *See* Schwartz Decl. (filed herewith) ¶¶ 5-8. Each attorney's customary hourly rate bears on (although is not dispositive of) the reasonableness determination. *Moysis v. DTG Datanet*, 278 F.3d 819, 828 (8th Cir. 2002). Furthermore, the listed attorney rates are in line with those that have been approved by this Court, including less than three years ago in *Miller v. Board of Regents of University of Minnesota*, 402 F. Supp. 3d 568, 591-92 (D. Minn. 2019) (approving rates in civil-rights case as high as $750 per hour and noting the Court had approved rates as high as $880 per hour in a case filed in 2015); *see also Schaub v. Cnty. of Olmsted,* No. 06-2725 (JRT/FLN), 2011 WL 3664565, at *3 (D. Minn. Aug. 19, 2011) (citing case law approving hourly billing rates, at that time, of up to $600). That is equally true of the time expended by RK staff, including paralegals, investigators, and trial support team members. *See North Dakota v. Heydinger*, Case No. 11–cv–3232 (SRN/SER), 2016 WL 5661926, at *16-17 (D. Minn. Sept. 29, 2016) (Nelson, J.) (approving, in 2016, $230 hourly rate for paralegals and $220 hourly rate for litigation support staff).[4]

---

[4] It is well-established that time expended by paralegals is compensable at prevailing market rates for such work. *See Jenkins*, 491 U.S. at 285-89. Likewise, as this Court recognized in *Heydinger*, 2016 WL 5661926, at *16, time expended by trial and support staff is also compensable, insofar as it is the type of expense typically "charged by attorneys to their clients," as attested to by Plaintiff's experts – Terrence Fleming and Eric Hageman – in their concomitantly filed Declarations. *See also Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005); *Washington v. Denney*, Civil No. 2:14–cv–06118–NKL, 2017 WL 4399566, at *4 (W.D. Mo. Oct. 3, 2017) (awarding fees for work by

92683472.1

The reasonableness of the requested rates, however, is buttressed by more than just the case law and the Declarations of Messrs. Bennett and Schwartz.  Expert evidence also supports the rates.  Soren has submitted Declarations from Terrance Fleming and Eric Hageman, experienced litigators in the Minneapolis market, who have attested that the requested rates are consistent with those in the community and for civil-rights litigation.  *See* Fleming Decl. (filed herewith) at ¶¶ 7, 11-16; Hageman Decl. (filed herewith) at ¶¶ 5-11, 15.

This evidence discharges Soren's burden under *Blum*.  The rates are reasonable and should be approved.

### C.     The documented hours were reasonably expended

The second step in the lodestar calculation is to determine the reasonable number of hours expended on the litigation.  In making that determination, the Court generally relies in the first instance upon counsel's contemporaneous billing records, as long as they satisfactorily document the time.  *See Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1172 (8th Cir. 2019); *see also Hensley*, 461 U.S. 433, 437 ("the party seeking an award of fees should submit evidence supporting the hours worked," and a fee applicant "bears the burden of . . . documenting the appropriate hours expended . . . and should maintain billing time records in a manner" permitting court review).

---

legal services case manager); *Hall v. Sebelius*, Civ. No. 13-295 (JRT/LIB), 2016 WL 424965, at *7 (D. Minn. Feb. 3, 2016)  (awarding fees for work performed by legal assistant).

92683472.1

Soren's counsel kept detailed contemporaneous records of the time expended in this case, as evidenced by the extremely particularized and lengthy Bennett Declaration and attached exhibits. *See Hall v. Sebelius*, Civ. No. 13-295 (JRT/LIB), 2016 WL 424965, at *6 (D. Minn. Feb. 3, 2016) (approving hours documented in time records in which "[t]he tasks are clearly delineated, and the hours are reasonably specific"). From those records, it is clear Soren's counsel spent a significant amount of time working on this case – time that was necessary for several reasons. Soren will not endeavor here to repeat in detail the 97 pages of submitted billing records or the lengthy Bennett Declaration, but rather provides below a short summary of the trajectory of this litigation as reflected in those records.

At the outset, following some preliminary investigation into his shooting, Soren's case was sued out against John Doe Defendants in a 30-page complaint. This was necessary to start the process of vindicating Soren's rights, especially after Soren was stonewalled in his attempts to learn the identity of his shooter.[5] This was due to the lack of reporting by MPD officers during the post-George Floyd murder operational period (widely known within the police department as May 26 to June 7, 2020) or any investigation by MPD commanders into wrongdoing by its officers. Indeed, the widespread failure to report during the protests of late May and early June 2020 sets this case apart from most civil-rights actions. A civil-rights plaintiff typically knows the

---

[5] "Section 1988 does not limit fee awards to work performed after the complaint is filed, but allows recovery of fees for time spent beforehand investigating facts and researching the viability of potential legal claims." *McDonald v. Armontrout*, 860 F.2d 1456, 1462 (8th Cir. 1988).

