## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Soren Stevenson,<br><br>Plaintiff,<br><br>v.<br><br>Benjamin Bauer, acting in his individual Capacity as a Minneapolis Police Officer, et al.,<br><br>Defendants | Case No. 20-cv-2007 (SRN/TNL)<br><br>**ORDER ON PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**<br>*Temporarily Filed Under Seal* |

Robert Bennett, Kathryn H. Bennett, Andrew J. Noel, and Marc Betinsky, Robins Kaplan LLP, 800 LaSalle Ave., Ste. 2800, Minneapolis, MN 55402, for Plaintiff

Kristin R. Sarff, Heather Passe Robertson, and Sharda R. Enslin, Minneapolis City Attorney's Office, 350 S. 5th St., Rm. 210, Minneapolis, MN 55415, for Defendants

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff's Motion for Attorneys' Fees [Doc. No. 83]. For the reasons set forth below, Plaintiff's motion is granted in part and denied in part.

## I.    BACKGROUND

### A.    Factual Background

In May 2020, after George Floyd tragically died in the custody of the Minneapolis Police Department ("MPD"), widespread demonstrations and incidents of civil unrest occurred throughout the country and in the city of Minneapolis. (Mar. 11, 2021 Order [Doc. No. 27] at 2–3.)

1

On May 31, 2020, Plaintiff Soren Stevenson participated in a daytime protest near the on-ramp to southbound I-35W from University Avenue.  (*Id*. at 3.)  Earlier in the day, a tanker truck had entered the nearby I-35W bridge deck and driven into a group of protestors.  (Bennett Decl. [Doc. No. 85], Ex. 6 (After-Action Review) at 22.)

Shortly after 6:00 p.m., MPD officers assembled opposite the group of protestors that included Stevenson.  (May 11, 2021 Order at 3.)  Defendant Benjamin Bauer, a member of MPD's SWAT unit, was among the contingent of MPD officers at the scene. Based on instructions from Defendant Ryan McCann, the SWAT Team Leader, and Defendant Matthew Severance, the MPD incident commander at the scene, to "scatter [the protestors] a little bit," the MPD officers met the protestors with force.  (Pl.'s Mem. [Doc. No. 92] at 2.)  An MPD officer aimed and fired a 40 mm round of blunt-impact projectiles, striking Stevenson's left eye.  (May 11, 2021 Order at 4.)  Stevenson suffered multiple physical and mental injuries, ultimately including the loss of his left eye.  (*Id*. at 3–4.) Stevenson asserts that not only did the officers provide no warnings on the use of force, they did not render medical assistance.  (*Id*. at 4.)

Further, Stevenson contends that not all of the officers on the scene recorded the events on their body-worn cameras ("BWCs"), and they failed to comply with MPD's force-reporting policies, which resulted in no documentation  that identified the officer who shot Stevenson.  (Bennett Decl. ¶ 81.)

In September 2020, Stevenson filed this lawsuit against the City of Minneapolis ("the City"), then-MPD Chief Medaria Arradondo, and unnamed MPD officers, asserting violations of his civil rights pursuant to 42 U.S.C. § 1983.  (Compl. [Doc. No. 1].)   In

March 2021, the Court denied in part the Defendants' Motion to Dismiss, but granted the dismissal without prejudice of claims against MPD Chief Arradondo in his individual capacity.  (Mar. 11, 2021 Order at 14.)

MPD officers did not report or document their use of force against Stevenson on May 31, 2020, nor against protestors in general, in the operational period following George Floyd's death.  (*See* Bennett Decl., Ex. 6 (After-Action Review) at 35) (reviewing MPD's actions following George Floyd's death, and finding that MPD officers violated MPD's use-of-force policy regarding reporting requirements and conduct).  The City claimed it lacked knowledge and information sufficient to identify the officer who shot Stevenson. (*See* Answer [Doc. No. 30] ¶¶ 54–55; Bennett Decl. ¶¶ 67, 74.)

In order to identify the officer and supervising officers, Stevenson's attorneys reviewed scores of BWC videos recorded by different officers at different angles and bearing different timestamps.   (Bennett Decl. ¶¶ 74–99; 102–03.)   However, a "CONFIDENTIAL" stamp obscured portions of some of the videos.  (*Id*.)  The City required Plaintiff's counsel to identify the relevant portions of such videos before the City provided unobstructed videos.  (*Id*. ¶¶ 74–88.)  In addition to Stevenson's counsel's review of the BWC videos, they also reviewed thousands of pages of documents.  (*Id*. ¶ 92–102, 107, 113.)  Through the efforts of Stevenson's attorneys, in July 2021, Stevenson filed an Amended Complaint and Second Amended Complaint, identifying Officer Bauer as the shooter, and Officers Severance and McCann as his supervising officers.  (Am. Compl. [Doc. No. 43].)

3

Defendants continued to deny knowledge of the shooter's identity and proposed that back-up officers from the Mille Lacs County Sheriff's Department might have shot Sorenson.  (Bennett Decl. ¶ 145; Bauer's Answer to Second Am. Compl. [Doc. No. 58] ¶¶ 74–81, 125–26, 149, 155, 171, 184.)  Plaintiff's counsel then subpoenaed information from the Mille Lacs County Sherriff's Department and attest that upon review of the information, "it was clear that the shot that struck Soren's left eye could not have come from any Mille Lacs County deputies."  (*Id*.)

To establish supervisory liability and to address the defense of qualified immunity, Stevenson's attorneys also obtained discovery from the City relevant to the involvement of supervisory MPD officers Severance and McCann, and to MPD's use-of-force training.  (Pl.'s Mem. at 2–4.)  Stevenson's counsel deposed McCann in October 2021 and Severance in December 2021.  (Bennett Decl. ¶¶ 122, 132.)  Also in December 2021, Plaintiff's counsel deposed Officer Bauer in another case stemming from the MPD's response to protests following George Floyd's death.  (*Id*. ¶ 128.)  Although Bauer testified that he did not know who shot Stevenson, he conceded the possibility that he had done so.  (*Id*.)

On February 9, 2022, the City served a Rule 68 Offer of Judgment on Stevenson.  (Bennett Decl., Ex. 3 (Defs.' Offer of J.).)  The City offered to resolve Stevenson's claims for $2.4 million and agreed to pay reasonable attorneys' fees and costs "incurred by Plaintiff prior to the date of this offer; that is, with the costs then accrued."  (*Id*. at 1.)  The Offer of Judgment contemplated that the Court would determine the amount of reasonable attorneys' fees and costs.  (*Id*.) ("The attorneys' fees and costs will be in an amount to be

set by the Court.").  After Stevenson verified that the City would assume full responsibility for payment of the offer, he accepted it.  (Bennett Decl., Ex. 4 (Pl.'s Acceptance).)

Stevenson now moves for an award of attorneys' fees and costs totaling $1,685,448.10.  (Pl.'s Mem. at 5.)  The requested award consists of $1,481,258 in attorneys' fees, $31,934.60 in costs, and $172,255.50 in attorneys' fees incurred in preparing the instant fee petition.  (*Id*.)