92683472.1

identity of the law-enforcement officer who violated his Fourth Amendment rights, because his interactions with law enforcement are documented in police reports – reports often already in the plaintiff's possession because he was arrested, with the reports provided to him in discovery in the resultant criminal case.  Here, however, Soren had committed no crime and was never charged with one.  He was unable to obtain any reports identifying who had shot him and the Minneapolis City Attorney's Office and MPD rebuffed all attempts to help ascertain the shooter's identity.  The failure to document the use of force against him, therefore, created significant hurdles that dramatically increased his attorneys' fees.

Soren's lawsuit initially was met with overtures by defense counsel to resolve the case, although Defendants moved to dismiss despite those overtures.  Nevertheless, the parties agreed to participate in early mediation while the Motion to Dismiss was pending. Undersigned counsel prepared for that mediation, in part, by reviewing complicated medical records about Soren's multi-faceted injuries.  Counsel also drafted a detailed confidential submission for the mediator, capturing video and photographic damages evidence.  Notably, Soren's counsel provided the mediation submission to defense counsel ahead of mediation, believing it would be a helpful tool to produce meaningful settlement discussions.  It did not; the mediation proved unsuccessful.  This process repeated itself later in the litigation at a settlement conference before Magistrate Judge Leung – reviewing copious records and preparing a lengthy submission to the Court, then attending an all-day settlement conference, to no avail.

Meanwhile, Soren's counsel had to research and draft an opposition to the Motion to Dismiss, then argue it before the Court. The Motion was granted only in small part (dismissing MPD Chief Arrandondo in his individual capacity) but had no real impact on the litigation's overall path.

Thereafter, Soren's counsel engaged in extensive discovery, including initial "identification discovery" to learn who had shot him, again without success – it was clear MPD would force Soren to identify his own shooter. Complicating this crucial task was the failure of MPD officers to use their BWCs in accordance with departmental policies and, again, the absence of proper use-of-force reporting. Indeed, the reader of any report could not tell the material facts regarding a use of force, including why it was employed, how it was used, the result of the force, or if any injuries had occurred. As such, Soren's counsel were left to embark on a painstaking review of hundreds of hours of BWC video to show that Defendant Bauer was Soren's shooter. This fastidious review led to the drafting and filing of the Amended Complaint and Second Amended Complaint – both 44 pages – alleging claims expressly against Bauer, McCann, and Severance. Soren's counsel also deposed MPD Sergeant Anthony Caspers, who was present at the scene, in addition to Defendants Severance and McCann, gleaning more facts about the shooting and the events leading up to it.

As depositions began in earnest, so too did the task of ensuring Soren could prove to a jury that Bauer was the shooter by way of the BWC evidence – *and* by ruling out other 40-millimeter "less-lethal" launcher operators or other "possible" causes of Soren's

injuries through process of elimination.[6]  This required subpoenaing records from other

involved law-enforcement agencies, such as the Mille Lacs County Sheriff's Office,

which proved that no Mille Lacs officer could have been Soren's shooter.  At the time the

final Rule 68 Offer was received, numerous depositions had been scheduled as part of

this rule-out process, and given the timing, preparation for those depositions was nearly

complete – with outlines drafted, reviewed, and discussed amongst Soren's legal team.

Counsel also had prepared for Soren's own deposition, those of other fact witnesses, and

Defendant Bauer, all of which were scheduled prior to the receipt of the Rule 68 Offer (as

they needed to be, with a March 1, 2022 discovery cut-off looming).

Other issues during discovery also required the investment of significant time.  For

example, Defendants produced thousands of documents in this case that were neither

indexed, labeled, nor specifically tied to any of Soren's Document Requests or

Interrogatories.  Making matters worse, these documents were produced as individual

PDFs and had to be opened one by one, all of which prolonged their review and analysis.

There was much strategizing, negotiation, and back-and-forth regarding discovery issues,

the Protective Order, the sealing of Complaints and other papers filed with this Court, and

the over-designation of materials as confidential, the latter of which led to motion

practice before Magistrate Judge Leung.

Soren's counsel also had to undertake numerous other tasks to ensure he could

successfully defeat a qualified-immunity motion by the defense, the bane of all civil-

---

[6] This process is explained in the Bennett Declaration at paragraphs 81-83, 101(c)-(d), 102-103, 115-116, 122 and 145.

92683472.1

rights plaintiffs.  This included, among other things, identifying, retaining, and consulting

with a nationally recognized use-of-force and police-practices expert, Jack Ryan.  Legal

research on many issues was performed, including case law updates on supervisory

liability, verdicts and settlements, damages, possible indemnification issues, and issues

with regard to the MGDPA and Defendants' theories to keep Section 1983 cases hidden

from public view.  And, of course, counsel kept Soren fully informed, answered his

questions, and discussed logistics and strategy through emails, calls, and the like

throughout the litigation.

Lastly, as the time records lay bare, each issue and fact in this case was hotly

contested by Defendants along the way – from confidentiality issues to whether the 40-

millimeter launcher is a firearm to whether Soren was even "shot" in the eye, let alone

whether it was Bauer who shot him.  Defendants' own litigation tactics directly resulted

in the expenditure of significant time on this case.  *See City of Riverside v. Rivera*, 477

U.S. 561, 580 n.11 (1986) ("The government cannot litigate tenaciously and then be

heard to complain about the time necessarily spent by the plaintiff in response.") (citation

omitted); *Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 611 (7th Cir. 2014)

("[H]yperaggressive defendants who drive up the expense of litigation must pay the full

costs, even if legal fees seem excessive in retrospect.").