The City objects to Stevenson's request on several grounds, including that the attorneys' hourly rates are unreasonable, many of the fees were unreasonably incurred, and Stevenson is not entitled to an award of attorneys' fees related to the fee petition.  (Defs.' Opp'n [Doc. No. 96] at 35.)  The City argues that numerous deductions, totaling $444,852.97, are warranted.

## II.   DISCUSSION

### A.   Reasonable Attorneys' Fees

A prevailing plaintiff on claims filed under 42 U.S.C. § 1983 is permitted a reasonable award of attorneys' fees and costs.  42 U.S.C. § 1988.  A "prevailing party" is a party who succeeds "on any significant issue in litigation which achieves some of the benefits the parties sought in bringing the suit."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (citation omitted); *see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) (noting that a prevailing party "is one who has been awarded some relief.").  Stevenson meets the definition of a prevailing party, having obtained significant relief.

5

In addition to being a prevailing party, and as noted earlier, Stevenson accepted the City's Offer of Judgment, which provides for an award of reasonable attorneys' fees and costs, (Bennett Decl., Ex. 3 (Defs.' Offer of J.) at 1; *id.*, Ex. 4 (Pl.'s Acceptance) at 1–2), and the Court has entered Judgment [Doc. No. 80].

Plaintiff's legal representatives from the Minneapolis law firm of Robins Kaplan include attorneys Robert Bennett, Andy Noel, Kathryn Bennett, Esther Mignanelli, Marc Betinsky, Greta Wiessner, paralegal Angela Koob, investigators, and trial and multimedia staff.[1]  Their work is reflected in the invoices that accompany Stevenson's fee petition. (*See* Bennett Decl., Ex. 8 (Invoices).)

The amount of an attorney's fee award must be determined on the facts of each case and is within the district court's discretion. *Hensley*, 461 U.S. at 429, 437; *see Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005) (citation omitted) ("Attorney's fees are within the broad discretion of the district court . . . .").  The starting point for determining a reasonable attorney's fee is the "lodestar" calculation, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hanig*, 415 F.3d at 825 (citation omitted); *see Hensley*, 461 U.S. at 433.

---

[1] The Court notes that "[w]ork done by paralegals is compensable if it is work that would have been done by an attorney." *Miller v. Alamo*, 983 F.2d 856, 862 (8th Cir. 1993). Similarly, this Court has recognized that time spent by trial and support staff is also compensable, provided that it is the type of expense typically charged by attorneys to their clients. *See North Dakota v. Heydinger*, No. 11-cv-3232 (SRN/SER), 2016 WL 5661926, at &16–17 (D. Minn. Sept. 29, 2016) (approving compensation for work performed by litigation support staff).

Courts consider "all relevant circumstances" when determining the reasonableness of hours and hourly rates. *Milner v. Farmers Ins. Exch.*, 748 N.W.2d 608, 621 (Minn. 2008) (citing *State v. Paulson*, 188 N.W.2d 424, 426 (Minn. 1971)). The Supreme Court, citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), has identified several factors relevant to the determination of reasonableness (the "*Johnson* factors*"):

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 429–30 n.3.[2] However, the Supreme Court has observed that most of the *Johnson* factors are subsumed in the initial calculation of the lodestar. *Id.* at 434 n.9.

Indeed, here, many of the *Johnson* factors are reflected in Jacobson's legal representatives' hourly rates, as the Court discusses *infra* at II.A.2.i, and are therefore subsumed in the lodestar calculation.

---

[2] The Minnesota Supreme Court has likewise identified six relevant factors, which are among the *Johnson* factors listed above: (1) the time and labor required; (2) the nature and difficulty of the responsibility assumed; (3) the amount involved and the results obtained; (4) the fees customarily charged for similar legal services; (5) the experience, reputation, and ability of counsel; and (6) the fee arrangement existing between counsel and the client. *Milner*, 748 N.W.2d at 621; *see also* Minn. R. Prof. Conduct 1.5 (listing nearly identical factors to determine reasonableness of an attorney's fee under ethical rules).

In determining the lodestar, courts "need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection."  *Fox v. Vice*, 563 U.S. 826, 838 (2011).  Courts "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."  *Id*.  But "[t]he determination of fees 'should not result in a second major litigation.'"  *Id.* (quoting *Hensley*, 461 U.S. at 437).

The fee applicant "should submit evidence supporting the hours worked and rates claimed."  *Hensley,* 461 U.S. at 433.   If "the documentation of hours is inadequate, the district court may reduce the award accordingly."  *Id.*

### 1.    Reasonable Rate

The chart below lists Plaintiff's requested hourly rates for his fee award, along with the City's proposed alternative hourly rates:

| Attorney/Legal Support | Plaintiff's Requested Hourly Rate | City's Proposed Alternative Hourly Rate |
|---|---|---|
| Robert Bennett, partner | $855 | $775 |
| Andrew Noel, partner | $730 | $660 |
| Kathryn Bennett, partner | $685 | $620 |
| Esther Mignanelli, associate | $580 | $400 |
| Marc Betinsky, counsel | $530 | $520 |
| Greta Wiessner, associate | $460 | |
| Angela Koob, paralegal | $230 | |
| Trial & Multimedia Support | $280–95 | |

| Investigators | $220 | |
|---|---|---|

(Pl.'s Mem. at 8; Defs.' Opp'n at 33–35.)

The City argues that Stevenson's attorneys' 2022 billing rates reflect an unjustifiable increase from their 2021 billing rates, on which the court based a fee award in a different case, *Parada v. Anoka Cnty.*, No. 18-cv-795 (JRT/TNL). (Defs.' Opp'n at 33–34) (citing *Parada* [Doc. No. 293 ¶¶ 13–14]). The City contends that here, "the requested jump in fees by as much as $80 per hour" is unwarranted. (*Id.*) Therefore, the City asks the Court to apply the 2021 hourly rates for Plaintiff's counsel, as reflected in *Parada* and the chart above, rather than the 2022 rates. (*Id.*) Also, with respect to the hourly rate of Ms. Mignanelli, the City seeks a lower hourly rate, arguing that she does not appear to have prior experience litigating § 1983 cases. (*Id.*) At the hearing on the instant motion, the City's counsel stated that applying the lower hourly rates would result in a deduction of $118,701.50 from Plaintiff's fee award.

The Court declines to apply lower hourly rates. First, "police misconduct cases are very difficult for plaintiffs to win and require significant trial skill and expertise of lawyers." *King v. Turner*, No. 05-cv-388 (JRT/FLN), 2007 WL 1219308, at *1 (D. Minn. Apr. 24, 2007). Stevenson's most experienced counsel possess such skill and expertise, which is reflected in their hourly rates. They have obtained significant, multi-million dollar awards in civil rights cases on behalf of their clients, (Bennett Decl., Ex. 2 (Attorneys' Bios.)), they are well-regarded by their peers in the legal community, (Hageman Decl. [Doc. No. 88] ¶¶ 3, 6, 9; Fleming Decl. [Doc. No. 89] ¶¶ 13, 15), Mr. Stevenson retained them based on their expertise, (Stevenson Decl. [Doc. No. 91] ¶¶ 6–8), and for purposes of this motion, even the

City recognizes the qualifications of Mr. Bennett, Ms. Bennett, and Mr. Betinsky.  (Defs.' Opp'n at 33.)