All told, the hours documented in counsel's billing records are well supported and

were necessarily expended vindicating Soren's constitutional rights.  And, Soren's fees

continue to accrue.  "[I]t is beyond peradventure" that fees incurred litigating a fee

petition "are recoverable" under Section 1988.  *Hixon v. City of Golden Valley*, Civ. No.

92683472.1

06-1548 (RHK/JSM), 2007 WL 4373111, at *4 (D. Minn. Dec. 13, 2007) (citing *Jones v. MacMillan Blodel Containers, Inc.*, 685 F.2d 236, 239 (8th Cir. 1982)).  Other courts agree.  *See, e.g.*, *Hines v. City of Albany*, 862 F.3d 215, 223 (2d Cir. 2017) ("Prevailing parties under Section 1988 are . . . entitled to recover a reasonable fee for preparing and defending a fee application."); *Jackson v. State Bd. of Pardons & Paroles*, 331 F.3d 790, 798-99 (11th Cir. 2003); *Volk v. Gonzalez*, 262 F.3d 528, 536 (5th Cir. 2001); *Hernandez v. Kalinowski*, 146 F.3d 196, 199 (3d Cir. 1998); *Brewster v. Dukakis*, 3 F.3d 488, 494 (1st Cir. 1993); *Bond v. Stanton*, 630 F.2d 1231, 1235-36 (7th Cir. 1980).  That is no less true of this Court.  *See Heydinger*, 2016 WL 5661926, at *25 ("Plaintiffs seek additional reimbursement of the attorneys' fees and costs they incurred in bringing their Motion for Attorneys' Fees before this Court[.]  Such compensation is permissible.").  To prepare the instant Motion, Soren's counsel devoted substantial time to reviewing and culling excess fees, drafting the supporting Bennett Declaration, and preparing this Memorandum.  *See* Bennett Decl. at ¶¶ 167, 174.[7]  Such time is compensable, especially because counsel are expected to exercise "billing judgment" and make a "good faith effort" to exclude unnecessary hours from a fee request.  *Hensley*, 461 U.S. at 434.[8]

### D.    The lodestar amount is reasonable and warranted

The total lodestar amount, based on the hourly rates set forth above and the reasonable expended hours documented in Soren's attorneys' billing records, is

---

[7] See also, Exhibit 10 attached to the Bennett Declaration, which includes the time entries for the billing review and other tasks associated with the filing of this Motion.

[8] As described in paragraph 167 of the Bennett Declaration, sound billing judgment was exercised in writing off certain time entries.

$1,481,258.00.  This fee is reasonable given the exceptional, seven-figure result obtained in this case.  *See also Casey*, 12 F.3d at 805 (noting the lodestar "is presumptively a reasonable fee").

As already noted, civil-rights litigation is notoriously complex, and recovery is no sure thing, especially given the ever-broader application of qualified immunity in Fourth Amendment cases over the past two decades.  *See, e.g.*, Kit Kinports, "The Supreme Court's Quiet Expansion of Qualified Immunity," *Minnesota Law Review: Headnotes* 40 (2016).[9]  The novelty and difficulty of these matters has been acknowledged by Congress and is known by the federal judiciary in Minnesota.  A team with extensive experience plus the proper skills and ingenuity to deal with the difficulties presented in Section 1983 lawsuits is required to obtain significant results.  The RK civil-rights group has developed a reputation as the preeminent firm in the region for prosecuting Section 1983 claims, as well as recent national attention, winning the *National Law Journal*'s Elite Trial Lawyers of the Year award for civil rights in 2021.[10]  As Judge Donovan Frank noted in *Madison v. Willis* when complementing the RK (formerly Gaskins Bennett) civil-rights team, "it is likely that [plaintiff's] success was due at least in part [to] the composition of the legal staff."  No. 09-930 (DWF/AJB), 2011 WL 851479, at *2 (D. Minn. March 9, 2011).

Furthermore, a comparison between the multi-million-dollar judgment obtained for Soren here and the results obtained in other George Floyd-protest cases highlights the

---

[9] Available at https://scholarship.law.umn.edu/cgi/viewcontent.cgi?article=1039& context=headnotes (last visited April 4, 2022).

[10] *See* https://www.event.law.com/nationallawjournal-etl/firm-individual-winners (last visited April 4, 2022).