Second, for civil rights fee petitioners, the appropriate billing rate to apply is the current hourly rate.  *King*, 2007 WL 1219308, at *2 (basing fee award on Mr. Bennett's then-current hourly rate).  As the Supreme Court has explained, applying current hourly rates is not only "within the contemplation of the statute [§ 1988]," it appropriately adjusts for the delay in payment to counsel, as is frequently the case in civil rights litigation. *Missouri v. Jenkins*, 491 U.S. 274, 283–84 & n.6 (1989).

A fee applicant bears the burden of showing that the requested hourly rates are consistent with those "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984).  Stevenson has met this burden by submitting declarations from local civil rights attorneys Eric Hageman and Terrence Fleming.  These attorneys are familiar with the work of Plaintiffs' counsel and are qualified to opine on reasonable hourly rates for civil rights attorneys and support staff in the local legal community.  (Hageman Decl. ¶¶ 5–6; Fleming Decl. ¶¶ 7, 9.)  Mr. Hageman and Mr. Fleming both attest to the reasonableness of the requested hourly rates for all of Plaintiff's counsel and legal support staff, including those with less experience.  (Hageman Decl. ¶ 10; Fleming Decl. ¶ 14.)  In fact, Mr. Hageman states that in forming his opinion on reasonableness, he did not take into account the fact that Plaintiff's counsel accepted representation on a contingent fee basis.  (Hageman Decl. ¶ 11.)  Even so, he opines that "the hourly rates charged would have been reasonable even if they were charged on a straight hourly basis, not taking into account the risk the firm

10

took on in pursing this case without the assurance of payment unless it was successful in recovery money for the plaintiff." (*Id*.)

Plaintiff also submits the Declaration of Thomas J. Schwartz, Robins Kaplan's Chief Operating Officer and Chief Financial Officer, who states that the hourly billing rates for Plaintiff's counsel are their standard rates and they "align with other attorney Standard Rates with similar years of experience[.]" (Schwartz Decl. [Doc. No. 90] ¶ 8.)

Based on Stevenson's record evidence and the Court's own experience and knowledge of Twin Cities market rates for legal services, the Court finds that the requested hourly rates are reasonable. *Hanig*, 415 F.3d at 825 ("District courts may rely on their own experience and knowledge of prevailing market rates.").

## 2.   **Reasonable Hours Expended**

An attorneys' fee award must be based on hours that were "reasonably expended." *Hensley*, 461 U.S. at 434. "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id*.

Stevenson seeks attorneys' fees totaling $1,653,513.50, consisting of $1,481,258 in pre-settlement fees, and an additional $172,255.50 for fees related to the fee petition. (Pl.'s Mem. at 5.)

In addition to the City's previously noted deduction to account for counsel's hourly rates, the City also asks the Court to further reduce Plaintiff's fee award by $123,008.50 to account for "unreasonable billing entries" based on: (1) excessive hours spent drafting the

Complaint, a deposition outline, and reviewing a GoFundMe fundraising page; (2) redundant attendance at three depositions, a settlement conference, and a non-dispositive motion hearing; (3) unreasonable communications with the referring attorney; (4) unnecessary technology set-up and analysis; (5) non-legal media preparations and communications; (6) non-legal medical subrogation interest; (7) administrative work; (8) vague entries; and (9) overbilling or billing errors.   (Defs.' Opp'n at 7–21.)  Finally, the City seeks a $183,142 deduction in Plaintiff's fee award for "untimely billing entries" based on work performed on the date of the Rule 68 Offer and for subsequent work related to the fee petition.  (*Id*. at 21–33.)  All told, the City seeks to reduce Plaintiff's fee award by $424,852 ($118,701.50 + $123,008.50 + $183,142).

### a.   Excessive Hours

The City argues that Plaintiff's counsel billed an excessive amount of time "for producing an unduly long complaint" that was "virtually identical to a complaint previously filed by counsel" in *Marks v. Bauer*, No. 20-cv-1913 (ADM/JFD).  (*Id*. at 8–9.) Accordingly, the City asks the Court to award only 25 percent of the billed time, totaling $7,165.75.  (*Id*.)  The Court does not find that Plaintiff's counsel's work was unreasonably excessive.  Plaintiffs Stevenson and Marks suffered their injuries on different dates, in different locations, and under different circumstances.  In each case, their attorneys were obliged to tailor the respective complaints to their individual clients.  The two complaints also contain client-specific photographs of the shootings of Mr. Stevenson and Mr. Marks and their subsequent injuries.   Given the nature of the events in question, which require context, the Court does not find that Stevenson's Complaint was "unduly long."  Despite

the City's criticism is this regard, Stevenson's allegations gave the City detailed notice and allowed it to better evaluate the case and any potential defenses.

The City also asks the Court to deduct $22,618.75 for time spent by three of Plaintiff's attorneys in preparing a deposition outline.  (*Id*. at 9–10.)  Given the dates in question, it appears that the attorneys prepared the outline for the October 2021 deposition of Officer McCann, Officer Bauer's supervisor.  (*See* Bennett Decl., Ex. 8 (Invoices).)  As Mr. Bennett explains, Stevenson's legal team engaged in significant preparation "to ensure we obtained testimony sufficient to overcome summary judgment on qualified immunity and to prove Soren's case" and "to establish his liability and that of Severance."[5]  (Bennett Decl. ¶¶ 115, 122.)  Furthermore, Stevenson's counsel considered the McCann deposition "an all-hands-on-deck" event because it was the only deposition scheduled before a November 2, 2021 settlement conference.  (*Id*. ¶ 122.)  Mr. Bennett further states that Stevenson's legal team used the McCann deposition "to lay the groundwork to show we could establish Bauer as [Stevenson's] shooter through the video."  (*Id*.)  Given the importance of McCann's deposition to the substantive issues of liability, qualified

---

[5] Preparation for this deposition also included conducting a hard review of the document productions; conferencing about the findings from the video evidence and key documents; strategizing about the use of key videos and documents at the deposition; creating van and weapons identification diagrams; creating diagrams of the line-up of law enforcement personnel on the front-line at the time Stevenson was shot; creating exhibits; meeting a trial specialist team regarding the conference center set-up and use of deposition equipment; meeting in person to run through the BWC evidence and outlines; and reviewing deposition transcripts of MPD SWAT team members and 40-mm launcher trainers that were then available from other post-George Floyd operational period cases. (Bennett Decl. ¶ 115.)

immunity, and identification of the shooter, as well as its strategic importance in the pretrial schedule, the Court declines to deduct any time for counsel's work in preparing the deposition outline.