92683472.1

significance of the result.  In one case, Autumn Larson alleged that MPD officers fired

tear gas into her car as she was trying to leave a protest on May 30, 2020, and, when she

extended her head outside the vehicle in order to get fresh air, she was shot in the face

with a less-lethal projectile, knocking her unconscious behind the wheel of her still-

running car.  *See* Complaint, *Larson v. City of Minneapolis et al.*, No. 21-cv-714

(ECT/JFD) (D. Minn. Mar. 16, 2021).  She suffered facial lacerations requiring stitches, a

severe concussion, and eye injuries causing ongoing vision problems, in addition to

headaches, dizziness, and continual ringing in her ears.  *Id.* ¶¶ 127-29.  In November

2021, Ms. Larson settled her lawsuit in exchange for payment of $45,000.  *See*

https://kstp.com/kstp-news/local-news/minneapolis-city-council-committee-signs-off-on-

less-lethal-settlement/ (last visited April 4, 2022).  Similarly, in another case Graciela

Cisneros alleged that on May 30, 2020, she was leaving the scene of a protest when,

without warning, an MPD officer shot her with a less-lethal projectile directly below her

left eye.  *See* Complaint, *Cisneros v. City of Minneapolis et al.*, No. 20-cv-1957

(PJS/BRT) (D. Minn. Sept. 15, 2020).  She suffered a fractured left cheekbone,

significant lacerations and swelling, and ongoing vision problems, among other injuries.

*Id.* ¶¶ 146-52.  In January 2021, Ms. Cisneros settled her lawsuit for $57,900.  *See*

https://www.staradvertiser.com/2021/01/27/breaking-news/woman-injured-by-

minneapolis-police-during-george-floyd-unrest-settles-lawsuit/ (last visited April 4,

2022).  While no two cases are perfectly alike or comparable, the result Soren obtained

here is approximately *fifty times* that obtained in these other cases.

92683472.1

As the Supreme Court has recognized, the "most critical factor" in setting a fee award is the "degree of success attained." *Hensley*, 461 U.S. at 436. By any measure, the degree of Soren's success is excellent. And "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation." *Id.* at 435. That principle applies with full force here.

Consideration of the factors set forth in Rule 1.5 of the Minnesota Rules of Professional Conduct similarly supports Soren's requested fees. In pertinent part, Rule 1.5 provides that a lawyer "shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." The factors to be considered in determining the reasonableness of a fee under the Rule include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

*Id.* These factors, too, amply support the instant fee request.

92683472.1

With regard to factors 1 and 7, as already noted, the difficulty of civil-rights cases is well-understood, and RK's civil-rights lawyers are uniquely experienced and skilled in successfully prosecuting these cases. With regard to factors 3 and 8, undersigned counsel undertook Soren's case on a contingency basis, running the risk of no payment in the event the case failed to produce a positive outcome. Contingent-fee arrangements are typical in this arena.[11] Factor number 4, the result obtained, has been addressed at length above. And while factors 2, 5 and 6 have lesser relevance in this case, they are still important and militate in favor of the requested fees; the facts supporting those and the other factors discussed above are addressed in paragraphs 159(a)-(e) of the Bennett Declaration and Soren's own Declaration.

Lastly, but perhaps most importantly, civil-rights cases remain vital. They frequently pit the disenfranchised against state actors with public money to spend on aggressive defense, including lengthy delays. The values at stake "often cannot be measured—or at least fully measured—with dollars." *Miller*, 402 F. Supp. 3d at 596. Indeed, as the Eighth Circuit noted in *Casey*, a plaintiff bringing a civil-rights action "does so not for himself alone but also as a 'private attorney general,' vindicating a

---

[11] Indeed, the fact that RK accepted the case on a contingency-fee basis created an "economic incentive not to sink unnecessary hours into this case." *Gilster v. Primebank*, 884 F. Supp. 2d 811, 876 n.35 (N.D. Iowa 2012), *rev'd on other grounds*, 747 F.3d 1007 (8th Cir. 2014); *accord Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("[L]awyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.").

policy that Congress considered of the highest priority." 12 F.3d at 805 (citation omitted). "In order for such a policy to be effective, Congress felt it appropriate to shift the true full cost of enforcement to the guilty parties to eliminate any obstacle to enforcement." *Id.* A substantial recovery like the one obtained here is an important step in preventing similar misconduct in the future. *Lash v. Hollis*, 525 F.3d 636, 643 (8th Cir. 2008) ("Lawsuits like the present case provide a forum for exposing official misconduct. Hopefully, this exposure helps induce governmental entities to institute policies protective of civil rights."). All of this weighs in favor of the significant award sought.

###    E.    No reduction of the lodestar is warranted

Soren anticipates Defendants will raise several arguments in an effort to reduce the lodestar amount. None, however, should move the Court.

####    1.    Partial success

Defendants likely will argue Soren achieved only "limited success" because the accepted Rule 68 Offer did not allow for judgment on his *Monell* claim against the City and MPD Chief Arradondo in his official capacity (Count IV of the Second Amended Complaint). This argument would be flawed for a number of reasons.