The City also asks the Court to reduce Plaintiff's fee award by $2,607.50 for 3.7 hours of time billed for counsel's review, discussion, and email communications concerning Mr. Stevenson's GoFundMe.com webpage. (Defs.' Opp'n at 10–11.) Shortly after Mr. Stevenson was shot in the eye, his family members organized an online fundraiser, seeking contributions to defray Stevenson's medical costs. Elizabeth Heehn, *Police Violence Recovery Fund for Soren*, https://www.gofundme.com/f/police-brutality-surgery-funds-soren-stevenson (last updated June 15, 2020). Accompanying the request was an account of the events prompting the appeal for donations that briefly described Stevenson's conduct at the protest and his subsequent injuries. *Id*. The caption for the page, *Police Violence Recovery Fund for Soren*, assigned blame to the police. *Id*.

The Court will not reduce Stevenson's fee award for counsel's relatively limited time for reviewing, discussing, and communicating about Stevenson's GoFundMe.com page. The written content of the webpage referred to the May 31 protest, the conduct of police officers, and Stevenson's injuries—all of which could be relevant to this lawsuit. Crowdsourced donations such as those solicited on GoFundMe.com are a relatively recent method of fundraising. Consequently, one legal commentator has cautioned that "the legal implications of the money raised [by crowdsourcing] should be a concern to attorneys and their clients." Will Sylianteng, *Crowdfunding Campaigns: Are Your Clients Raising Money for Their Injuries?*, The Legal Intelligencer (Nov. 24, 2021),

https://www.law.com/thelegalintelligencer/2021/11/24/crowdfunding-campaigns-are-your-clients-raising-money-for-their-injuries/?slreturn=20221008104919.     Such online appeals may implicate the collateral source doctrine and potentially affect a plaintiff's financial recovery for personal injury. *Id*. In addition, the accompanying written appeal may contain "lengthy descriptions of the accident or event" and "a running commentary by those checking in on the site or donating," *id*., which could bear on several legal issues such as liability, witness identification and statements, and discovery. As a result, "[w]hile there is not much litigation yet involving crowdfunded campaigns and their effect on litigation pertaining to the underlying circumstance that led to the campaign," attorneys are advised to be aware of the pros and cons of crowdsourcing and to "advise [their] clients accordingly." *Id*. In light of the potential relevance of the information on Mr. Stevenson's GoFundMe.com page to his lawsuit, no deduction is warranted.

### b.      Staffing

The City also asks the Court to reduce Plaintiff's fee award because of "overstaffing" the depositions of MPD Officers McCann and Severance, the deposition of MPD Bike Rapid Response Team Commander Anthony Caspers, a settlement conference, and motion hearings. (Defs.' Opp'n at 12–15.)

At the McCann deposition, while Mr. Bennett was the examining attorney, Ms. Bennett and Mr. Betinsky assisted him. (*Id*. at 12–14.) The City requests that the Court eliminate $4,823 for Mr. Betinsky's attendance at the deposition, and $6,233.50 for Ms. Bennett's attendance. (*Id*. at 13–14.) With respect to the two other depositions, for which

Ms. Bennett was the examining attorney, the City requests that the Court eliminate $5,582.50 (Severance) and $1,325 (Caspers), respectively.   (*Id*. at 14.)

The Court takes no deduction for Plaintiff's staffing at these depositions.  As one court has observed, "[A] court should not hesitate to discount hours if it sees signs that a prevailing party has overstaffed a case," but "[o]n the other hand, . . . [g]iven the complexity of modern litigation, the deployment of multiple attorneys is sometimes an eminently reasonable tactic."  *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 297 (1st Cir. 2001).  The staffing of Stevenson's legal team was reasonable here, given the nature of the case and the particular circumstances.  As local civil rights attorney Mr. Hageman attests in his declaration, "Civil rights actions such as these require large teams of lawyers and paralegals devoting significant time and effort on one case for an extended time period, the retention of expensive experts, and lawyers skilled and experienced in this area." (Hageman Decl. ¶ 13.)  The City downplays the complexity of this case.  (Defs.' Opp'n at 33–34) ("Plaintiff makes much of the notion that this case is of particular complexity.  Not so.").  But if it were as straightforward as the City claims, presumably the City could have identified the shooter itself.  Doing so might have streamlined the staffing complement of Plaintiff's legal team and spared them the need to expend hundreds of hours obtaining, organizing, reviewing, and discussing extensive evidence to establish the shooter's identity. Even if this case did not involve novel legal issues, it certainly presented significant discovery challenges, to say nothing of the general sensitivity of litigating a case against the MPD during a fraught time.

The McCann deposition was a significant deposition through which Stevenson hoped to identify Officer Bauer as the shooter. (Bennett Decl. ¶ 122.) With Mr. Bennett's decades of experience in civil rights litigation, it was reasonable for him to serve as the examining attorney. However, because portions of video evidence would be shown during the deposition, it was likewise reasonable for the attorney most familiar with that evidence, Ms. Bennett, to attend.[6] (*Id*.) She assisted in displaying the evidence and discussing it with Mr. Bennett. (*Id*.) Nor is a deduction warranted for Mr. Betinsky's work. Mr. Betinsky attended the McCann deposition to confer with Mr. Bennett regarding questions to establish liability and qualified immunity—issues central to the case. (*See* Bennett Decl. ¶ 122.)

Likewise, the Court declines to reduce Plaintiff's fee award based on the attendance of non-examining attorneys at the Severance and Caspers depositions, the November 2, 2021 settlement conference (for which the City seeks a $5,724 deduction), and motion hearings (for which the City seeks a $3,508 deduction). (*See* Defs.' Opp'n at 15–16.) The City's failure to follow its report-writing procedures influenced the staffing and time that Stevenson's counsel expended to identify the shooter through video evidence and deposition testimony. (Bennett Decl. ¶¶ 81–83.) In addition, given the manner in which the City produced discovery, it was not unreasonable for multiple attorneys, who had different roles with regard to discovery, to attend proceedings. As another judge in this

---

[6] Moreover, at the hearing on the instant motion, Mr. Bennett stated that due to vision issues, he relies on other team members' familiarity with video evidence.

District noted when reviewing a fee petition, "[T]he extent of the work expended by plaintiffs' attorneys was not conducted in a vacuum. Rather, much of plaintiffs' attorneys' effort was spent responding to defendants' [] attorneys[.]" *See I-Sys., Inc. v. Softwares, Inc.*, No. 02-cv-1951 (JRT/FLN), 2005 WL 1430323, at *12 (D. Minn. Mar. 7, 2005)).

Accordingly, for all of the foregoing reasons, the Court declines to reduce Stevenson's fee award based on "overstaffing."

### c.     Necessity of Work

The City also argues that certain fees should be reduced as unnecessary. First, it asks the Court to eliminate $6,583.50 from Plaintiff's fee award for counsel's time spent communicating with Plaintiff's referring attorney, Ronn Kreps. (Defs.' Opp'n at 16.) The City characterizes such time as non-compensable "business development and origination" work. (*Id.*) The Court declines to reduce Plaintiff's fee award on this basis. As Mr. Bennett explains, Mr. Kreps was more than just the referring attorney—he was a long-time friend of the Stevenson family, with whom he remained in communication. (Bennett Decl. ¶ 36 n.2.) Although Mr. Kreps did not enter an appearance in this lawsuit, it is not unusual for counsel to communicate with referring attorneys about the status of the referred litigation.