First, while it is true, as already discussed, that a plaintiff's degree of success impacts the fee to be awarded, a $2,400,000 judgment – *plus* attorneys' fees and costs – against Soren's shooter and two supervisors is no small feat and can in no way be deemed "limited." *See Heaton v. The Weitz Co.*, 534 F.3d 882, 892 (8th Cir. 2008) (labeling as a "substantial judgment" a jury award of approximately $137,000 in compensatory

damages and $25,000 in punitive damages on two of five claims asserted in Title VII case); *Wal-Mart Stores, Inc. v. Barton*, 223 F.3d 770, 773 (8th Cir. 2000) ($25,000 recovery on only one of six claims in sex-harassment action was a "substantial judgment" and "significant success"). As *Hensley* noted, "litigants in good faith may raise alternative legal grounds for a desired outcome," and thus, "*[t]he result is what matters.*" 461 U.S. at 435 (emphasis added). A plaintiff's degree of success is no simple mathematical exercise, in which the Court constructs a fraction with the numerator equal to the number of successful claims and the denominator equal to the total number of claims asserted. *See Phelps-Roper v. Koster*, 815 F.3d 393, 398 (8th Cir. 2016) (noting the court has rejected "arithmetically simplistic" fee calculations "based simply on the number of claims upon which the plaintiff prevailed"); *Lash*, 525 F.3d at 641-42. "The scoreboard on [Soren's] causes of action" simply does not present "an accurate portrayal of the . . . results obtained." *C.P.X. v. Garcia*, Case No. 4:17-cv-00417-SMR-HCA, 2021 WL 302754, at *3 (S.D. Iowa Jan. 7, 2021).

Here, Soren won the claim "at the heart of [his] case," namely, the violation of his constitutional rights through the unlawful use of force against him. *Barton*, 223 F.3d at 773. All of his other claims were predicated on that assertion. *See* 2d Am. Compl. (Dkt. No. 53) ¶¶ 233, 241, 246, 251. As this Court has stated, "a plaintiff may obtain significant success, even when prevailing on [only] one of several claims." *Ewald v. Royal Norwegian Embassy*, No. 11–CV–2116 (SRN/SER), 2015 WL 1746375, at *14 (D. Minn. Apr. 13, 2015) (Nelson, J.). Pejoratively labeling Soren's success "limited" or "partial" simply does not make it so.

92683472.1

Second, "once a party is found to have prevailed, a fee award should not be reduced merely because a party did not prevail on every theory raised in the lawsuit," since lawyers prosecute *cases*, not *claims*. *Casey*, 12 F.3d at 806 (cleaned up) (recognizing that "counsel's time is devoted to the case as a whole, rather than to specific theories"). Hence, courts have repeatedly recognized that fees should not be deducted where the facts and legal theories undergirding a plaintiff's claims are interrelated. *Hensley*, 461 U.S. at 438; *Casey*, 12 F.3d at 806; *Shrader v. OMC Aluminum Boat Group, Inc.*, 128 F.3d 1218, 1220 (8th Cir. 1997) ("When a plaintiff obtains substantial relief and the lawsuit consists of closely related claims, the award is not reduced because plaintiff did not prevail on every argument asserted."). Only where an unsuccessful claim is "distinct in all respects" from a successful one should fees be excluded. *Hensley*, 461 U.S. at 440; *Emery v. Hunt*, 272 F.3d 1042, 1046 (8th Cir. 2001).

There can be no serious dispute here that Soren's *Monell* claim was interrelated with his claims against Bauer, Severance, and McCann. The *Monell* claim was predicated on Soren's assertion that Bauer's use of force against him was part of a broader pattern of excused, improper force reporting by the MPD, fostering an environment in which excessive force by officers occurred with impunity. *See* 2d Am. Compl. ¶¶ 251-52. This same allegation was a key component of Soren's claims against Severance and McCann, which alleged that they, as supervisors, had similarly fostered an environment in which excessive force by officers ran amok. *See id.* ¶¶ 243-46. Simply put, the gravamen of the two claims was similar. *See also Estate of Loury v. City of Chicago*, Case No. 16-CV-04452, 2017 WL 1425594, at *2-4 (N.D. Ill. Apr. 20, 2017)

23

(denying motion to bifurcate discovery between excessive-force and *Monell* claims given the "factual overlap" between them). Thus, "it is unlikely that the scope of discovery" in this case "would have been much different had [Soren's] complaint" not contained his *Monell* claim. *Miller*, 402 F. Supp. 3d at 595. More importantly, the work undertaken on the *Monell* claim was *necessarily* intertwined with the remaining Counts in the Second Amended Complaint – and discovery thereon – because proof of an underlying constitutional violation is required in order to establish *Monell* liability. *See, e.g.*, *Muir v. Decatur Cnty.*, 917 F.3d 1050, 1054 (8th Cir. 2019) ("[T]here must be an unconstitutional act by a municipal employee before a municipality can be held liable."). Stated differently, Soren could not have successfully litigated his *Monell* claim without first showing Bauer, Severance, and/or McCann acted unlawfully. "Claims are related, and hence deserving of compensation, if they 'involve a common core of facts' or are 'based on related legal theories.'" *Emery*, 272 F.3d at 1046 (quoting *Hensley*, 461 U.S. at 435).