Second, the City asks the Court to reduce Plaintiff's fee award by $722.50 for time expended by two Robins Kaplan multimedia support staff in setting up a courtroom for counsel's attendance at a hearing that was convened remotely. (Defs.' Opp'n at 16.) In addition, the City seeks a reduction of $5,035 for time Mr. Betinsky spent on September 27, 2021 strategizing about in-person or remote depositions, as well as technology

considerations relevant to the type of deposition.  (*Id*. at 16–17.)  The Court declines to make the City's requested deductions.  Regardless of location, counsel's attendance at the motions hearing, held remotely, required technical support that counsel would have otherwise performed himself.  Moreover, Mr. Betinsky's consideration of the pros and cons of remote depositions and in-person depositions was reasonable, as personal safety of deposition participants during the COVID-19 pandemic weighed in favor of remote depositions, while the effective use of video evidence and accompanying technology favored in-person depositions.  (*See* Bennett Decl. ¶¶ 111–12.)  Mr. Betinsky's work appears to have informed counsel's decision on September 27 to cancel the Zoom depositions and to hold in-person depositions instead.  (*Id*. ¶ 112.)

### d.    Non-Legal Services

The City also asks the Court to deduct certain amounts from Plaintiff's fee award for work that it characterizes as non-legal.  (Defs.' Opp'n at 17–18.)  First, it requests a deduction of $6,133.50 for work regarding a press conference, media strategy, preparation for "media attention," and conferences with the media.  The Court grants this deduction, having previously observed that "public relations/media work is not compensable and should be deducted from the lodestar," as it is not substantive legal work.  *Ewald v. Royal Norwegian Embassy*, No. 11-cv-2116 (SRN/SER), 2015 WL 1746375, at *11 (D. Minn. 2015); *see also Depuy v. McEwen*, 648 F. Supp. 2d 1007, 1021 (N.D. Ill. 2009) (finding time spent by plaintiffs' attorneys in conducting press conferences in § 1983 class action was not compensable, as conferences were out-of-court activities that did not meaningfully contribute to the litigation).

Second, the City seeks a $1,003 deduction for work related to Plaintiff's medical subrogation interest. (Defs.' Opp'n at 17.) The Court declines to reduce Plaintiff's fee award on this basis. Given Stevenson's injuries, any amounts paid by non-parties for his medical care were relevant to Stevenson's financial recovery in this case.

Third, the City requests a $855 deduction for time counsel spent reviewing a job offer made to Stevenson. (*Id.*) The Court also declines to make this deduction, as Stevenson's acceptance of employment could affect his damages and mitigation of damages.

### e.   Administrative Work

The City argues that fees for certain work performed by Plaintiff's counsel are not recoverable because the work was administrative in nature. (*Id.* at 18.) Specifically, the City contends that counsel's work in organizing the City's discovery production—in particular, the BWC videos—should not have been billed at an attorney's hourly rate. (*Id.*) The City asks the Court to reduce Plaintiff's fee award by $21,359 for such work. (*Id.* at 18–19.)

Tasks that are administrative or purely clerical in nature cannot fairly be accounted for at the billing rates of attorneys. *See Harris v. Chipotle Mexican Grill, Inc.*, Nos. 13-cv-1718 (SRN/SER); 14-cv-4181 (SRN/SER), 2018 WL 617972, at *10 (D. Minn. Jan. 29, 2018) (citing *Rosen v. Wentworth*, 13 F. Supp. 3d 944, 952–53 (D. Minn. 2014)).

However, the Court will not reduce Plaintiff's fee award on this basis. While the City argues that it provided an index for the BWC videos, (Defs.' Opp'n at 18), it is unclear when the City provided an index and whether it provided any meaningful detail. In any

20

event, the City's production of discovery material was not organized in a manner that allowed Plaintiff's counsel to easily ascertain the contents.  (Bennett Decl. ¶¶ 75–78.) Moreover, the City's responses to interrogatories merely "direct[ed] the Plaintiff to [the City's] document production," providing no greater specificity.  (*Id* ¶¶ 79–80.)  Mr. Bennett attests that when Plaintiff's counsel requested that Defendants provide an index of their discovery production, they "were told Defendants would not do so and we should have one of our team members do it instead.  So we did."  (*Id*. ¶ 80.)

Thus, Plaintiff's legal team laboriously compiled indices that helped counsel utilize the produced material and alerted them to missing discovery.  (*Id*. ¶ 92.)  Again, the review of the BWC videos assumed outsized importance because of MPD's failure to document its use of force during the relevant period.  (*Id*. ¶ 81.)  Moreover as noted earlier, portions of key videos were obscured with a "CONFIDENTIAL" stamp which the City required Stevenson to identify before agreeing to produce unobstructed versions of the videos.  (*Id*. ¶¶ 87–88.)   In addition, it appears that in subsequent document productions, the City produced the requested materials in a disorganized fashion, "unlabeled, unindexed, and untethered to any specific request or interrogatory."  (*Id*. ¶¶ 107, 113, 121.)  As a result, Plaintiff's attorneys were forced to repeatedly index and review the newly produced materials, which they did with an eye toward the use of such materials in depositions.  (*Id*. ¶¶ 110, 121.)

The Court finds that Stevenson's attorneys reasonably performed this review and indexing work.  Not only did *the City's counsel* suggest that Stevenson's counsel index the documents, (*id*. ¶ 80), the City's conduct necessitated the work in the first place, given its

disorganized discovery productions.  The indexing work was reasonably performed by Plaintiff's legal team, as they understood the legal ramifications of the evidence and its relation to other evidence, they identified missing discovery, and they organized the material in a way that would be most useful to them in depositions.  This is the type of work reasonably performed by attorneys.

f.      **Vague Entries**

Citing "vagueness," the City also objects to certain billing entries totaling $5,130. (Defs.' Opp'n at 19–20.)  The City contends these billing entries are so indeterminate and vague that it is difficult to determine whether they relate to this case "or they demonstrate cross-billing from another case."  (*Id*. at 19.)

For the most part, when reviewed in context with surrounding billing entries for the same date, it is possible to determine the nature of the "vague" work and whether it pertained to this case.  For instance, while the City objects to an entry for October 27, 2020 that states, "review several issues," when read in context with the surrounding entries from that date billed by Mr. Noel, Ms. Bennett, Mr. Betinsky, and Ms. Koob, to which the City lodges no objection, one can reasonably infer the content of the "several issues" that counsel reviewed.  (Bennett Decl., Ex. 8 at Oct. 27, 2020 entries.)  The City also objects to billing entries for August 9, 2021 and October 28, 2021, in which the timekeeper states "review file" or "file review."   While these entries indeed lack detail, when read in conjunction with the surrounding entries, one can reasonably infer that the file review concerned discovery or was conducted in preparation for an upcoming mediation.  (*See id*. at Aug. 9 (K. Bennett), 11 (K. Bennett, M. Betinsky), & 12 (K. Bennett, R. Bennett), 2021

billing entries.)  As for an August 11, 2020 billing entry that states, "Conference with Andy Noel," Mr. Noel's billing entry for the same date indicates that the conference concerned the Complaint.  (*Id*. at Aug. 11, 2020.)