Third, and finally, in no way is it proper to label Soren as "unsuccessful" on the *Monell* claim. To be sure, the Judgment entered in this case does not include the *Monell* Defendants. But that was simply the product of the Rule 68 Offer, acceptance of which led to the *Monell* claim falling away. At no point has the Court deemed the claim inadequate – in fact, the Court noted the claim was plausibly pleaded when it *denied* Defendants' Motion to Dismiss that claim. *See* Dkt. No. 27 at 6-12. Without the Court having further opined on the merits of the claim, it is not fairly characterized as "unsuccessful" simply because it was not captured within the Offer of Judgment. *See Phelps-Roper*, 815 F.3d at 399 ("[A]utomatically characterizing a mooted claim or

24

consent judgment as 'unsuccessful' and subsequently reducing the fee award for this reason is inaccurate because the district court did not reach the merits of these claims."). Indeed, that is especially true given that although the Judgment was entered against the individual Defendants, it will actually be *paid* by the City of Minneapolis – essentially, the <u>only</u> *Monell* Defendant – itself.[12]

### 2.      Overstaffing/over-conferencing

Soren also expects Defendants to raise a common argument employed against prevailing plaintiffs' fee petitions:  overstaffing and excessive conferencing.  This argument, too, would not hold water.

At the outset, it is important to recognize it is not inherently improper for multiple attorneys to work on a case, particularly a one (such as this case) involving complicated factual and legal issues, multiple parties, voluminous discovery, and numerous claims. Indeed, the Eighth Circuit has stated that the use of more than one attorney is "both desirable and common" in multi-party litigation.  *A.J. by L.B. v. Kierst*, 56 F.3d 849, 863 (8th Cir. 1995).  Hence, this Court routinely awards fees to multiple attorneys and staff members representing prevailing plaintiffs.  *See, e.g.*, *Miller*, 402 F. Supp. 3d at 591-92 (awarding fees in sex-discrimination case to two law firms and at least seven attorneys and paralegals representing plaintiff); *Heydinger*, 2016 WL 5661926, at *16 (awarding fees for legal team comprising "seven to nine attorneys, one law clerk, three paralegals,

---

[12] Though the *Monell* claim included former Chief Arradondo in his official capacity, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Banks v. Slay*, 875 F.3d 876, 880 (8th Cir. 2017) (citation omitted).

and three to five research/litigation support staff . . . who had varying degrees of involvement over the course of four years of litigation"); *Hixon*, 2007 WL 4373111, at *3 (excessive-force case approving fees for six lawyers and paralegals).  Notably, Defendants seem to understand the benefit of having multiple people work on this complex case, as three attorneys from the City Attorney's Office appeared in this matter and several additional staff members from the Office were involved in discovery.  *See* Bennett Decl. ¶ 34.  *See also, e.g.*, *Gerling v. Waite*, Case No. 4:17-CV-02702 JAR, 2022 WL 558083, at *3 & n.2 (E.D. Mo. Feb. 24, 2022) (awarding fees to ten attorneys and paralegals who worked on a "vigorously litigated" single-plaintiff excessive-force case against a lone police officer).

True, multiple attorneys attended hearings and depositions in the case, but this was neither improper nor unexpected given their importance.  *See Fancher v. Klann*, Civ. No. 13-435 (DSD/JJK), 2015 WL 1810235, at *2 (D. Minn. Apr. 21, 2015) ("it is common practice in civil rights cases for two attorneys to participate in depositions [and] motion practice," even when – unlike here – the matter does "not involve particularly complex legal or factual issues"); *Washington*, 2017 WL 4399566, at *5 (awarding fees for two attorneys to attend three "key" depositions).  Indeed, a fee reduction is not automatic even when attorneys perform the exact same tasks.  *See Rode v. Dellarciprete*, 892 F.2d 1177, 1187 (3d Cir. 1990) ("A reduction for duplication is warranted only if the attorneys are *unreasonably* doing the same work.") (emphasis in original) (internal quotation marks and citation omitted).  And, some duplication of effort is to be expected in cases that last for several years.  As one court has stated:

92683472.1

> When a case goes on for many years, a lot of legal work product will grow
> stale; a competent lawyer won't rely entirely on last year's, or even last
> month's, research: Cases are decided; statutes are enacted; regulations are
> promulgated and amended.  A lawyer also needs to get up to speed with the
> research previously performed. All this is duplication, of course, but it's
> *necessary* duplication; it is inherent in the process of litigating over time. . . .
> One certainly expects some degree of duplication as an inherent part of the
> process.  There is no reason why the lawyer should perform this necessary
> work for free.

*Moreno*, 534 F.3d at 1112 (emphasis in original).

As for excessive conferencing, the contemporaneous billing records submitted in this case reveal that, as a general matter, tasks were completed by various attorneys commensurate with the importance of the issues involved in the litigation and the attorneys' seniority and experience.  Some tasks, such as reviewing the voluminous discovery provided by Defendants and the hundreds of hours of BWC videos, of necessity involved work by more than one attorney.  The need to split tasks among lawyers, of course, *ipso facto* required extensive conferencing to understand the evidence and strategize and plan accordingly.  In addition, the entirety of this case – from Soren's shooting through the acceptance of the Rule 68 Offer – occurred during the COVID-19 pandemic, resulting in work being completed remotely and, thus, a significant number of telephone and ZOOM conferences and strategy sessions.  Such team efforts are appropriately commended, not castigated.  *See Gilster*, 884 F. Supp. 2d at 877 (declining to impose fee reduction for emails and conferences among co-counsel, since "communication among lawyers should help to improve efficiency and avoid duplicative and repetitive efforts"); *Franklin v. Magnolia Flooring Mill, LLC*, No. 1:17-CV-01073, 2019 WL 2427952, at *4 (W.D. Ark. June 10, 2019) ("the fact that numerous attorneys

92683472.1

work collectively on one case is not in-and-of-itself unreasonable and, in some cases, may indeed be more efficient and lead to a reduction in the total number of hours worked on a matter").