The City also objects to a January 23, 2022 billing entry that states, "Review Gerlicher outline for depositions; review Gerlicher interview including exhibits."  (Defs.' Opp'n at 20.)  The City observes that former MPD SWAT Commander Scott Gerlicher was not deposed in this matter, but was deposed in the lawsuit filed by Ethan Marks.  (*Id*.)  Consequently, it contends that counsel's billing entry reflects cross-billing between the cases.  (*Id*.)  The Court disagrees.  As surrounding billing entries demonstrate, Stevenson's counsel reviewed the outline and interview notes obtained in the *Marks* case in preparation for the deposition of MPD Bike Rapid Response Team Commander Caspers, in this case.  (Bennett Decl., Ex. 8 at Jan. 22 (K. Bennett) & 24 (R. Bennett, K. Bennett), 2022.)  This case and *Marks* both involved MPD SWAT officers who were deposed in connection with allegations of police brutality allegations against protestors during the same period.  The information from former SWAT Commander Gerlicher's deposition in *Marks* could certainly be relevant to depositions in Stevenson's case, just as the Gerlicher deposition outline could provide a useful template for the line of questioning of Commander Caspers in this case.  Accordingly, the Court denies City's request for deductions on grounds of vagueness as to these billing entries.

However, the Court will grant the City's request for deductions totaling $1,026 for entries that refer to "[a] state court order," (Mar. 15, 2021); the "[r]eview of [a] court order," (Apr. 29, 2021); and "[the] review [of] *Guardian* article" (Aug. 12, 2020).  (Defs.'

Opp'n at 20.)  These entries are vague and the surrounding billing entries fail to provide sufficient context by which to assess reasonableness.

> ### g.    "Billing Errors"

The City further seeks a deduction totaling $3,122.50 for "overbilling" or "billing errors." (*Id*. at 20–21.)  First, it requests a reduction of $1,537 for time billed by Mr. Betinsky on October 18, 2021 for a debriefing following the McCann deposition.  (*Id*.) The City argues that such billing is unsupported because no other billing entries from other attorneys refer to debriefing with Mr. Betinsky.  (*Id*. at 20.)  A closer examination of Stevenson's invoices, however, shows that Mr. Bennett's time entry for the same day states, "Prep for and attend deposition of Ryan McCann, including meeting with clients and [Civil Rights Team] during *and after deposition*."  (Bennett Decl., Ex. 8 at Oct. 18, 2021) (emphasis added).  Such a post-deposition meeting supports Mr. Betinsky's reference to "debriefing," and does not warrant a reduction in Plaintiff's fee award.

Similarly, the City seeks a reduction of $274 for time that Ms. Bennett billed on January 10, 2022, described as, "Conference with [Robert Bennett] re: depositions." (Defs.' Opp'n at 20.)  The City stresses that Ms. Bennett "billed .40 for a meeting about depositions that no other counsel, including Mr. Bennett appeared to participate in." (*Id.*) The Court disagrees.  First, the challenged billing entry refers to a "conference," not a meeting.  Second, and most importantly, only three lines above, on the invoice for the same day, Mr. Bennett billed for a "[p]hone call with K[athryn] Bennett re: deponents." (Bennett Decl., Ex. 8 at Jan. 10, 2022 (R. Bennett).)  Mr. Bennett's reference to the "phone call" fully supports Ms. Bennett's reference to a "conference" about the same subject matter.

Next, the City points to billing entries for July 14, 2020[7] in which Ms. Bennett and Mr. Betinsky attended a particular meeting for .4 hours, "yet Mr. Bennett billed the same meeting as .7 hours, resulting in .3 or $256 in over-billing." (Defs.' Opp'n at 21.) Again, the City fails to read the billing entries in full. The challenged portion of Mr. Bennett's billing entry states, "Telephone conference with Katie Bennett and Marc Betinsky re tactics *and review Washington Post piece on 40 mm misuse* [.7]." (Bennett Decl., Ex. 8 at July 14, 2020 (R. Bennett)) (emphasis added). Mr. Bennett block-billed .7 hours, which included *both* the meeting and the additional task of reviewing a relevant newspaper article—he did not bill .7 hours for the meeting alone.[8] (*Id.*) Accordingly, he did not overbill, and the City's request for a deduction is denied.

Additionally, the City requests a reduction of $1,055 for work performed on an erroneous filing. (Defs.' Opp'n at 21.) The City notes that on July 7, 2021, Mr. Betinsky billed .4 hours, at no charge, to address a filing error in a stipulation that the City claims it did not agree to file. (*Id.*) Mr. Noel billed 1.3 hours, totaling $949, that same day for "deal[ing] with Stip issues." (*Id.*) Subsequently, Mr. Betinsky billed .2 hours on July 15, 2021, which the City describes as overbilled time for fixing the issue. (*Id.*) Because Mr.

---

[7] The City refers to July 14, 202<u>1</u> as the day in question, (Defs.' Opp'n at 21 n.27), but there are no billing entries for that date, whereas the entries for July 14, 2020 align with the City's argument.

[8] "[B]lock billing is the lumping together of daily time entries consisting of two or more task descriptions." *King*, 2007 WL 1219308. While "[i]nadequate documentation may warrant a reduced fee," fees may be awarded based on block-billed time entries. *Nassar v. Jackson*, 779 F.3d 547, 554 (8th Cir. 2015) (finding no abuse of discretion in awarding fees based on block-billed time entries)

25

Noel's July 7 time entry occurred the same day as the filing error, the " Stip issues" appear to be related to the filing error.  As the Court lacks more specific information, it will deduct $949 from Plaintiff's fee award for Mr. Noel's 1.3 hours, consistent with the "no charge" for Mr. Betinsky's time that day.  However, the Court declines to deduct fees for Mr. Betinsky's .2 hours on July 15, for which the time entry denotes "Emails re Sarff's changes to replacement stip."  (Bennett Decl., Ex. 8 at July 15, 2021 (M. Betinsky).)  This work appears to involve edits and input proposed by the City's attorney, unrelated to correcting the July 7 filing error.

        **h.**      **Fees Incurred as of the Rule 68 Offer of Judgment and Thereafter**

Stevenson seeks to recover $183,142 for fees incurred in submitting his fee petition ($172,255.50), sometimes referred to as "fees on fees," and for fees incurred on the date of the Rule 68 Offer of Judgment, February 9, 2022 ($10,886.50).  (Pl.'s Mem. at 30–32; Bennett Decl., Ex. 8.)  Citing the terms of the Offer of Judgment, however, the City contends that Stevenson is not entitled to recover fees for any work performed on the date of the Offer and thereafter.  (Defs.' Opp'n at 21–33.)

In civil rights cases that do not involve a Rule 68 Offer of Judgment, courts have awarded the prevailing plaintiffs fees and costs incurred in preparing the fee petition.  *See, e.g., Hixon v. City of Golden Valley*, No. 06-1548 (RHK/JSM), 2007 WL 4373111, at *1 (D. Minn. Dec. 13, 2007) (awarding plaintiff fees incurred in preparing the initial fee application).