At bottom, the RK civil-rights team adequately staffed, and must continue to adequately staff, this and other cases and collaborate, conference, and strategize together in order to achieve success. Indeed, there are many aspects of representing clients in civil-rights cases that require communication and collaboration among the team. It is often easy to fool one's self about strategies and concepts; team conferencing helps counsel to arrive at a reasoned consensus about what is a "good idea" versus a "bad idea." *See Bohen v. City of East Chicago*, 666 F. Supp. 154, 157 (N.D. Ind. 1987) ("Consultation among lawyers ensures that they do not overlook significant facts or inquiries."). The product of counsel's extensive collaboration in this case is Soren's multi-million-dollar judgment. In light of that significant result, any complaint that Soren's case was overlawyered or that counsel excessively conferenced should fall flat. As Judge Tunheim stated in *King v. Turner*, "Plaintiff was successful in her claim, and her success likely depend[ed] in large part on the consultation and insight from her attorneys on how to best present this case." Civ. No. 05-388 (JRT/FLN), 2007 WL 1219308, at *3 (D. Minn. Apr. 24, 2007); *accord Madison*, 2011 WL 851479, at *2 ("the Court declines to reduce the request based on allegations of overstaffing, excessive conferencing, or duplicative work by Plaintiff's legal team," as Plaintiff's "success was due at least in part on the composition of the legal staff and their consultation with each other").

**F.      Soren is entitled to recover the costs incurred in bringing this action**

Soren also seeks to recover $31,934.60 in costs incurred during this case.  As already noted above, while costs taxable under Federal Rule of Civil Procedure 54 typically track those set forth in 28 U.S.C. § 1920, the costs awardable under 42 U.S.C. § 1988 are broader and encompass all charges for "items reasonably charged by attorneys to their clients."  *Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005).

The costs associated with the prosecution of Soren's civil rights are discussed within the Bennett Declaration and are specifically identified in the attachments thereto. Some of the costs are expressly taxable under § 1920, including filing fees, witness fees, and fees for service of process.  However, the most significant costs were incurred through:  retaining and consulting with experts; obtaining Soren's extensive medical records; transcribing and videotaping depositions; and mediation fees.   As opined in Declarations of Messrs. Fleming and Hageman, all such costs are of the type typically charged by attorneys to their clients.  Fleming Decl. at ¶ 17; Hageman Decl. at ¶ 13. They should be awarded.  *See also Williams v. ConAgra Poultry Co.*, 113 F. App'x. 725, 728 (8th Cir. 2004) ("travel expenses for attorneys" properly awardable); *Miller*, 402 F. Supp. 3d at 597-98 (awarding costs for computer-research fees, travel expenses, and expert fees); *Heydinger*, 2016 WL 5661926, at *28 (approving costs for expert fees, parking, delivery services, certificates of good standing, express mail, and photocopying).

**G.      Soren is entitled to recover the fees incurred in bringing this Motion**

Finally, from February 10, 2022 to today, Soren's counsel incurred $172,255.50 in fees in conjunction with the instant Motion.  *See* Bennett Declaration at ¶¶ 174-185.

92683472.1

Defendants likely will argue Soren is not entitled to recover these fees, *i.e.*, fees on fees. As already noted, fees incurred litigating a fee award are compensable. *Jones*, 685 F.2d at 239; *Heydinger*, 2016 WL 5661926, at *25. Nevertheless, Defendants may argue that because the Rule 68 Offer limited fees to those incurred "by Plaintiff prior to the date of this offer," any fees incurred after the Offer's date – including those expended preparing (and litigating) the instant Motion – are barred.

To be sure, some courts have endorsed this logic, as a matter of strict contract interpretation since Rule 68 offers (and their acceptance) are governed by general contract principles. *See Lilly v. City of N.Y.*, 934 F.3d 222, 235 (2d Cir. 2017); *Peterson v. Tenant Tracker, Inc.*, Civ. A. No. 6:20-CV-00588-JDK, 2021 WL 4956244, at *3 (E.D. Tex. Sept. 30, 2021) (Report & Recommendation of Love, M.J.), *adopted*, 2021 WL 4950389 (E.D. Tex. Oct. 25, 2021); *but see Makinen v. City of N.Y.*, No. 1:11-cv-07535 (ALC) (GWG), 2019 WL 970945, at *2-3 (S.D.N.Y. Feb. 28, 2019) (rejecting such a "formalist stance" to fees on fees and awarding them as a matter of "equity"). This Court has, at times, applied the same reasoning, albeit without analysis and expressly mentioning contract law. *Taylor v. City of Amboy*, No. 14-CV-722 (PJS/TNL), 2017 WL 4075163, at *5 (D. Minn. Sept. 14, 2017); *Young v. Diversified Consultants, Inc.*, 554 F. Supp. 2d 954, 957 (D. Minn. 2008). There are, however, at least three reasons why such logic should not be applied in this case.