However, this case involves an accepted Rule 68 Offer of Judgment, by which the parties are bound. Settlement agreements are contracts to which ordinary principles of contract interpretation apply. *See Sheng v. Starkey Labs., Inc.*, 53 F.3d 192, 194 (8th Cir. 1995); *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 581-82 (Minn. 2010). The Offer of Judgment, which Stevenson accepted, provides for payment of $2.4 million "plus reasonable attorneys' fees and costs incurred by Plaintiff *prior to the date of this offer*; that is, with the costs *then accrued*." (Bennett Decl., Ex. 3 (Defs.' Offer of J.) at 1) (emphasis added). In other words, the plain terms of the agreement only permit Stevenson to recover fees and costs incurred through February 8, 2022. Courts in the Eighth Circuit, including this District, have found that similar contractual language forecloses a plaintiff from obtaining fees on fees. *Young v. Diversified Consultants, Inc.*, 554 F. Supp. 2d 954, 957 (D. Minn. 2008) (finding plaintiff in FDCPA action not entitled to fees incurred after date of Offer of Judgment, which provided that fees and costs were "limited to time and amounts expended on Plaintiff's claims in this matter through the date of Plaintiff's counsel's receipt of service of this Offer."); *Burton v. Nilkanth Pizza Inc.*, 4:19-CV-00307-BRW, 2022 WL 266670, at *2 (E.D. Ark. Jan. 27, 2022) (denying fee request for fees related to plaintiff's appeal in FLSA case, where Offer of Judgment limited recovery to fees "accrued to date" prior to appeal); *Taylor v. City of Amboy*, No. 14-cv-722 (PJS/TNL), 2017 WL 4075163, at *5 (D. Minn. Sept. 17, 2007) (denying fees incurred after date of Rule 68 Offer of Judgment, which only permitted fees "incurred to date" in data privacy lawsuit).

In his memorandum, Stevenson does not argue that the language of the Rule 68 Offer of Judgment was ambiguous. But even if it were, Rule 68 itself contemplates a

temporal limitation on the recovery of fees and costs, stating, "At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, *with the costs then accrued*." Fed. R. Civ. P. 68(a) (emphasis added). In *Grissom v. Mills Corp.*, 549 F.3d 313, 315 (4th Cir. 2008), the Offer of Judgment expressly stated that it did not cover any attorneys' fees and costs that the plaintiff had incurred, leaving the issue of fees and costs to be resolved by the court in a separate proceeding. While the Offer of Judgment lacked specificity, the Fourth Circuit relied on Rule 68, which, "by its plain and unambiguous terms, provides for entry of judgment in favor of the plaintiff on terms specified in an offer of judgment, plus *pre-offer* costs (here, including attorneys' fees)." *Id.* (emphasis added). Thus, the Fourth Circuit found no entitlement to any fees and costs that had accrued beyond the date of the Rule 68 Offer of Judgment. *Id.*

Under certain circumstances, courts have awarded post-offer fees and costs because of equitable concerns, even while recognizing clear language to the contrary in a Rule 68 Offer of Judgment. For instance, in *Morjal v. City of Chicago*, 774 F.3d 419, 420 (7th Cir. 2014), the court awarded fees incurred after the date of the Rule 68 Offer because the defendants raised frivolous fee-related arguments that necessitated the plaintiff's response. Here, the City has not raised frivolous arguments. In *Rosado v. City of New York*, No. 11 Civ. 4285 (SAS), 2012 WL 955510, at *1 (S.D.N.Y. Mar. 15, 2012), the court awarded fees that post-dated the offer, even though the Offer of Judgment precluded such an award, finding, as a matter of equity, that the plaintiff should receive some amount for the time his counsel spent preparing the fee application. The court reasoned that by not settling the fee

issue through negotiation, the parties were "put on notice" that counsel's time in preparing the fee petition would become a component of the "reasonable attorney's fees."  *Id.*; *see also John v. Demaio*, No. 15-CV-6094, 2016 WL 7469862, at \*1 (E.D.N.Y. Dec. 22, 2016) (holding an award of attorney's fees for preparation of the fee petition was fair, despite clear language to the contrary in the offer, as neither a lack of opportunity for defendants to resolve the fee issue nor an obligation of plaintiffs to negotiate fees precluded an award of post-offer fees in this case).

However, in *Lilly v. City of New York*, 934 F.3d 222, 225 (2d Cir. 2019), a § 1983 excessive force case, the court was unpersuaded by the plaintiff's equitable arguments and declined to award attorney's fees that post-dated the Rule 68 Offer of Judgment.  The plaintiff had accepted an Offer of Judgment for $10,001 and "reasonable attorney's fees, expenses, and costs incurred to the date of the offer."  *Id*.  Denying the award of fees incurred for preparing the fee petition, the Second Circuit stated, "[T]he express terms of the accepted Rule 68 offer of judgment limit the fees recoverable to those incurred 'to the date of the offer.'"  *Id*.  Recognizing that some courts have granted fees on fees as a matter of equity, the Second Circuit found that "as noble as this practice may be, it violates the first principle of contract interpretation: where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms."  *Id*. at 236. The court held if the offer terms were clear, the court must take care not to alter the express terms of the agreement or impose obligations on the parties that the unambiguous terms of the agreement did not mandate.  *Id*. at 235.  The Second Circuit reasoned that if the plaintiff desired fees on fees, the plaintiff could have ensured the settlement terms did not foreclose

the availability of such fees. *Id*. at 238. The Second Circuit found that adherence to the clear language of an offer and denial of an award of post-offer fees did not contradict civil rights public policy. *Id*. at 237.

Here, as in *Lilly*, the Court finds that principles of equity and civil rights policy do not supersede clear contract language. While the Court has the authority and discretion to award reasonable attorneys' fees, the Court is obliged to interpret the Offer of Judgment according to ordinary contract principles. Persuasive authority from the District of Minnesota and other courts, discussed above, makes clear that the contractual language "incurred by Plaintiff prior to the date of this offer" limits post-offer fees and costs. The language of Rule 68, which refers to "the cost then accrued," suggests that costs are limited to post-offer fees and costs as well. Principles of equity do not compel an award of post-offer fees here because the concerns surrounding party behavior that typically motivate such an award are not present in this case. While the parties strongly contested this case, the Court is not persuaded that bad faith was involved in the Rule 68 Offer. (*Compare* Pl.'s Mem. at 32, *with* Defs.' Opp'n at 31–32.) The Court recognizes the importance of vindicating civil rights abuses. But awarding fees on fees solely based on civil rights policy, and in contradiction of the parties' agreed-upon contractual language, does not find strong support among courts that have encountered similar Rule 68 Offers, under similar circumstances. In sum, the clear language in the Offer of Judgment as well as persuasive authority from other courts, including other judges in the District of Minnesota, favors the enforcement of the terms of the Offer of Judgment, even in the context of a civil rights case. Accordingly, the Court reduces Stevenson's award by $183,142.