First, there is more at play in this action than simply the law of contract. As discussed extensively above, this case concerned the vindication of Soren's constitutional rights pursuant to Section 1983, rights which Congress has deemed so important as to

92683472.1

require a prevailing plaintiff's attorney fees to be shifted onto the defense in contravention of the "American Rule" requiring parties to litigation to bear their own costs. In order to encourage the vindication of those critical rights, fee awards should not be diluted by forcing prevailing plaintiffs' attorneys to bear the expense of litigating their entitlement to fees. *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 981 (9th Cir. 2008) (noting "it would be inconsistent to dilute a fees award by refusing to compensate attorneys for the time they reasonably spent in establishing their rightful claim to the fee"). Put another way, state contract law should not stand in the way – indeed, it *cannot* be allowed to stand in the way – of Soren's federal rights. *See, e.g., Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

Second, accepting this logic would lead to perverse results. As one court has stated, precluding a prevailing plaintiff from recovering the fees he incurred establishing the reasonableness of his fees "could allow an offering defendant to object to every dollar requested as unreasonable and yet refuse to pay any fees for the litigation necessary for a plaintiff to establish his entitlement to reasonable compensation." *Arch v. Glendale Nissan*, No. 03 C 7297, 2005 WL 1421140, at *3 (N.D. Ill. June 7, 2005). Defendants should not be so incentivized, particularly where, as here, the Rule 68 offer *expressly contemplates* that the Court will be asked to set the reasonable fee, assuming the parties cannot agree. In such a situation, "the defendants have effectively been 'put on notice that time spent by counsel in seeking fees would become a component' of the 'reasonable attorney's fees' authorized under Section 1988." *John v. Demaio*, No. 15-CV-6094 (NGG) (CLP), 2016 WL 7410656, at *3 (E.D.N.Y. Dec. 22, 2016) (citation omitted).

92683472.1

Third, and finally, defendants failing to negotiate the issue of attorney fees in good faith are rightly penalized for such conduct, and courts have awarded fees on fees even in the face of contrary Rule 68 offers in such circumstances. *See, e.g.*, *Morjal v. City of Chicago*, 774 F.3d 419, 422-23 (7th Cir. 2014); *John*, 2016 WL 7410656, at *3 (citing case law recognizing that "if a defendant disputes the fee motion in bad faith, then even a clear Rule 68 offer would not necessarily preclude plaintiffs from recovering for time spent securing their fee award") (internal quotation marks omitted).  That is true here. Soren's counsel expeditiously reviewed the billing records in this case, exercising billing judgment to reduce the total fee, and submitted those records to defense counsel on February 28 in an effort to negotiate the fees without Court intervention.  As of the date of this filing, April 4, 2022, *no response* has been received, despite several attempts at follow up.  Given these facts, there is nothing unfair or improper about awarding Soren fees on fees.  *Cf. Robles v. City of N.Y.*, No. 19-CV-6581 (AT) (BCM), 2021 WL 1034773, at *6 (S.D.N.Y. Feb. 26, 2021) (Report & Recommendation of Barbara Moses, M.J.) (finding fees on fees inappropriate where defendant "engaged in substantial fee negotiations with [the plaintiff's] attorney"), *adopted*, 2021 WL 1177462 (S.D.N.Y. Mar. 29, 2021).

## <u>CONCLUSION</u>

Soren's Section 1983 case began like so many others:  from the day of his encounter with his shooter, Defendant Bauer, he and his legal team were at a disadvantage.  The Defendants held all the cards.  However, given the timing of the incident, and the breakdown and lack of adherence to MPD use-of-force and reporting

92683472.1

policies during the post-George Floyd murder operational period, the disadvantage was compounded.  Then, Defendants boldly informed Soren they would not investigate his shooting and he would have to identify his shooter on his own.  And when he finally did so, after Herculean effort, Defendants raised putative defenses that had to be stripped away both factually and legally, one by one.  After nearly two years, Soren prevailed in striking fashion, obtaining a seven-figure Judgment against not only his shooter, but also the shooter's supervisors.  What his counsel have requested is, under these circumstances, fair, just and reasonable and, accordingly, should be awarded by this Court.

Respectfully submitted,

**ROBINS KAPLAN LLP**

Dated:  April 4, 2022                *s/Robert Bennett*
                                     Robert Bennett, #6713
                                     Andrew J. Noel, #322118
                                     Kathryn H. Bennett, #0392087
                                     Marc E. Betinsky, #0388414
                                     800 LaSalle Ave, Suite 2800
                                     Minneapolis, MN 55402
                                     Telephone:  612-349-8500
                                     rbennett@robinskaplan.com
                                     anoel@robinskaplan.com
                                     kbennett@robinskaplan.com
                                     mbetinsky@robinskaplan.com
                                     ***Attorneys for Plaintiff Soren Stevenson***

92683472.1