###### i.    Attorneys' Fees Lodestar and Whether Enhancement or Reduction is Warranted

Applying the deductions noted above results in a revised fee lodestar of $1,462,263, calculated as follows:

| | |
|---|---|
| **Plaintiff's Requested Attorneys' Fees** | **$1,653,513.50** |
| **Deductions** | |
| Media Preparation and Communications | -$6,133.50 |
| Vague Entries | -$1,026.00 |
| Billing Errors | -$949.00 |
| Entries for Day of R. 68 Offer and Fee Pet. | -$183,142.00 |
| **Adjusted Fee Lodestar** | **$1,462,263.00** |

There is a strong presumption that the lodestar is a reasonable fee, and courts may increase the amount only in "rare and exceptional cases." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986). For instance, if the lodestar "does not adequately take into account a factor that may properly be considered in determining a reasonable fee," enhancement may be warranted. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553–54 (2010). The Supreme Court has noted that it may be appropriate to enhance a fee where: (1) the method used in determining the hourly rate in the lodestar calculation does not adequately measure the attorney's true market value; (2) the attorney's performance includes an extraordinary outlay of expenses in exceptionally protracted litigation; or (3) the attorney's performance involves exceptional delay in the payment of fees. *Id.* at 555–56.

Many of the factors noted in *Hensley* are subsumed in the lodestar determination, such that the "novelty [and] complexity of the issues," "the special skill and experience of counsel," the "quality of the representation," and the "results obtained" from the litigation

are typically reflected in the lodestar amount, and "cannot serve as independent bases for increasing the basic fee award." *Del. Valley*, 478 U.S. at 565, 106 (citing *Blum*, 465 U.S. at 898–900).  In addition to these factors, several other factors apply here, including the time and labor involved; the contingent nature of counsel's fee; and the preclusion of employment by the attorneys due to acceptance of the case.  *Hensley*, 461 U.S. at 429–30 n.3 (citation omitted).

Having considered all of these factors, the Court finds that Plaintiff's counsel's hourly rate adequately measures counsel's true market value.  While the Court recognizes that Plaintiff's counsel's fee was contingent, resulting in some delay in the payment of fees, the litigation was not unusually protracted.  Accordingly, the Court finds no reason to enhance or reduce Plaintiff's fee award.  Rather, in calculating the lodestar, the Court has considered the factors noted in *Hensley*, and generally agrees that Plaintiff is entitled to most of his requested attorneys' fees at the attorneys' requested hourly billing rates.

### B.    Reasonable Expenses

Stevenson seeks to recover $31,934.60 in costs.  (Pl.'s Mem. at 5.)  The City's Rule 68 Offer to Stevenson included "reasonable attorneys' fees and costs incurred by Plaintiff prior to the date of this offer; that is, with the costs then accrued."  (Bennett Decl., Ex. 3 (Defs.' Offer of J.) at 1.)   The City objects to portions of Plaintiff's request, arguing that he impermissibly includes items not specifically identified as taxable costs under 28 U.S.C. § 1920, including fees for copies of court submissions in a state court case; a retainer fee; an "explanatory expert" fee; review by experts who were not appointed by the court; parking fees; mediation fees; messenger services; service of process expenses; and copies.

(Defs.' Opp'n at 35–36.)    Calculating these expenses, the City asks for a $20,000.97 deduction in Plaintiff's award of costs.  (*Id*.)

As a general matter, a prevailing party may seek certain taxable costs from its opponent by filing a Bill of Costs pursuant to § 1920.[10]  28 U.S.C. § 1920(1)–(6).  As the City notes, a district court may decline to award costs set forth under § 1920, but may not award costs omitted from the statute.  *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441–42 (1987).

The Supreme Court has observed that under Rule 68, "the term 'costs' refers to all costs awardable *under the statute or other authority that is the basis for the underlying claim.*"  *Marek v. Chesny*, 473 U.S. 1, 9 (1985) (emphasis added).  "Where the underlying statute defines 'costs' to include attorney's fees, therefore, such fees are "costs" for purposes of Rule 68.  *Wilson v. Nomura Sec. Int'l, Inc.*, 361 F.3d 86, 89 (2d Cir. 2004) (citing *Marek*, 473 U.S. at 9).

Under 42 U.S.C. § 1988, a prevailing party in a § 1983 action, such as Stevenson, may be awarded attorney's fees and costs "as part of the costs."  *Marek*, 473 U.S. at 9.

---

[10] Specifically, under § 1920, a judge or clerk of court may tax the following costs: "(1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."  28 U.S.C. § 1920.

Although the City objects to certain invoiced expenses that are not among those specifically listed in § 1920, under § 1988, courts have more broadly awarded costs beyond those listed under § 1920 (or under related bill-of-costs rules) to prevailing plaintiffs if they are out-of-pocket expenses that a law firm would normally bill its client, as opposed to general overhead expenses. *Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005) (finding, in § 1983 case, that although certain travel expenses were not among those listed as taxable appellate costs, "these charges are properly part of a fee award as items reasonably charged by attorneys to their clients."); *Ladd v. Pickering*, 783 F. Supp. 2d 1079, 1096–97 (E.D. Mo. 2011) (finding travel costs recoverable under § 1988 to prevailing plaintiff in civil rights action) (citing *Jenkins v. Kan. City Mo. Sch. Dist.*, 525 F.3d 682, 682 n. 1 (8th Cir.2008) ("travel expenses and other out-of-pocket expenses that a law firm normally would bill to its client are more properly characterized as part of an attorney fee award" under Section 1988 than costs under Section 1920); *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294–95 (8th Cir.1996) (per curiam ) (same)).

The City does not argue that the expenses in question are not of the type typically billed by attorneys to their clients. In fact, Stevenson has presented declarations from Mr. Fleming and Mr. Hageman stating that all of the incurred costs are of the type typically charged by attorneys to their clients. (Fleming Decl. ¶ 17; Hageman Decl. ¶ 13.) The Court has reviewed the requested costs and finds that they were reasonably incurred. *See Williams v. CongAgra Poultry Co.*, 113 F. App'x 725, 728 (8th Cir. 2004) ("travel expenses for attorneys" were properly awardable); *Miller v. Bd. of Regents of Univ. of Minn.*, 402 F. Supp. 3d 568, 597–98 (D. Minn. 2019) (awarding costs for computer research, travel

expenses, and expert fees); *Heydinger*, 2016 WL 5661926, at *28 (approving costs for expert fees, parking, delivery services, certificates of good standing, express mail, and photocopying). Accordingly, the Court awards Plaintiff costs in the amount of $31,934.60.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Attorneys' Fees and Costs [Doc. No. 83] is **GRANTED in part and DENIED in part**.

2. Plaintiff shall recover from Defendant the City of Minneapolis the sum of $1,494,197.60, consisting of $1,462,263 in reasonable attorneys' fees and $31,934.60 in reasonable costs.

3. This Order is temporarily filed under seal in light of sealed declarations and exhibits that are referenced herein. Within seven (7) days of the date of this Order, the parties are **ORDERED** to show cause as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long. To that end, the parties must file (under seal) a joint brief, no longer than five (5) pages, and/or a proposed Redacted Order, if they would like portions to remain under seal.

Dated: November 17, 2022                     s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge